IN THE UNITED STATES DISTRICT COURT
EASTERN DIVISION OF NEW YORK

CARMELA BONSIGNORE, *Acting as Administrator of the Estate of Jesse Bonsignore*,

    Plaintiff,

v.

COUNTY OF SUFFOLK, et al

    Defendants

Case No. 2:22-cv-0295-ENV-AYS

---

## EXPERT DECLARATION AND REPORT OF TIMOTHY LONGO

### I. Education and Qualification

My name is Timothy J. Longo, Sr. and I have been actively involved in police practices and law enforcement since 1981. On May 1, 2016, I retired as the Chief of Police for the City of Charlottesville, Virginia. Presently, I serve as the Associate Vice President for Safety and Security, and the Chief of Police for the University of Virginia.

Prior to my appointment to these positions, I served as an Assistant Professor and Program Director for Public Safety Administration in the School of Continuing and Professional Studies. I continue to serve on the Adjunct Faculty at the University of Virginia, School of Law. In addition to my University responsibilities and experience as an expert witness, I have served as an independent monitor in three matters before the federal courts: United States of America v. City of Cincinnati, et al, United States of America v. City of Cleveland, et al, and United States of America v. Los Angeles County Sheriff's Department.

With respect to the Cincinnati Memorandum of Agreement, I served as the use of force monitor. With respect to the Cleveland Consent Decree, I served as the Director of Implementation and was engaged in examining Use of Force policy and training, Internal Affairs and Force Investigations, and the work of the independent Office of Professional Standards. In Los Angles, my role was narrowly focused on that portion of the Settlement Agreement pertaining to Investigative Stops, Detentions, Searches, and examining the proposed training curriculum surrounding those areas.

Prior to my appointment as the Chief of Police for the City of Charlottesville, in February of 2001, I served with the Baltimore Police Department where I retired as a Police Colonel and the Chief of the Department's Technical Services Bureau. Since my retirement from Baltimore City, I have been heavily engaged in police and law enforcement practices as a private consultant, trainer, and expert witness regarding law enforcement matters.

During my tenure in Baltimore, I matriculated through the ranks of a large municipal agency and ultimately achieved the rank of Colonel over-seeing the Technical Services Bureau. During my almost 19 year tenure with the department, I served in the following capacities; Police Cadet assigned to the Central Records and Internal Investigations Division, Patrol Officer assigned to the Central District, Plain Clothes Police Officer assigned to the Central District Vice Enforcement Unit, Police Agent assigned to the Education and Training Division as the agency's primary law instructor for basic and in-service training, Police Sergeant assigned to the Central District cell-block and later the Command Investigation Section, Police Lieutenant assigned to the Northwestern District, Detective Lieutenant assigned to the Internal Investigations Division/Special Investigations Section, Major/Director assigned to the Communications Division, Major/District Commander assigned to the Southeastern District, Chief of Staff to the Police Commissioner, and Colonel/Chief of Technical Services.

With regard to conducting and overseeing criminal investigations, my training and experience in the following operational and substantive areas of law enforcement uniquely qualify me to render an expert opinion in this regard; patrol officer, drug and vice enforcement officer, police academy instructor, patrol shift commander, internal affairs detective lieutenant, district commander of a patrol district located within a large urban city, and as the Chief of Police of a municipal law enforcement agency.

As a district commander in one of Baltimore's 9 police districts, I was in a position of oversight with regard to routine and complex criminal investigations. As the Chief of Police of a municipal law enforcement agency, I frequently had occasion to oversee both routine and complex criminal investigations, including homicide investigations.

Immediately following my retirement from the Baltimore City Police Department, I served as a consultant and Project Manager for a global strategic management consulting firm, PSComm, LLC, previously located in Rockville, Maryland. During that time my principal responsibilities included managing a project within the District of Columbia Police Department. My responsibilities also included audits of the Denver Police Department's Internal Affairs Division, the Pasadena Police Department's Communications Division, and the District of Columbia Police Department's Communications Division. I resigned my position to accept an appointment as the Chief of Police in Charlottesville, Virginia on February 26, 2001. I served in that capacity until I retired on May 1, 2016. In October of 2019, I returned working in law enforcement to serve as the Associate Vice President (AVP) for Safety and Security for the University of Virginia and the Chief of the University Police Department, which consists of 77 sworn law enforcement officers, 105 Hospital and Grounds Security personnel, and numerous administrative support staff specialists responsible for records management, camera control, budget, purchasing, Quartermaster, and compliance with national accreditation standards. In this capacity I also oversee the Office of Emergency Management for both the academic and health systems, the Office of Threat Assessment, Clery Compliance and Youth Protection, Safety and Security Technology, the Office of Fire Safety, and a central office staff that serves the various offices and divisions.

From approximately 1995 until 2000 I served as an adjunct faculty member at Towson University and instructed undergraduate classes in Police Administration and Conflicts in Policing. In addition to my appointed responsibilities at the University of Virginia, I have served as a guest lecturer at the University of Virginia, Darden School of Business, the Sorensen Institute for Political Leadership, and the Batten School for Public Policy and Leadership From 2016 to 2019, I was an assistant professor and the program director for public Safety at the University of Virginia School of Continuing and Professional Studies. From 2016 through the present, I have served as an adjunct professor/lecturer at the University of Virginia's School of Law.

Additionally, I have served on the adjunct faculty of the Institute for Law Enforcement Administration at the Center for American and International Law in Plano, Texas for approximately 32 years, and also the Center for the Constitution at Montpelier, the home of James Madison, where I taught for 8 years.

I am the co-author of the Virginia Search and Seizure Manual for Law Enforcement Officers, 5th Edition, published by the Lexis-Nexis Company, and I am the sole author of the 6th and 7th editions.

In addition to my practical law enforcement experience and legal education, I have instructed courses in Substantive and Procedural Criminal Law, Police Ethics, Internal Affairs, Constitutional Law, and the liabilities in Law Enforcement Operations.

