**Office of the New York State Attorney General Letitia James**

# Office of Special Investigation

September 9, 2022

# Report on the Investigation into the Death of Jesse Bonsignore

ag.ny.gov/osi    (800) 771-7755

## SUMMARY

New York Executive Law Section 70-b (Section 70-b) authorizes the Office of Special Investigation (OSI), of the Office of the Attorney General of New York to investigate, and, if warranted, to prosecute offenses arising from any incident in which the death of a person is caused by a police officer. When OSI does not seek charges, Section 70-b requires OSI to issue a public report describing the results of the investigation.

This is OSI's report of its investigation into the death of Jesse Bonsignore, who was shot and killed on May 20, 2021, by Suffolk County Police Department (SCPD) Officer James Skidmore.

In the evening of May 20, 2021, a person called 911 to report a man lying down in the back seat of a car parked on the grassy area across the street from his house, in Manorville, Suffolk County. Officer Skidmore responded and woke up Mr. Bonsignore, who was sleeping in the back seat of the car. According to Officer Skidmore, when Mr. Bonsignore woke up, he screamed without saying words. Mr. Bonsignore then yelled, "I know my rights. I'm going to kill you." Although Officer Skidmore directed Mr. Bonsignore to stay in the car, Mr. Bonsignore got out of the car. There was a folding knife (which was later recovered) on Mr. Bonsignore's waistband. During a pat-down search, Officer Skidmore said Mr. Bonsignore reached for his knife twice. Officer Skidmore said he tried to handcuff Mr. Bonsignore to prevent him from grabbing his knife, that Mr. Bonsignore resisted being handcuffed, and that they fell to the ground in a struggle. Officer Skidmore said Mr. Bonsignore pulled on Officer Skidmore's gun holster several times during the struggle on the ground, and that he tried to control Mr. Bonsignore's arms to prevent Mr. Bonsignore from taking his gun. Officer Skidmore said he drew his gun from his holster to keep it away from Mr. Bonsignore, and Mr. Bonsignore grabbed the wrist of his gun hand. Officer Skidmore fired two shots, striking Mr. Bonsignore, who died on scene.

OSI's investigation of this incident included interviews of Officer Skidmore and other police, medical, and civilian witnesses, and review of civilian security video, recordings of 911 calls and radio runs, SCPD dispatches, photographs of the scene, physical evidence, firearm analysis reports, and the Medical Examiner's autopsy report.

Having thoroughly investigated the matter and analyzed the law, OSI will not seek charges against Officer Skidmore, because the evidence does not disprove beyond a reasonable doubt that the officer's use of deadly force against Mr. Bonsignore was justified under New York law.

# FACTS

### a. The Scene

The shooting occurred in Suffolk County, across the street from the house at 67 Bauer Avenue, Manorville, New York. Bauer Avenue is a residential street, and there is a grassy, wooded area across the street from 67 Bauer Avenue.



*The yellow arrow indicates the front door of 67 Bauer Avenue, where Ring camera video was obtained. The red x indicates the location of the shooting. The maroon-colored car is Mr. Bonsignore's car, and the white car is Officer Skidmore's police car.*

### b. Background of Primary Police Officers Involved

OSI interviewed Suffolk County Police Department ("SCPD") Officer James Skidmore, who was the first officer on scene and the shooter. Officer Skidmore has been an SCPD officer for twenty years. He said that, before this incident, he had never discharged his firearm except for training at the range. He had never met Mr. Bonsignore prior to this incident.

OSI interviewed SCPD Officer Scott Jensen. Officer Jensen was the second officer on scene and arrived after the shooting. Officer Jensen has been an SCPD officer for twenty-six years. Officer Jensen had never met Mr. Bonsignore or the 911 caller before this incident. Officer Jensen said he has responded to scenes with Officer Skidmore many times.

### c. Events Leading to Police Response

OSI and SCPD interviewed K.R., who lives at 67 Bauer Avenue.[1] K.R. stated that on May 20, 2021, at approximately 10:15 pm, he was driving home on Bauer Avenue and saw a car parked on the grass across the street from his house. At that time, he did not see anyone inside the car. K.R. said a short time later, when he took his dog for a walk with a flashlight, he looked into the parked car and saw a man lying down in the back seat. K.R. went home and called 911.