My education includes a Bachelor of Science Degree from Towson University in Baltimore, Maryland, and a Juris Doctor Degree from the University of Baltimore, School of Law. I am currently a member in good standing of the Maryland Bar.

## II.  Introduction

I was retained by Plaintiffs' counsel in this matter to review testimony, reports, investigative material and other documents, and to render an opinion as to the Defendants' conduct regarding the shooting death of Jesse Bonsignore by Officer James Skidmore, who at the time of this incident was serving as a duly sworn police officer for the Suffolk County Police Department.

A list identifying all the material Plaintiffs' counsel provided to me is attached as an exhibit to my report.

Based on my review of the materials, coupled with my specialized training, education, and experience in the field of law enforcement, I have formed my opinion to a reasonable degree of professional certainty that Defendant Skidmore's conduct with respect to the shooting death of Jesse Mr. Bonsignore's was contrary to generally accepted law enforcement practices in place at the time of his death.

All of my opinions are rendered to a reasonable degree of professional certainty in the field of police practices, law enforcement training, administration and discipline based upon my education, training and employment as a law enforcement officer, as well as my work as an educator, law enforcement trainer, court-appointed monitor for monitoring law enforcement agencies, and my experience as a consultant in the field.

The opinions that I have rendered here are based upon the material provided to me regarding the Defendants conduct, my formal education, specialized law enforcement experience, training and knowledge of generally accepted standards and practices in the field, as well as my continued work within the field of police practices, and my work with other law enforcement agencies and municipalities around the country.

I also recognize that additional documentation may be provided to me. I welcome the opportunity to review additional relevant material as the case proceeds. In the event additional material is provided to me, I will be prepared to supplement my report.

### III.  Methodology

The opinions in this report have been formulated to a reasonable degree of professional certainty in the field of law enforcement. I base these opinions on my specialized education, training, and vast experience as a police officer, supervisor, investigator, field commander, district commander, bureau chief, chief executive officer, trainer, court appointed monitor, and recognized police practices expert.

The method that I used in reaching my conclusions included a review of materials provided by Plaintiffs' counsel vetted against what I have come to know through my years of specialized education, training, and experience as generally accepted practices in the field of law enforcement. These practices have their origin in our Constitution which establishes the basis from which police policy, practices, and procedures derive. These standards have also been established in model policies promulgated by professional organizations such as the International Association of Chiefs of Police (IACP) and the Commission on Accreditation for Law Enforcement (CALEA). These practices have also been consistently reinforced by research-based organizations such as the Police Executive Resource Forum. Lastly, these practices have been vetted through our courts as evidenced by innumerable United States Supreme Court decisions, some of which are cited within this report. I mention these important court decisions not to invade the province of the fact finder, but because these decisions provide the guiding principles on which law enforcement policy and practices are based.

There is a large body of knowledge and literature about the practices and standards that modern, reasonably managed and administered police agencies across the U.S. should follow and apply to its operations. These generally accepted practices have developed over time to encourage and assist police agencies to deliver police services to communities that are serviced which are professional, reasonable, effective and legal. Many of these generally accepted practices have been developed from law enforcement critical analysis of field incidents and examinations of incidents reported to cause police liability, deficiencies and employee misconduct. These generally accepted practices have been a response to reported cases of police misconduct and liability and a desire by law enforcement to create a system to ensure that police conduct remains within acceptable legal and constitutional bounds. I am familiar with this body of knowledge and through my continuous training and audits assist law enforcement with this requirement for reasonable and legal police response to field incidents and for constant improvement.

My examination of the factors involved in this police practices incident embodies the basic fundamentals which I employ in my professional examination of police agencies during my audits and when working as an independent monitor. My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and supervision.

The terminology I use in my Expert Report is not meant to invade the purview of the court or the final jury determination. I use these terms in my training of police supervisors, managers and command officers when instructing on administrative investigations and civil liability. These are products of my continuous review of case law which should guide a reasonable police agency in supervising its employees. These terms have become common terms within law enforcement supervision, management and risk management; just as the terms of probable cause, reasonable suspicion and the prima facie elements of crimes have become common terminology for police field personnel and detectives.

At the outset it is important to note that this report is based upon the facts as presented by the materials provided and specifically avoids drawing conclusions based upon credibility issues of the parties. The assessment as to the credibility of the witnesses falls squarely within the purview of the factfinder and is beyond the scope of my expert opinion.

## IV. Background of the Shooting Death of Jesse Bonsignore

### A. Officer Skidmore's Initial Contact with Mr. Bonsignore

On the evening of May 20, 2021, at approximately 10:15 P.M., the resident of 67 Bauer Avenue in Manorville, Suffolk County, New York was driving to his home when he noticed a vehicle parked in the grass across from his house. Upon initial observation, there appeared to be no one inside the vehicle.

The resident later told investigators that at some point shortly thereafter they had occasion to be walking their dog and passed by the vehicle again. At that point in time, they saw a man lying down in the backseat. They returned home and called 911.[1] That call is reported to have been received at the primary public safety answering point at 10:44 P.M.[2]

At 10:46 P.M., a call for service was dispatched indicating a *"person lying in the backseat"*, and that *"someone was hiding in the backseat."*[3] Having not listened to the resident's call to 911, it is unclear to me how the call taker or dispatcher came to the conclusion that the person who was lying in the back seat of a parked vehicle, conspicuously parked on the side of the road, was *"hiding"*. It's also unclear to me what influence such information may have had on the responding officer's preparations and subsequent decision making as he formulated his plan as to how he would respond and otherwise address this non-emergent call for service.

---

[1] *See, Report in the Investigation into the Death of Jesse Consignor,* Office of the Attorney General of New York, Office of Special Investigations, at page 4.
[2] *Id.*
[3] *Id.*

The discovery materials provided for my review do not reveal any information that the occupant of the car was engaged in any illegal activity, was armed, or posed a danger to themselves or others.