OSI reviewed the recorded 911 call and SCPD radio transmissions. K.R. called 911 at 10:44 pm and said there was a car parked across the street from his house and that someone was "hiding" in the backseat and was "hunkered down in the back of the car." He described the car as a maroon-colored sedan. At about 10:46 pm, the 911 operator broadcast the call as a car across the street from 67 Bauer Avenue with a "person laying in the backseat" and that someone was "hiding in the backseat." According to SCPD radio transmissions reviewed by OSI, at about 10:49 pm, Officer Skidmore arrived on scene.

### d. The Shooting

Officer Skidmore told OSI that on May 20, 2021, he was driving a marked patrol car, in uniform, working alone. His gun belt held a firearm on his right side with a double release holster, a Taser on his left side, and handcuffs on the back. He carried a police radio in his pants pocket. Officer Skidmore was not equipped with a body worn camera and his patrol car was not equipped with a dashboard camera.

Officer Skidmore said he responded to the call for 67 Bauer Avenue, which was within his patrol sector, taking about four minutes to arrive. There was no pedestrian or street traffic outside 67 Bauer Avenue. He parked nose to nose with Mr. Bonsignore's car. He said Mr. Bonsignore's car did not have a front license plate or registration sticker. Officer Skidmore walked to the back of the car, looked at the back plate, and called in the plate number over his radio to determine whether the car was stolen.

Officer Skidmore said he saw Mr. Bonsignore lying in the back seat of the car. All the car windows were up. He knocked on the window and Mr. Bonsignore woke up screaming. Mr. Bonsignore was not screaming any words when he first woke up. He was screaming loudly and without pause. Officer Skidmore told Mr. Bonsignore to "calm down" and told Mr. Bonsignore he was not in any trouble. Mr. Bonsignore continued to scream. Officer Skidmore used his radio to ask how far away backup was. According to Officer Skidmore, and OSI's review of recordings of police car-to-car transmissions, Officer Jensen responded that he was

---

[1] Initials are used to protect the identities of civilian witnesses.

two minutes away. Officer Skidmore told OSI he was worried about physically interacting with Mr. Bonsignore because he would not stop screaming, so Officer Skidmore wanted him to stay in the car until backup arrived. Officer Skidmore again told Mr. Bonsignore to calm down and he was not in any trouble. Officer Skidmore told Mr. Bonsignore to stay in the car. Officer Skidmore said Mr. Bonsignore stopped screaming and moved towards the driver's side rear door. Officer Skidmore heard Mr. Bonsignore yell, "I know my rights. I'm going to kill you" through the closed windows.

K.R. told OSI, and the Ring video footage shows, he was inside his house when the police arrived and that, by the time he left his house, Mr. Bonsignore was outside the car. [2]

Although Officer Skidmore had told Mr. Bonsignore to stay in the car, Mr. Bonsignore opened the rear door, stepped out of the car, and said, again, "I know my rights. I'm going to kill you." Mr. Bonsignore spoke in a monotone and at a normal volume. Mr. Bonsignore was moving at a normal pace and his behavior appeared calm. As Mr. Bonsignore stepped out of the car, Officer Skidmore said he saw a folding knife on his waistband. Officer Skidmore told OSI that Mr. Bonsignore was not moving or speaking aggressively, but he explained that Mr. Bonsignore seemed "off." Officer Skidmore said he saw Mr. Bonsignore was taller than he was. Officer Skidmore told Mr. Bonsignore again that he was not in trouble. Mr. Bonsignore said again, "I know my rights. I'm going to kill you."

Now that Mr. Bonsignore was out of the car, Officer Skidmore told Mr. Bonsignore to place his hands on the roof of the car, because he was nervous for his own safety, given Mr. Bonsignore's repeatedly saying "I'm going to kill you" and the knife on his waistband. Mr. Bonsignore complied and put his hands on the roof of the car. Officer Skidmore said he placed one hand on Mr. Bonsignore's back so he could feel Mr. Bonsignore's movements. Officer Skidmore told him to spread his legs, but Mr. Bonsignore did not comply. Mr. Bonsignore said again, "I know my rights. I'm going to kill you" in a monotone and at a normal volume. Officer Skidmore used his foot to spread Mr. Bonsignore's legs by pushing his legs apart. Officer Skidmore said he asked Mr. Bonsignore if there was anything on him that might hurt him. Mr. Bonsignore replied, "Yeah, my knife," and moved his arm down toward his knife. Officer Skidmore grabbed his hand and placed it back on the roof of the car.