At 10:49 P.M., Officer James Skidmore, a duly sworn member of the Suffolk County Police Department, arrived on the scene in uniform and driving a marked patrol vehicle.

When deposed by Plaintiff's counsel, Officer Skidmore testified that he recalled responding to a 911 call that was related to an abandoned and parked car with someone sleeping inside.[4] He further testified that he didn't know whether there were any signs in place that would have prohibited the vehicle from being parked at that location.[5] Nor, did the officer have information that would cause him to believe that the subject inside the vehicle was engaged in any criminal activity.[6] Moreover, when he ran the vehicle license plate, the dispatcher did not provide him with any information that would cause him to be alarmed.[7]

According to Officer Skidmore, when Mr. Bonsignore awoke, he was screaming in a manner that the officer described as *"unintelligible"*.[8] It was at this point that Officer Skidmore could tell something was wrong with the man and requested back-up.[9]

Throughout Officer Skidmore's continued interaction with Mr. Bonsignore, from the point that he requested back-up until the time Mr. Bonsignore was shot, there is no indication that the officer sought to determine the response time for assistance; nor did he provide any information updating responders as to the urgency of the situation at hand.[10] He was aware, however, that Officer Scott Jensen was coming his way.[11]

In his deposition, Officer Skidmore describes Mr. Bonsignore's behavior as *"screaming incoherently"*, *"mumbling"*, and *"attempting to exit the vehicle"*. [12] He could discern that something was wrong with Mr. Bonsignore, [13] yet he never communicated that to responding units.

---

[4] *See*, Skidmore Deposition at page 83.
[5] *Id.* at page 88.
[6] *Id.* at page 91.
[7] *Id.*
[8] *Id.* at page 107.
[9] *Id.* at page 108. Also, *see*, page 126.
[10] *See, Id.* at page 133. Officer Skidmore stated that knew that unit 712 was close, yet surprisingly he never mentioned that something was wrong despite Mr. Bonsignore's purported escalating behavior.
[11] *Id.* at page 109.
[12] *Id.* at pages 120-125.
[13] *Id.* at page 126.

Officer Skidmore testified in his deposition that he couldn't be certain who opened the car door, but that Mr. Bonsignore was attempting to get out of the car.[14] He also indicated that he saw no reason to prevent him (Bonsignore) from doing so and saw this as a *"gray"* area for law enforcement.[15]

According to Officer Skidmore, when Mr. Bonsignore stood up and got out of the car, he (Bonsignore) was immediately turned around and instructed to place his hands on the car. He obeyed those directions without resistance.[16]

Despite having given these directives, Officer Skidmore's belief was that Mr. Bonsignore was free to leave, and thus, was not in custody.[17] I find this to contradict the officer's actions as he took intentional steps to acquire Mr. Bonsignore's person and control his movement. In my experience and through my professional training, that constitutes a seizure of Mr. Bonsignore's person.

There came a point in time that Officer Skidmore's characterization of Mr. Bonsignore's custody status changed when he (Bonsignore) pronounced that he *"knows his rights"*.[18]

*"So now, I have somebody who is obviously, in my eyes, does not like authority, he feels he's in trouble in some way shape or form or feels like he's done something wrong. So, for his protection and mine I am going to attempt to try to place him in cuffs."*[19]

Officer Skidmore based his decision to attempt to handcuff Mr. Bonsignore on *"his erratic behavior"*, yet it is unclear to me how his behavior changed aside from the assertion that he challenged the officer's authority and declared that he knew his rights.

According to Officer Skidmore, Mr. Bonsignore said that he was going to kill the officer, grabbed him, and threw him to the ground.[20] While the two were on the ground, there were no apparent attempts for Officer Skidmore to disengage, use less lethal force, create distance, or wait for back-up.[21] In my opinion, any one of these actions would have been appropriate under the circumstances and conformed to generally accepted law enforcement practices.

There came a point in time after the two men went to the ground where Officer Skidmore was on top of Mr. Bonsignore who was purportedly on his back.

According to Officer Skidmore, he was *"fighting for his life"*.[22]

---

[14] *Id.* at page 125.

[15] *See,* Pennsylvania v. Mimms, 434 U.S. 106 (1977), *and* Maryland v. Wilson, 519 U.S. 408 (1997). In my experience these cases provide sufficient guidance to law enforcement officers as to how they may control operators and occupants of motor vehicles during these types of encounters.

[16] *See,* Skidmore Deposition at page 137.

[17] *Id.* at page 137-138.

[18] *Id.* at page 140.

[19] *Id.* at page 141.

[20] *Id.* at page 158-167.

[21] *Id.* at page 168.

[22] *Id.* at page 169.

In his sworn deposition, Officer Skidmore testified, *"I don't recall exactly; I know we were fighting over my weapon. I was able to pull my weapon out, he then grabbed my wrist. I pulled back, fired, fired, and assessed the threat, no need to fire again."*[23]

According to Officer Skidmore, he told the first responding officer, Scott Jensen, that Mr. Bonsignore was going for the officer's gun.

*"He grabbed my holster and was pulling on it."*[24]

Despite the officer's assertion, I have not reviewed any physical, photographic, or forensic evidence that confirms that Mr. Bonsignore had any contact whatsoever with Officer Skidmore's firearm while it was holstered. Moreover, because there is no independent evidence that confirms Mr. Bonsignore's attempts to disarm the officer or otherwise engage with his firearm once it was consciously and deliberately un-holstered by Officer Skidmore, the determination as to the credibility of that account remains within the province of the court. Unfortunately, the officer had neither a body worn camera, nor a dash camera. Both would have proven invaluable in an analysis of this event.