Officer Skidmore said he patted down Mr. Bonsignore and Mr. Bonsignore reached for his knife again. Officer Skidmore grabbed his hand and placed it back on the car. Officer Skidmore told Mr. Bonsignore he had to put him in handcuffs because he reached for the knife again. Officer Skidmore said Mr. Bonsignore would not put his arms behind his back to be handcuffed. Officer Skidmore tried to push and pull Mr. Bonsignore's arms behind his back

---

[2] In early interviews with OSI and SCPD, K.R. said the Officer told Mr. Bonsignore to get out of the car, and that the Officer took him out of the car. In a later interview with OSI, K.R. did not recall making those statements and said he was not even outside when the police arrived and first approached the car.

5

to get handcuffs on his wrists. Officer Skidmore was not successful because Mr. Bonsignore was pulling his arms away and resisting being handcuffed. According to K.R., Mr. Bonsignore was resisting, flailing his arms, and continuously reached back for the police officer who was standing right behind him. After trying to handcuff Mr. Bonsignore for a few moments, Officer Skidmore said Mr. Bonsignore pushed backwards off the car, causing Officer Skidmore to stumble back. Mr. Bonsignore turned around and placed Officer Skidmore into a bear hug. Officer Skidmore said he attempted to reach his taser but could not. Officer Skidmore said he and Mr. Bonsignore fell to the ground with Officer Skidmore on top of Mr. Bonsignore. Officer Skidmore said Mr. Bonsignore continued to say, "I know my rights. I'm going to kill you."

Officer Skidmore stated that while on the ground, Mr. Bonsignore repeatedly reached for his knife. Officer Skidmore tried to pin down Mr. Bonsignore's arms to stop him from reaching the knife. He said he took out his police radio to call for help and Mr. Bonsignore tried to take the radio. Officer Skidmore could not make a call for help because Mr. Bonsignore was fighting for the radio. Officer Skidmore said the radio flew out of his hand during the struggle over it with Mr. Bonsignore.

Officer Skidmore said he felt and saw Mr. Bonsignore pulling on his gun holster. Officer Skidmore tried to remove Mr. Bonsignore's hand from the holster but could not. Officer Skidmore said since he could not get Mr. Bonsignore's hand off his holster, he removed the firearm from his holster with one hand, while he pinned Mr. Bonsignore's other arm to the ground. He said he believed Mr. Bonsignore was trying to remove the gun from his holster to shoot him, and Officer Skidmore wanted to gain control of the gun before that could happen. Officer Skidmore said he also thought Mr. Bonsignore would stop fighting once he saw Officer Skidmore take out his firearm. Officer Skidmore said that when he took out his firearm, Mr. Bonsignore grabbed the wrist of his gun hand and tried to grab the gun. Officer Skidmore said he believed his life was in danger because Mr. Bonsignore kept saying, "I'm going to kill you," because of Mr. Bonsignore's lack of compliance and physical aggression, and because of his repeated attempts to reach his folding knife and his pulling on Officer Skidmore's holster. As Mr. Bonsignore was holding Officer Skidmore's wrist and trying to gain control of the gun, Officer Skidmore told OSI, "I thought I was going to die."

Officer Skidmore said he fired one shot in the direction of Mr. Bonsignore's torso, with one hand on the firearm, while Mr. Bonsignore was still holding on to Officer Skidmore's wrist. Officer Skidmore did not know if Mr. Bonsignore was struck. Mr. Bonsignore let go of Officer Skidmore's wrist after the first shot. Officer Skidmore said he quickly fired another shot towards Mr. Bonsignore's torso while he rose up to a standing position. Officer Skidmore said he heard Mr. Bonsignore say, "Why," and then Mr. Bonsignore stopped moving. Officer Skidmore said he ran to find his police radio and called for rescue to get medical treatment for Mr. Bonsignore. Officer Skidmore stood about fifteen feet away from Mr. Bonsignore and pointed his firearm towards him because he thought Mr. Bonsignore might still be a threat.