Officer Skidmore's lieutenant, Thomas Gozaloff provided deposition testimony that described a two-step process that must be achieved to draw a weapon from an officer's holster, and to the best of his knowledge all of the officers have the same holster.[25] In my experience this level of retention provides additional safety for the officer and absent some specialized knowledge on the part of someone who may be attempting to defeat these retention measures, the officer's weapon would remain secure.

Because of Officer Skidmore's actions, Jesse Bonsignore died at the scene. An autopsy was performed by the Office of the Chief Medical Examiner, and a report was prepared by Dr. Odette R. Hall, MD, signed on January 22, 2022. Dr. Hall's report revealed that Mr. Bonsignore suffered a gunshot wound to the right supraclavicular neck with a wound track through the right lung, cervicothoracic vertebra, and rib cage; a gunshot wound to the left lower chest with a wound track through the rib cage, left lung, heart, and liver; and blunt force trauma to the head, torso, and extremities. His cause of death was gunshot wounds of the torso, and the manner was determined to be homicide.

An investigation into Mr. Bonsignore's death was conducted by the Office of Special Investigations, Office of the Attorney General for the State of New York. No criminal charges were sought as a result of Officer Skidmore's actions as the investigation determined that there was not proof beyond a reasonable doubt that the officer's use of force was not justified under New York law. I am unaware of any investigation done or report prepared by the Internal Affairs Bureau as neither Officer Skidmore nor Lieutenant Gozaloff were formally interviewed regarding the incident.[26]

---

[23] *Id.* at page 176.

[24] *Id.* at page 185.

[25] Thomas Gozaloff Deposition at page 44.

[26] *See,* Skidmore Deposition at pages 118-199, and Gozaloff Deposition at page 58.

## VI. Analysis and Opinion

### A. The use of deadly force against Jesse Bonsignore was pre-mature, unreasonable, unnecessary, and not proportional to any threat he may have posed at the moment in time in which that force was used and, thus, was contrary to generally accepted law enforcement practices.

When arriving at my opinion as to the use of deadly force against Jesse Bonsignore, there are several factors that I believe are relevant to my analysis and Officer Skidmore's actions: (1) At the time of Officer Skidmore's response to the call for service that brought the two together, he had no reason to believe that Mr. Bonsignore was engaged in any criminal behavior. Nor, did the officer have reason to believe that Mr. Bonsignore posed a danger to himself or others; (2) Upon engaging with Mr. Bonsignore, Officer Skidmore discerned that he was a person in crisis; (3) Officer Skidmore made a conscious and deliberate decision to not disengage from Mr. Bonsignore and await back-up; (4) Mr. Bonsignore never presented a weapon in association with his threats. While the officer testified seeing a knife and one was recovered from Mr. Bonsignore's person, it was never removed or otherwise presented in a threatening manner; (5) I have not reviewed any physical, photographic, or forensic evidence that supports Officer Skidmore's assertion that Mr. Bonsignore attempted to retrieve the officer's weapon, and given the officer's retention holster I am uncertain that he would have had the ability to do so; (6) I have not reviewed any evidence that indicated that Officer Skidmore considered the use and application of less-lethal force despite having access to an electronic control weapon; and (7) Officer Skidmore consciously and deliberately drew his firearm in a close quarter situation having not been presented with a circumstance that necessitated deadly force and thus exposed the weapon to a person in crisis which I believe escalated a situation that could have otherwise been mitigated.

Having served as a law enforcement officer for more than 40 years, I can attest to the fact that generally accepted law enforcement practices require that officers receive rigorous training about the constitutional principles pertaining to their interactions with the citizens they serve, and particularly when those interactions result in the decision to use force. Departmental training curriculum, policies, and law enforcement practices are largely premised on these important guiding principles. It has been my experience that law enforcement officers are specifically instructed about how and when to use force, even deadly force, when it is necessary and objectively reasonable to do so.

Throughout my career, I have had the opportunity to participate in the process of preparing law enforcement officers for many critical responsibilities. Among those responsibilities are decisions pertaining to the use of deadly force. The United States Supreme Court has provided specific guidance for law enforcement officers regarding the application of deadly force. All uses of deadly force must be objectively reasonable based upon the totality of the circumstances. Objective reasonableness is satisfied where a suspect poses an imminent threat of serious bodily harm or death to the officer or others; or, when an officer has probable cause to believe that a

suspect has committed a violent felony involving the infliction or threatened infliction of serious bodily harm or death and by his or her escape poses a danger of serious bodily harm to others.[27]

Based on my training and experience, I have come to believe that officers must take into consideration the necessity to use force under a given set of circumstances and must balance the proportionality of such force against the level of resistance confronting the officer at the time.

In the last several years, officers have also been trained to take into consideration various ways in which to de-escalate encounters with the public or otherwise diminish the likelihood of having to use force, particularly deadly force. Such considerations may include, but may not be limited to, waiting for additional resources, giving strong verbal commands, taking a position of cover, and waiting out a potential threat when it is safe and feasible to do so. I believe these factors are especially important to consider in the context of this case, and Officer Skidmore's interaction with Mr. Bonsignore that resulted in the tragic death of a person in crisis.

I believe that Officer Skidmore's use of deadly force was premature, unnecessary, unreasonable, and contrary to generally accepted law enforcement practice. Mr. Bonsignore did not commit any crimes and was a person in crisis. In my opinion, Officer Skidmore escalated the situation in which he was presented, failed to disengage, await back-up, consider less lethal options, and consciously and deliberately presented a firearm in close quarters which resulted in its use ending Jesse Bonsignore's life.