*This photograph shows Mr. Bonsignore after he was shot. The maroon car is Mr. Bonsignore's car, and the police car is Officer Skidmore's.*

Officer Jensen told OSI he was driving a marked patrol car, in uniform, and working alone. The call for 67 Bauer Avenue was outside his sector but he responded to help. Officer Jensen said, en route, he heard Officer Skidmore's radio broadcasting on and off. Officer Jensen said he could hear sounds of a struggle over the radio, but nothing specific.[3]

According to Officer Jensen, when he arrived, he saw Mr. Bonsignore lying in the street. He saw Officer Skidmore standing about 15-20 feet away from Mr. Bonsignore with his firearm drawn and pointed towards him. Officer Skidmore asked him to handcuff Mr. Bonsignore, which he did. Officer Jenson said he saw Mr. Bonsignore lying on his back with a small amount of blood around him, and a folding knife on his waistband. Officer Jenson said Officer Skidmore told him, "He went for my gun."

According to K.R., he did not see the shooting because he went inside to get his shoes and, by the time he returned to his outside porch, Mr. Bonsignore was on the ground and a police officer was pointing a gun at him.[4] In his interviews with the SCPD and OSI, K.R. said he heard the first responding police officer tell the second responding officer, "He went for my gun."

---

[3] The radio transmission recordings, reviewed by OSI, corroborate Officer Jensen's description of the radio broadcasts.
[4] Ring camera recordings corroborate that K.R. went inside the house prior to the shooting and did not go out the front door until after the shooting.

Officer Jensen said additional SCPD members arrived and initiated CPR. OSI's review of SCPD crime scene paperwork showed that Mr. Bonsignore died on scene. Lt. Thomas Gozaloff stated in his SCPD supplemental report that he arrived on scene at approximately 10:54 pm, just as Officer Jenson was placing handcuffs on Mr. Bonsignore, who was lying in the roadway. Lt. Gozaloff checked Mr. Bonsignore's vitals and did not feel a pulse. He and another officer began CPR and continued until the Manorville Rescue Squad arrived on scene and took over the emergency medical care of Mr. Bonsignore. Lt. Gozaloff stated in his report that at approximately 11:06 pm Mr. Bonsignore was pronounced dead by a member of the Manorville Rescue Squad. According to Detective Donald Truesdell's crime scene report, he arrived on scene to collect evidence at approximately 12:08 am, and Mr. Bonsignore was deceased and lying on his back.

Officer Jensen told OSI that after being on scene for a short amount of time, he took Officer Skidmore to the hospital because he looked "dazed." Officer Jensen said he did not speak to Officer Skidmore about the incident on the way to the hospital because Officer Skidmore seemed to be in shock.

Officer Skidmore told OSI that after the shooting he was in shock and did not feel physical pain right away. Officer Skidmore said his right knee started to hurt after he was released from the hospital and began to walk around. Officer Skidmore stated he was later diagnosed with a torn meniscus in his knee and is receiving treatment for that injury.

OSI obtained Officer Skidmore's medical records from Peconic Bay Medical Center in Riverhead, New York, where he was treated on May 20, 2021, after the shooting. According to the medical records, Officer Skidmore's chief complaint was nausea and chest pain. The medical records note that Officer Skidmore denied trauma or injury except for an abrasion to his lefty pinky finger. While Officer Skidmore acknowledged injury to his left pinky finger, he specifically denied musculoskeletal injury on his body, which includes injury and pain to the knee. The hospital records note under the category of *Nurse Initial Assessment Note,* "Musculoskeletal Denies Any Symptom: No Injury or Deformity, No Calf Tenderness." The remainder of the medical records focus on Officer Skidmore's chief complaint of chest pain. OSI contacted Officer Skidmore's legal representation and asked where Officer Skidmore was diagnosed and treated for his knee injury so that we could obtain those medical records and corroborate his injury. In the alternative, OSI asked for a copy of the medical records that showed his knee injury diagnoses or indicated treatment for the knee injury. Officer Skidmore's legal representation would not provide information or records of his knee injury diagnoses or treatment. As a result, OSI cannot corroborate Officer Skidmore's statement that his meniscus was torn during the interaction with Mr. Bonsignore.