### B. Officer Skidmore Disregarded Generally Accepted Law Enforcement Practice in Dealing with a Person in Crisis.

In my training of law enforcement officers around the country, I have taught that knowledge of a subject's mental capacity and emotional state should be considered when evaluating the totality of factors used in an officer's decision to use deadly force.[28]

Officers must recognize and take into account mental illness or emotional disturbance known to them at the time of their encounter with a person in crisis, and alter their tactics where they can safely do so.[29]

Indeed, dealing with individuals such as Jesse Bonsignore carries the potential for violence. Responding to interactions such as this requires specialized law enforcement skills and abilities that were either forgotten, or consciously abandoned, on the evening of Jesse Bonsignore's death. Knowing that a subject is mentally ill, emotionally disturbed, or simply in crisis is important information to consider when evaluating readily available alternatives such as the ability to disengage, take cover, resort to less lethal means, and await additional help. Depending on the severity and immediacy of a threat or any potential risk to the public that may come about because of an officer's delayed response, it is sometimes appropriate for an officer to retreat or wait for

---

[27] See, *Tennessee v. Garner,* 475 U.S. 1 (1985).

[28] See, Gaddis v. Redford Township, and City of Dearborn Heights, 364 F.3D 763 (6th Cir. 2004). Also, see, Palma, et al v. Johns, No. 21-3315 (6th Cir. 2021).

[29] See, https://www.llrmi/artciles/legalupdate/uof_mentallyill#~text=In Gaddis v involving an emotionally disturbed person.

additional resources when encountering someone in crisis.

In my opinion, Officer Skidmore failed to consider his various options once he recognized that Mr. Bonsignore was in crisis. It's important to note that Mr. Bonsignore had committed no crime, and had not yet made any threats of violence against the officer when the officer first engaged. Even after making verbal threats, Mr. Bonsignore posed no imminent threat to Officer Skidmore that necessitated closing in and taking intentional steps to go hands on with someone who was clearly in crisis.

Once the two went to the ground, presuming a struggle ensued, it was reckless in my opinion to draw a firearm in such close quarters and risk even further escalation. Officer Skidmore retained the option of disengaging and placing distance between the two, or resorting to the less lethal force that he had at his disposal. Notwithstanding the fact that he had not duty to retreat, it would be consisted with generally accepted law enforcement practice to do so when dealing with a person in crisis.

The concept of dealing with a person in crisis during a law enforcement encounter has been a topic of instruction in law enforcement training for decades. In addition to being trained on all uses of force and the legal principles underpinning such high risk and critical tasks, law enforcement officers in America have been trained to discern when a person is in crisis and the steps that can be taken to slow down an encounter and mitigate an escalation that may result in the need to use force, especially deadly force. This important process has been known to law enforcement officers, supervisors, trainers, and policy makers for more than four decades.

In the mid 1980's Gerald Murphy authored a report on behalf of the Police Executive Research Forum that detailed a recommended training program to equip officers in dealing with persons who are emotionally disturbed or in crisis. This important advancement which began with Murphy's report provides the framework for how law enforcement officers have begun to deal with persons like Mr. Bonsignore who are emotionally disturbed, mentally ill or in crisis. It serves as the basis for law enforcement training programs around the country, and provided the underpinning for the principles that were discounted on the evening of Mr. Bonsignore's untimely death.

Decades ago, the Memphis Police Department created the Crisis Intervention Team (CIT) concept. Since that time this concept has become a "best practice" for law enforcement agencies across the Nation. Crisis Intervention Training consists of a 40-hour training program and is a blend of professionals involved with the mentally ill community and police experts that teach verbalization, confrontational diffusing techniques, and subject control and restraint techniques. It has been my professional experience that this training has much application in the day-to-day operation of a police agency, and the skills it provides are used by officers regularly when assisting a growing population of persons who, like Mr. Bonsignore, suffer from mental illness or experience crisis in their lives.

The policies and training that have come about over the last several decades have the goal of providing for safe interactions between law enforcement officers and those they may encounter in crisis. Those efforts have been complimented by the work of law enforcement professionals around the country. In my experience as both a trainer and practice expert, I have trained thousands of law enforcement officers nationally, and have spoken directly to CIT principles and their direct application to the role of law enforcement.

More specifically, I have spoken to the value of CIT training in minimizing use of force incidents through adherence to those principles and a deep respect and value for the sanctity of human life. I have repeatedly emphasized the importance of applying these principles to reduce the likelihood of force and improve the outcomes of crisis situations.

When it comes to the use of deadly force, law enforcement officers around the nation are specifically taught about the sanctity of human life in the application of deadly force and deadly force decision making. Embodied within this important principle is the framework of crisis intervention and the factors of planning, coordination, time, distance, and resources. Officers who are properly trained in Crisis Intervention are taught to identify persons in crisis and use basic de-escalation skills to gain control of a situation, maintain a safe environment for the person in crisis and the involved officer(s), and decide as to the need for further mental health evaluation or the voluntary seeking of mental health services.

Considering when established and time-honored crisis intervention principles, I am of the opinion that Officer Skidmore failed in adhere to these principles and missed a critical opportunity to safely resolve this incident and avoid a tragic death. Rather than create space between him and Mr. Bonsignore at the moment in time that he recognized him to be in crisis, begin verbal de-escalation, and await for additional resources he continued to advance his physical control over Mr. Bonsignore's person by going hands on and escalating the engagement into a deadly force encounter that, in my experience, may have been avoided.

In 1998, the International Association of Chiefs of Police established a model policy for dealing with the mentally ill, emotionally disturbed, and persons in crisis. It has been readily available to law enforcement officers across America.[30] This policy speaks to the importance of taking steps to calm a crisis, assuming a quiet and non-threatening manner when approaching or otherwise conversing with the individual in crisis, and where violence and destructive acts have not occurred, avoiding physical contact, and taking the time to properly and thoroughly assess a given situation.

It has been my experience that when law enforcement officers are summoned under circumstances such as this it is important to consider what they may have learned and observed about a given situation before they have even engaged with the subject of their call or the person who summoned their assistance. In this case, there was no evidence whatsoever that Mr. Bonsignore had committed or threatened to commit any acts of violence prior to or throughout his initial contact with Officer Skidmore. At the point that Officer Skidmore perceived a crisis situation, a prudent officer who was knowledgeable of crisis intervention techniques would have disengaged, created distance, and awaited additional resources.