## RING VIDEO

Ring video footage of the incident was collected from 67 Bauer Avenue and was reviewed by OSI.[5] The Ring video does not clearly show what happened because the camera was far away from the shooting and was partially obstructed by bushes and a fence. On the video, one can see or hear the following:
- K.R. on his front porch.
- Officer Skidmore and Mr. Bonsignore standing beside Mr. Bonsignore's car.
- Officer Skidmore saying "put your hands on the car," and "do you understand?" and "put your hands behind your back."
- Officer Skidmore and Mr. Bonsignore struggling and falling to the ground.
- Officer Skidmore rising up slightly, but hunched over and still engaged in a physical struggle on the ground.
- Officer Skidmore's arm and the sound of two gunshots.
- Officer Skidmore rising, running off camera, and saying "roll over" while off camera.[6]
- Officer Jensen arriving on scene.
- Additional police cars arriving.

## EVIDENCE COLLECTION FROM SCENE

### a. Ballistic Evidence

A review of SCPD Identification Section paperwork showed that Officer Skidmore's gun belt, holster, and accessories, were collected, along with Officer Skidmore's department-issued firearm. Two spent shell casings were recovered from the scene and submitted for microscopic testing (results below).

### b. Mr. Bonsignore's Property

Officer Dow said in a statement to SCPD that he arrived on scene soon after Officer Jensen and started CPR on Mr. Bonsignore. While conducting CPR, he saw a wood-handled folding knife attached to Mr. Bonsignore's belt, on the outside of his shorts near his right front pocket. Officer Dow removed the knife, placed it on the roadway, and continued CPR. OSI reviewed SCPD paperwork which shows that the knife was later photographed by the SCPD Identification Section and invoiced as evidence.

SCPD paperwork also shows Mr. Bonsignore's car, a 2009 Hyundai Sonata, was impounded from the scene, processed, and searched by SCPD Identification Section on May 24, 2021.

---

[5] The Ring video can be viewed HERE.
[6] K.R. is not the person yelling "roll over" because the yelling is heard a distance away and K.R. is right beside the Ring camera.

SCPD recovered various personal items and did not find any illegal drugs or weapons. A handwritten note in the trunk stated, "Do not murder. Do not kill. Do not steal." OSI reviewed photographs depicting the above-described property.


*Pictured here is the knife recovered from Mr. Bonsignore.*

MEDIAL EXAMINATION AND AUTOPSY

Dr. Odette Hall, Medical Examiner at Suffolk County Medical Examiner's Office, performed an autopsy on Mr. Bonsignore and issued a report reviewed by OSI. OSI interviewed Dr. Hall and reviewed her autopsy report. According to the autopsy report the cause of death was "gunshot wounds of torso." Mr. Bonsignore sustained two bullet wounds, one to the right side of his neck and a second to his left lower chest. The direction of the bullet strike to his neck was from right to left, front to back, and downward. The direction of the bullet strike to his left chest was from front to back, left to right, and upward. The report indicated that there was no blunt force injury to Mr. Bonsignore's head and no fractures to his skull. The external examination of Mr. Bonsignore's head showed two subscapular bruises. Mr. Bonsignore did not sustain any fractures to any part of his body. Mr. Bonsignore sustained bruising to his left shoulder and middle anterior of his left leg. The toxicology report indicated there were no drugs in Mr. Bonsignore's urine or blood.

A review of SCPD Identification Section paperwork shows two bullets were recovered from Mr. Bonsignore's body during the autopsy. Those bullets were invoiced as evidence and submitted for forensic testing.

## FORENSIC EVIDENCE

Officer Skidmore's firearm was tested for DNA by the Suffolk County Crime Laboratory, whose report, reviewed by OSI, states the swabs from the pistol were "consistent with a mixture of three individuals." The report further states, "assuming Officer Skidmore is a contributor to this mixture, no individual profiles of the additional contributors could be determined." OSI spoke with the DNA analyst regarding these findings. According to her, and the report quoted above, these findings indicate that there was insufficient DNA deposited on the firearm to identify minor DNA contributors.