---

[30] IACP Model Policy, Effective April, 1997.

Over the course of my career, I have come to realize that there are some basic principles that law enforcement officers should consider when dealing with persons in crisis; principles that involve coordination, containment, communication, and time. Proper coordination requires careful consideration as to the appropriate resources and equipment that may be needed to safely resolve a situation. Proper coordination also includes determining specifically who will be performing what aspects of the operation or task, developing a safe perimeter to minimize outside interference or distraction, determining who will be the lead person who will deal with the subject, and ensuring that the officers at the scene conduct themselves in manner that will not agitate or otherwise excite the person who is in crisis. Moreover, I have learned that it is important that while engaging a person who is emotionally disturbed or in crisis that the person and the immediate area around them be contained until the situation is safely resolved. This oftentimes requires that responding officers recognize and respect the individual's "comfort zone" and not take actions that may unnecessarily agitate the person or escalate what may already by a volatile situation. Rather than retreat and create a safe space, Officer Skidmore continued to advance in his engagement with Mr. Bonsignore alone and without the benefit of additional resources which were on their way to assist.

How an officer responding to a person in crisis communicates with the individual is critical in ensuring that a situation does not escalate. Communication should be non-threatening, and should not include sharp, authoritative commands. I believe that officers must constantly analyze what impact, if any, their actions are having on the subject and adjust their behaviors accordingly without placing themselves or others at risk of harm. Once again, the immediacy Officer Skidmore's actions in the absence of better coordination escalated his strategy to a series of actions that Mr. Bonsignore may or may not have reasonably comprehended given his crisis state.

In February 2012, the Police Executive Research Forum hosted a forum to address the de-escalation and minimization of Use of Force. Among their recommendations were factors such as "slowing the situation down" and getting a supervisor on the scene to reduce the chance of violence; using a Crisis Intervention Team approach to deal with persons more effectively in crisis; training officers in "tactical disengagement"; and the importance of training officers in these encounters and practicing strategies to de-escalate volatile situations.[31]

In my experience, the longer a situation is allowed to unfold the better the chance of a successful and safe resolution. The passage of time may allow the subject in crisis to reflect on his or her circumstances. Moreover, it also allows for the deployment of additional police resources that may be needed to resolve an otherwise tense and uncertain scenario safely, peacefully, and efficiently. Lastly, it encourages the ability to communicate and creates a relationship between the lead officer and the subject aimed at a safe resolution for all parties.

I believe that the urgency in which Officer Skidmore acted evidence his failure to have utilized the safe and viable alternatives that were at his disposal, and enhanced the foreseeable likelihood that the situation would escalate and that force would result.

---

[31] Police Executive Research Forum, *Critical Issues in Policing Series: An Integrated Approach to De-Escalation and Minimizing Use of Force,* 2012.

### C. The County of Suffolk was On-notice of the Importance of Properly Training Suffolk County Police Officers in Dealing with Persons in Crisis.

Officers are often presented with multiple choices when seeking to safely resolve a situation in which they are confronted. Unfortunately, as in this case, making the wrong choice will frequently result in an unnecessary use of force and exacerbate an already tense and uncertain situation resulting in harm to a person in crisis. Adhering to the specific training and guidelines provided with respect to dealing with people in crisis will ultimately assist them in making the correct choices and lead to a safer outcome for everyone involved. The concept of Crisis Intervention and the need to train police officers in this important concept was not unknown to the County of Suffolk and its Police Department at the time of Mr. Bonsignore's tragic death.

In March of 2021, County Executive Steve Bellone, released a report entitled *"Police Reform and Reinvention: Task Force Final Report, In Accordance with New York State Executive Order 203"*. The Executive Order cited required localities with police departments to evaluate *"current police force deployments, strategies, policies, procedures, and practices, and develop a plan to improve such deployments, strategies, policies, procedures and practices, for the purpose of addressing the particular needs of the communities served by such police agency and promote community engagement to foster trust, fairness, and legitimacy.."*[32]

Two topics arose within the context of the report that I believe has relevance to this matter; the police us of force and dealing with persons in crisis.

With regard to use of force, the Task Force recommended the adoption of a use of force decision making model advanced by the Police Executive Research Forum:

*"The Department will enhance de-escalation training by incorporating the Police Executive Research Forum's (PERF) Integrating Communications, Assessment, & Tactics (ICAT) De-Escalation component. The ICAT training is designed to enhance both officer safety and the safety of the individuals they encounter, by relying on tactics and skills to de-escalate potentially volatile officer-citizen interactions. ICAT will improve the Department's current curriculum as follows: By training officers in a wider array of options to handle and "slow down" these situations, officers may have beer alternatives to the use of deadly force and potentially avoid the use of force altogether. Training is designed for patrol officers responding to circumstances where a person is behaving erratically and is either unarmed or armed with anything less than a firearm. It is these types of encounters, PERF contends, that have received the most criticism on police training and use of force. The ICAT curriculum is an integration of crisis recognition and intervention, communication skills, and operational tactics."*[33]

I believe that the PERF model touches on an important aspect of de-escalation that was seemingly ignored by Officer Skidmore during his encounter with Jesse Bonsignore; that is, the need to slow down a situation before it is escalated to force. And while it appears that the Defendant County committed to this process as evidenced by the Task Force Report, it appears to have been discounted by Officer Skidmore and those who evaluated his actions. Moreover, I

---

[32] Task Force Report at page 6.
[33] *Id.*

have reviewed no training materials that demonstrates that Officer Skidmore was exposed to this training. Nor was this particular aspect of training articulated by Officer Skidmore or Lieutenant Gozaloff in their sworn depositions.