The DNA report indicates that swabs of Officer Skidmore's gun belt, holster, and accessories were inconclusive, stating, "these results are not suitable for comparison due to the poor quality or complexity of the data." OSI spoke to the lab analysist who conducted these tests. The analyst said the swabs for the gun belt, holster, and accessories were too complex to isolate a result and make comparisons because there were more than three contributors of DNA to the DNA mixture on the items.

The Suffolk County Crime Laboratory conducted microscopic testing on the recovered ballistics evidence. Their report, which was reviewed by OSI, says the two casings recovered from the scene were ejected from Officer Skidmore's service weapon, a Glock pistol, and that the two expended bullets recovered from Mr. Bonsignore's body were fired from Officer Skidmore's service weapon.

## LEGAL ANALYSIS

New York Penal Law ("PL") Article 35 sets forth the defense of justification to crimes involving the use of physical force. Justification is a defense, not an affirmative defense: if there is evidence at trial sufficient to raise the defense of justification, the burden is on the People to disprove justification beyond a reasonable doubt. People v. Steele, 26 N.Y.2d 526 (1970).

PL Section 35.30 is the provision defining justification when a police officer or peace officer uses force to effect or attempt to effect an arrest.

PL Section 35.30(1) provides:

> "A police officer or a peace officer, in the course of effecting or attempting to effect an arrest … of a person whom he or she reasonably believes to have committed an

offense, may use physical force when and to the extent he or she reasonably believes such to be necessary to effect the arrest ... or in self-defense or to defend a third person from what he or she reasonably believes to be the use or imminent use of physical force; except that deadly physical force may be used for such purposes only when he or she reasonably believes that ... (c) regardless of the particular offense which is the subject of the arrest ... the use of deadly physical force is necessary to defend the police officer or peace officer or another person from what the officer reasonably believes to be the use or imminent use of deadly physical force."

The law, therefore, delineates the circumstances where physical force and deadly physical force are justified. Deadly physical force by a police officer is justified when the officer reasonably believes deadly force is necessary to defend the officer or another against the imminent use of deadly physical force. Police officers using force pursuant to PL Section 35.30(1) are under no duty to retreat when threatened with deadly physical force, according to PL Section 35.15(2)(a)(ii).

PL Section 35.15 is the general provision defining justification when force is used in defense of a person. Regarding deadly physical force, Subdivision (2) of PL 35.15 states a person may use deadly force upon another person when:

> "the actor reasonably believes that such other person is using or about to use deadly physical force. Even in such case, however, the actor may not use deadly physical force if he or she knows that with complete personal safety to oneself and others he or she may avoid the necessity of doing so by retreating...."

Under both provisions of Article 35, "reasonable belief" means that a person actually believed, "honestly and in good faith," that physical force was about to be used against them and that physical force was necessary for self-defense, and that a "reasonable person" under the same "circumstances" could have believed the same. People v. Goetz, 68 N.Y.2d 96 (1986); People v. Wesley, 76 N.Y.2d 555 (1990). Therefore, before using deadly force in self-defense, a person must honestly and in good faith believe deadly force is about to be used against them, deadly force is necessary for self-defense, and a reasonable person under the same circumstances could believe the same.

Based on the evidence in this investigation, the prosecution would not be able to disprove beyond a reasonable doubt that the officer's use of deadly physical force was justified under the law. When Office Skidmore awakened Mr. Bonsignore, Mr. Bonsignore started screaming and said, "I'm going to kill you." Officer Skidmore radioed for backup and told Mr. Bonsignore to stay in the car. Despite that direction, Mr. Bonsignore got out of his car, and there was a folding knife on his waistband. Mr. Bonsignore said, again, "I'm going to kill you." Officer Skidmore tried to avoid a physical confrontation with Mr. Bonsignore by asking him to stay in

the car and calling for help when Mr. Bonsignore started screaming. Mr. Bonsignore escalated matters by getting out of the car and repeating "I'm going to kill you," while having a knife on his waistband and reaching for it twice while Officer Skidmore did a pat down search. These facts gave Officer Skidmore probable cause to believe that Mr. Bonsignore had committed Menacing in the Second Degree, PL Section 120.14(1),[7] and Obstructing Governmental Administration in the Second Degree, PL Section 195.05.[8] Under PL Section 35.30, Officer Skidmore could use the physical force he reasonably believed to be necessary to effectuate the arrest and could use deadly force if he reasonably believed it was necessary to defend himself against Mr. Bonsignore's imminent use of deadly force.