Further, from what I can discern by reviewing their report the AG's investigation into this matter appears to have discounted any relevance to this important issue; that is, whether Officer Skidmore took any steps to de-escalate and follow the model espoused by PERF and Crisis Intervention Training. Rather, the AG focused on whether the officer's actions violated the state's criminal statutes. In my experience, that is not unusual. The mistake that is made is when the agency relies upon and, thus, adopts the conclusions reached by such bodies. In doing so they miss the opportunity to identify and address issues that relate to training, supervision, investigations, and the agency's overall response to the incident.

In this case, the administrative review may never have fully developed as is evidenced by the fact that neither Officer Skidmore nor Lieutenant Gozaloff was never interviewed by the police department's Internal Affairs element.[34] In my opinion, the absence of such a review is contrary to generally accepted law enforcement practices.

Another aspect of the Task Force report that bares relevance on the instant matter, is something that is referred to as *"Policies of 8 Can't Wait"*. According to the report, many of these endeavors have presumably been in place for some time: prohibiting choke holds (adopted, 5/1/89), requiring de-escalation (adopted, 6/6/92), requiring a warning before shooting (adopted, 5/1/89), requirement that all options be exhausted before shooting someone (6/6/92), requiring a duty to intervene when the Constitutional rights of another are being violated (6/6/92), the prohibition of shooting at moving vehicles (4/1/16), the adoption of a use of force continuum (adopted, 6/6/92), and a requirement that all uses of force be reported (6/6/92).[35]

In preparation of my report, I discovered a slide deck entitled, *"Police Reform and Reinvention Collaborative"*, County of Suffolk Police, Geraldine Hart, Police Commissioner. Highlighted within this presentation is the topic of mental health and the police response to persons in crisis. In 2020, the Suffolk Police Department responded to some 4,227 reports of persons in crisis, and some 5,500 the year before. Clearly, the Defendant County and police department was on notice of the foreseeable risks presented when officers are not properly equipped to deal with persons who are in their most vulnerable state. In fact, they noted, *"If these situations go sideways the result will likely be significant scrutiny. 'Should your agency have been able to identify an issue with the individual earlier? Was your agency's actions in previous encounters appropriate?'"*

In May of 2021, the Suffolk Police Department adopted two important polices that are relevant to this matter and to my analysis; Policy 409 is entitled Crisis Investigation Incident, and Policy 300 deals with Use of Force.

---

[34] Skidmore Deposition at page 119.
[35] Task Force Report

Policy 409 acknowledges what is clearly evident in this case and countless others that I have been exposed to throughout my law enforcement career, that is, that there is a potential for miscommunication and violence when officers are confronting a person in crisis. The policy also sets out guidance for how an officer is to respond when dealing with a person in crisis.
Officers are to promptly assess the situation in a manner that is independent of the information that has been reported to them and determine whether a mental health crisis may be a factor. If so, available back up should be requested along with specialized resources that may be deemed necessary to safely resolve the situation. As I have discussed throughout my report, the policy also talks about the use of de-escalation techniques, and talks about the relevance of considering a person's mental and emotional state and potential inability to understand commands or to appreciate the consequences of their actions or inactions as may be perceived by the officer. Two other important factors are mentioned that I believe have relevance here; consideration as to the nature of the crime, and the consideration of alternatives to force.[36]

Policy 409 also discusses the importance of de-escalation, an important concept that has been mentioned throughout my report. Specifically, the policy cautions that *"officers should consider that taking no action or passively monitoring the situation may be the most reasonable response to a mental health crisis."*

It goes on to say: *"Once it is determined that a situation is a mental health crisis and immediate safety concerns have been addressed, responding members should be aware of the following considerations and should generally: evaluate safety conditions, introduce themselves and attempt to obtain the person's name, be patient, polite, calm and courteous and avoid overreacting, speak and move slowly and in a non-threatening manner, moderate the level of direct eye contact, remove distractions or disruptive people from the area, demonstrate active listening skills (i.e., summarize the person's verbal communication), provide for sufficient avenues of retreat or escape should the situation become volatile."*[37]

The policy is comprehensive and consistent with generally accepted law enforcement practice, yet it appears to have been issued some six days prior to Officer Skidmore's engagement with Mr. Bonsignore and his tragic and untimely death. I have reviewed no other materials that would cause me to be believe that the County of Suffolk or its Police Department had any policy that previously guided an officer's work when dealing with a person in crisis. Moreover, in my review of Officer Skidmore's training record from March 11, 2002 to December 16, 2022, I did not see one block of instruction that appeared to address dealing with the mentally ill, emotionally disturbed or persons in crisis despite the fact that this training has been in existence for more than three decades.[38]

---

[36] COS00123.

[37] COS 00128.

[38] *See,* Response to Plaintiff's Demand for Documents (COS 00001-221).

According to the county's webpage, since 2019, 220 officers had been trained in Crisis Intervention. While it's unclear when that information was posted, another post on the same page references ICAT training that began in 2021 leading me to believe that between 2019 and 2021, 220 officers had received Crisis Intervention Training.[39] If the officer's training record is accurate, he had not yet been provided with this training. In my opinion, this was an area where there is an obvious need to train and that has been the case for decades.

In my review of Officer Skidmore's training record, it is noted that he did receive training on deadly force, and beginning in 2010 that training appears to have included less-lethal force. What I cannot discern is what training was included in what is characterized in the training record as *"command inspection"*. In his sworn deposition, Officer Skidmore's lieutenant, Thomas Gozaloff, talked about this level of training, but had no recollection of conducting any use of force training with his officers. Nor was he familiar with the specific policies that govern use of force, and could not articulate the use of force continuum.[40] In my opinion, these are basic principles in policing that are well known throughout the profession. Not only is it incumbent upon a supervisor to know and properly understand these principles, but equally important that they reinforce them to the subordinate staff. While I have not reviewed any materials beyond the lieutenant's deposition that would cause me to opine as to the quality of training and supervision in the department, I can say that his absence of knowledge in these fundamental and high risk critical areas is contrary to generally accepted law enforcement practices and may signal a more widespread problem in the organization.