Even if Officer Skidmore was not attempting to arrest Mr. Bonsignore for an offense under PL Section 35.30, the justification provision relating to police officers making an arrest, the prosecution would not be able to disprove beyond a reasonable doubt that Officer Skidmore was justified under PL Section 35.15, the general provision justifying use of force.

According to Officer Skidmore, when he attempted to place handcuffs on Mr. Bonsignore, Mr. Bonsignore pushed back from the car, causing him to stumble, and put him in a bear hug, which led to a physical struggle on the ground. The Ring camera video supports this account by showing the two struggle and fall to the ground moments after Officer Skidmore told Mr. Bonsignore to put his hands behind his back. K.R. told OSI that Mr. Bonsignore was flailing his arms and resisting prior to falling to the ground.

According to Officer Skidmore, Mr. Bonsignore tried to get his knife from his waistband while they wrestled. Officer Skidmore said he wanted to prevent Mr. Bonsignore from grabbing his knife. Officer Skidmore said Mr. Bonsignore grabbed at his holster while they wrestled and pulled the wrist of his gun hand after he drew his gun. Officer Jensen and K.R. said Officer Skidmore said "He went for my gun" moments after Officer Jensen arrived on scene. The immediate reporting of that fact, before Officer Skidmore had a chance to digest the events that occurred, support the narrative that Mr. Bonsignore tried to get control of Officer Skidmore's gun. The medical examiner determined Mr. Bonsignore did not suffer significant injuries apart from the gunshot wounds, and that the direction of both bullets was front to back. Officer Skidmore could have reasonably believed that Mr. Bonsignore would imminently use deadly physical force against him and could have reasonably believed that using deadly physical force was necessary to defend himself.

---

[7] "A person is guilty of menacing in the second degree when: He or she intentionally places or attempts to place another person in reasonable fear of physical injury, serious physical injury or death by displaying a deadly weapon, dangerous instrument or what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm."

[8] "A person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act…"

In sum, based on the investigation, there is insufficient evidence to disprove beyond a reasonable doubt that Officer Skidmore justifiably used deadly force in self-defense. Therefore, OSI will not seek charges in this matter.

RECOMMENDATIONS

*Suffolk County Police Department Should Equip Its Officers with Body-Worn Cameras*

OAG has previously issued multiple reports recommending that police departments equip officers with body-worn cameras ("BWCs").[9] Here, Officer Skidmore was not equipped with BWC. Had Officer Skidmore been equipped with BWC, there would have been a clearer picture of the incident, which would have greatly facilitated the investigation of this case and provided the public with greater transparency into the events. OAG recognizes that SCPD is in the process of police reform initiatives that include outfitting police officers with BWC. Prior to this incident, in March 2021, the Police Reform and Reinvention Task Force of the Office of the Suffolk County Executive, issued a report stating SCPD "will deploy body-worn cameras as standard police-worn equipment for all officers who engage with the public in the course of their professional duties."[10] SCPD has informed OAG that in July 2022 it will commence a pilot program in the 7th precinct in which its uniformed police officers will be outfitted with BWCs. SCPD plans to have all uniformed police officers outfitted with BWCs by the fall of 2022. SCPD will train its officers how to use their BWCs. SCPD aims eventually to outfit all officers, including detectives and superior officers with BWC. While OAG commends this initiative, the current status is that SCPD officers are not equipped with BWC, and therefore we take this opportunity to urge SCPD to implement this initiative as soon as practicable.

September 9, 2022

---

[9] OSI highlighted its many prior recommendations regarding BWCs in its First Report Pursuant to Executive Law Section 70-b (ny.gov) (p. 16, "Recommendations"), which was published after this incident took place.
[10] https://suffolkcountyny.gov/portals/0/formsdocs/police%20reform/Suffolk%20County%20Police%20Reform%20&%20Reinvention%20Plan%20-%20Final.pdf#page=93