### D. The County of Suffolk was on Notice of a Potential Pattern and Practice of Unreasonable Force Incidents within the Suffolk County Police Department

In preparation of my report, I have had the opportunity to review several years of the Annual Report of Biased Policing that is prepared and published by the Suffolk County Police Department. In the years from 2016-2020, excessive force complaints exceeded 60 in number. In 2022, there were 82 allegations of excessive force, and only 7% of all complaints were substantiated. The remainder were either unfounded, unsubstantiated, or the officers were deemed to have been exonerated from those reports of alleged misconduct.

Because of the information contained in these reports, it's difficult for me to know what percentage of excessive force complaints were substantiated when separated from the universe of other complaints that were investigated. Moreover, not knowing the department's authorized strength, or what percentage of them were performing functions where the opportunities to use of force would have been more likely, it's difficult for me to discern whether the number of complaints is particularly high. It would be useful to know the total number of use of force incidents, and to have the ability to review those investigative files in an effort to determine whether those investigations were conducted in a manner that was consistent with generally accepted law enforcement practices.

---

[39] https://suffolkpd.org≥Mental-Health.
[40] Thomas Gozaloff Deposition at pages 21-23.

I found it especially surprising that the shooting death of Jesse Bonsignore does not appear to have been the subject to an administrative review by the Suffolk Police Department. Neither Officer Skidmore nor his supervisor were interviewed by departmental personnel.

*"Internal affairs never- what do you call it, approached me or attempted in any way to reach out to me in reference to this case."[41]*

And, I am not aware of any internal documentation that was prepared that addresses policy, training, or supervision issues that might be relevant to Officer Skidmore's use of deadly force. It's my understanding that this is required by departmental policy adopted in May of 2021.[42]

I believe that it is irresponsible to rely solely upon a criminal investigation report, such as that which was prepared by the AG's office, given its narrow scope. The subsequent administrative investigation takes a deeper dive into the event and examines the officer's tactics, decision making, as well as any departure from policy and training. If what occurred in this case is consistent with the manner in which deadly force actions are reviewed by the department, I am of the opinion that this practice is contrary to generally accepted policing practice.

A review of Officer Skidmore's personnel file revealed two Internal Affairs Bureau complaints. The first (2020-0233), involved a use of physical force and a failure to file a use of force report. I have no idea how that particular matter was resolved, or what if any remedial or disciplinary action was taken. Officer Skidmore's lieutenant, who had supervised him since 2019, had no recollection of any complaints against the officer, nor did he ever have occasion to discipline the officer.[43]

The second complaint (2021-0498) against Officer Skidmore involved a failure to investigate an incident involving a 73 year old constituent. Not only did the officer fail to thoroughly and properly investigate what appears to be an assault, he failed to provide proper notice of the incident and used unprofessional language when communicating with the victim's family member. Again, I am unaware of his this investigation was resolved or what remedial steps or disciplinary action may have been taken.

Of these two complaints, I am especially concerned about the use of force, how it may have investigated, why his lieutenant was either not aware or had no recollection of the event, and whether there may have been other incidents over the course of his career that went unreported.

A common way in which a municipality and department becomes aware of practices that run afoul policy, law, and generally accepted law enforcement practice is through the civil litigation process. Whether it be a notice of intent to sue or the filing of a civil complaint, such information alerts the organization of an action or series of actions that pose a risk of harm to the organization, its membership, and the community that it serves. In preparation for this case,

---

[41] Skidmore Deposition at pages 118-119.

[42] *See,* Policy 305.(7).

[43] Deposition of Thomas Gozaloff at pages 16-17, 19.

Plaintiff's counsel brought to my attention several civil claims against the County that were resolved in the favor of the Plaintiffs in those particular matters. In all of these cases, the use of force (and in some cases, deadly force) was the underpinning for the cause of action.[44]

As I have previously stated in my report, I was not provided with any training materials that would cause me to properly review the propriety of that training and its compliance with generally accepted practice. But given, the relatively small number of officers that appeared to have been trained in 2021, in contrast to the some 2,500 sworn officers that represented the department during that time period, I believe that the County and its police department missed an opportunity to train the department's sworn staff in a high risk critical area where there is an obvious need to provide such training. Assuming that Officer Skidmore had training in dealing with persons in crisis, his actions demonstrate to me that the department's training in that regard may have fallen below the generally accepted law enforcement practices. Even absent a review of training materials, woefully inadequate training or the failure to operationalize that training in the day to day tasks performed by an officer can be revealed through tragedies such as that which was the subject of my review.

## Conclusion

It is my opinion, based on my specialized background, training, education and experience as well as my research, auditing, consulting, and training on law enforcement practices nationwide that the use of deadly force against Mr. Bonsignore was pre-mature, unreasonable, unnecessary, and not proportional to any threat he may have posed at the moment in time in which that force was used and, thus, was contrary to generally accepted law enforcement practices.

I declare pursuant to 28 U.S.C. §1746 that the foregoing is true and correct are based upon the information I have been provided to date. I reserve the right to modify my opinions should I receive new or additional information.

My fee for professional services in this matter is a flat fee of $8,500.00 for review of the materials and preparation of an expert report. My fee for deposition and trial testimony is $3,000 per day including travel and lodging.

I affix my signature this 14th Day of March in the year 2025 in Charlottesville, Virginia.

_____

Timothy Longo

---

[44] *See*, Kelly v. County of Suffolk, 14-cv-04431, McCune v. County of Suffolk, cv-2:14-4431, Kirby v. County of Suffolk, 16-cv-7261, and Gonzalez v County of Suffolk, cv-09-1023.