1
```
 1                                              1

 2    UNITED STATES DISTRICT COURT

 3    EASTERN DISTRICT OF NEW YORK

 4    -------------------------------------------x

 5    CARMELA BONSIGNORE, Individually, and As

 6    Administrator of The Estate of JESSE J.

 7    BONSIGNORE,

 8                              Plaintiff,  Case #:
                                            22-cv-02925
 9                                          ENV-AYS
                   - against -
10
      COUNTY OF SUFFOLK, SUFFOLK COUNTY POLICE
11    DEPARTMENT, POLICE OFFICER JAMES SKIDMORE,
      Individually and in his official capacity, and
12    JOHN DOES 1-5, Individually and in their official
      capacity,
13                              Defendants.
      -------------------------------------------x
14
                       Zoom Deposition
15
                       August 20, 2024
16                     10:31 a.m.

17

18

19            Deposition of Defendant,

20        SUFFOLK COUNTY POLICE DEPARTMENT by

21        LIEUTENANT THOMAS GOZALOFF,

22        pursuant to Notice, before Diana

23        Mitchell, a Notary Public of the

24        State of New York.

25
```

A P P E A R A N C E S:

LAW OFFICES OF FREDERICK K. BREWINGTON

Attorney for Plaintiff

    556 Peninsula Boulevard

    Hempstead, New York 11550

BY:   A. SHAMEL D. MANUEL, ESQ.

        - and -

GABRIELE & MARANO, LLP

Attorneys for Plaintiff

    100 Quentin Roosevelt Boulevard

    Garden City, New York 11530

BY:   LORI MARANO, ESQ.


CHRISTOPHER J. CLAYTON, ESQ.

ACTING SUFFOLK COUNTY ATTORNEY

    Attorney for Defendants

    H. Lee Dennison Building

    100 Veterans Memorial Highway

    Hauppauge, New York 11788

BY:   ANNE LEAHEY, ESQ.

IT IS HEREBY STIPULATED AND
AGREED by and between the attorneys
for the respective parties herein,
that the filing, sealing and
certification of the within
deposition be waived.

IT IS FURTHER STIPULATED AND
AGREED that all objections, except
as to the form of the question,
shall be reserved to the time of
the trial.

IT IS FURTHER STIPULATED AND
AGREED that the within deposition
may be sworn to and signed before
any officer authorized to
administer an oath with the same
force and effect as if signed and
sworn to before the Court.

- oOo -

T H O M A S   G O Z A L O F F,

called as a witness, having been duly

sworn by a Notary Public, was examined

and testified as follows:

        *          *          *

<u>EXAMINATION BY</u>

<u>MR. MANUEL</u>:

    Q    Please state your full name for the record.

    A    My name is Lieutenant Thomas Gozaloff.

    Q    What is your address?

    A    My business address is 30 Yaphank Avenue, Yaphank, New York 11980.

    Q    Good morning, Lieutenant Gozaloff.

    A    Good morning.

    Q    My name is Shamel Manuel. I'm an attorney for the Bonsignore family in this matter.  Also on the screen you see Attorney Lori Marano, who is co-counselor with me.  We're just going to ask you some questions today and ask you to provide answers.

         Have you been deposed before,
Lieutenant?

         A     No, I haven't.

         Q     So I will give you a couple
of quick rules, if you don't mind.  As
you just did, if you would answer all
questions verbally, avoid shaking your
head or saying Un-un or Uh-huh, that way
the court reporter can take down your
answers accurately.  Do you understand
that?

         A     Yes, I do.

         Q     I also ask that you wait for
me to complete my question before you
answer also so that the record is clear
and you can provide an answer to the
actual question I'm asking.  Do you
understand that?

         A     Yes.

         Q     If for any reason my question
is not clear to you, just let me know and
I will repeat it or rephrase it as
needed, all right?

         A     Yes.

1

2      Q     If for any reason you need a

3  break, just let us know, as long as there

4  is no unanswered question you can take a

5  break whenever you need, okay?

6      A     Yes.

7      Q     Now, Lieutenant, have you

8  taken any medication or any other

9  substance that might impair your ability

10  to understand my question or answer it

11  truthfully?

12      A     No, I have not.

13      Q     Have you failed to take any

14  medication or other substance that might

15  impair your ability to understand my

16  question or answer it truthfully?

17      A     No.

18      Q     Have you read any documents

19  in preparation for today's deposition?

20      A     Yes.

21      Q     What documents did you review

22  in preparing for today's deposition?

23      A     I reviewed my supplemental

24  report that I made.

25      Q     Is there anything else that

you reviewed?

    A    No.

    Q    Who are you currently
employed by, Lieutenant?

    A    I'm currently employed by the
Suffolk County Police Department.

    Q    And your rank is lieutenant;
is that right?

    A    That's correct.

    Q    Where is your command?

    A    I'm currently assigned to the
7th Precinct, which is located on William
Floyd Parkway in Shirley.

    Q    How long have you been with
the 7th Precinct?

    A    I arrived at the 7th Precinct
September of 2019.

    Q    What was your rank in
September of 2019?

    A    Lieutenant.

    Q    Where were you immediately
prior to your arriving at the 7th
Precinct in 2019?

    A    Immediately before that I was

assigned to the 3rd Precinct, which is
Bay Shore, New York, as a lieutenant.

    Q    What was your rank while you
were at the 3rd Precinct?

    A    Lieutenant.

    Q    How long were you at the 3rd
Precinct?

    A    Approximately five months.

    Q    Why the transfer from the 3rd
Precinct to the 7th Precinct?

    A    Personal reasons mostly.
There was a midnight spot available in
the 7th Precinct, and I like working the
midnight tours so I asked to be
reassigned to the 7th Precinct.

    Q    Where were you immediately
prior to being stationed in the 3rd
Precinct?

    A    I was assigned to the police
academy for five weeks.

    Q    Was that also in 2019 or was
that 2018?

    A    2019.

    Q    Is that when you were

initially hired by Suffolk County Police
Department?

    A     No, I was originally hired by
the police department in March of 1993.

    Q     What was your position in
2019 with the police academy?

    A     I was promoted to lieutenant
on, I believe it was March 3, 2019, I was
assigned to the -- to be a member of the
in-service training there.

    Q     Were you conducting
in-service training for those five weeks
in 2019?

    A     I was supervising the people
that conducted in-service training.

    Q     When you supervised
in-service training in 2019, what was the
training comprised of?

    A     Any in-service training they
had at the time.  They had various
classes where they bring people back for
training.

    Q     What type of training were
you supervising?

A        I wasn't supervising the
training, I was supervising the schedule
mostly.  There would be various classes,
so from instructor development to
learning new computer programs to any --
any in-service training they had at the
time.  I don't really recall what other
specific classes they had when I was
there.

Q        When you say you were
"supervising the schedule," what do you
mean?

A        Supervising the staff, I had
a sergeant that was basically making sure
that instructors were assigned to certain
classes.

Q        What is your highest level of
education, Lieutenant?

A        I received a bachelor of arts
degree from SUNY Albany.

Q        What is your bachelor's in?

A        I majored in psychology with
a criminal justice minor.

Q        What was your rank prior to

becoming lieutenant?

 A      I was a sergeant.

 Q      How long were you a sergeant
with Suffolk County?

 A      I was promoted to sergeant in
November 2005 until March of 2019, so
about 13 plus years.

 Q      In making the transition from
sergeant to lieutenant, did you undergo
any type of specialized training?

 A      No, I took a promotion exam,
I did well enough to get promoted.

 Q      In 2021 when you were a
lieutenant with the 7th Precinct, what
were your duties?

 A      I'm the officer in charge of
squad 4, which is a midnight squad.  At
that time I had three sergeants to
supervise, and we had about, I don't know
the exact number, about 18 to 20 police
officers assigned to squad 4.

 Q      In what manner did you
supervise these people?

 A      It varies.  Reviewing, going

on calls, being available for questions
they have for me, making sure, you know,
they're doing their jobs, supervise
arrests, you know, making sure paperwork
is filled out correctly.

    Q     In your supervisory capacity,
did you do evaluations of the officers?

    A     Personally, no.

    Q     You didn't in any way grade
the work of the people that you
supervised?

    A     I don't really know what you
mean.  Grade?

    Q     You didn't or did you in any
way have any input into how effective
your police officers were performing?

    A     I wouldn't say that's
correct.

    Q     In what manner would you make
any type of comment or recommendation
regarding the effectiveness of your
police officers?

    A     If hypothetically a situation
arised [sic] where there was a

*Rich Moffett Court Reporting, Inc.*

disciplinary problem, one of my sergeants
would bring it to me and we would deal
with it. We would either speak to the
officer or learn a way to correct his
behavior, to correct his behavior if it
was necessary.

      Q     Would it be the sergeant's
duty to determine whether or not
disciplinary action should be taken
against an officer?

      A     It could be, it could also be
mine or it could be ours jointly.

      Q     The officers that you
supervised, the three sergeants and
approximately 18 officers, did you
monitor their arrest records?

      A     Yes.

      Q     Did you make any type of
evaluation regarding your officers'
arrest records?

      A     No.

      Q     As a supervising lieutenant
did you monitor your officers who
conducted stops, police stops, vehicle

traffic stops?

A    Can you repeat the question?

Q    Did you monitor your officers in the way that they conducted vehicle traffic stops?

A    There is a -- a -- a system in place where their activity is monitored.

Q    Yes, and as a lieutenant did you yourself monitor their traffic stops?

A    As far as number of traffic stops?

Q    Well, let's start with the broad way, in any way did you monitor their vehicle traffic stops?

A    I would say yes.

Q    Did you monitor, we'll start with the number, as you suggested --

A    Yes.

Q    -- did you monitor the reasons for the stops?

A    Not so much the reason. The -- the number of tickets written is something we keep an eye on.

Q      Did you monitor the
demographics of the individuals who were
stopped?

A      No.

Q      Did you yourself monitor the
stops that transitioned into arrests?

A      Personally, no.

Q      Were you involved in
recommending any of your officers for a
promotion?

A      No.

Q      Other than the incident that
we're here for today, have any of your
officers that you supervised been
involved in the death of a suspect?

A      No.

Q      Other than the incident we're
here for today, have any of the officers
you supervised been investigated for
their behavior with a suspect?

A      I wouldn't have knowledge of
that, no.

Q      So you yourself have never
investigated any of your officers?

1

2     A      No, I haven't.

3     Q      Do you know Officer Skidmore?

4     A      I know Officer Skidmore, yes.

5     Q      In 2021, were you his

6 supervisor?

7     A      I was the officer in charge

8 of his squad, yes.

9     Q      What was his squad in 2021?

10    A      He was assigned to squad 4 in

11 the 7th Precinct.

12    Q      Were you his lieutenant?

13    A      Yes.

14    Q      How long had you worked with

15 Officer Skidmore?

16    A      From the time that I got to

17 the 7th Precinct, September of 2019.

18    Q      And he was already an officer

19 at the 7th Precinct when you arrived?

20    A      I believe so, yes.

21    Q      Did you ever, in working with

22 Officer Skidmore, have to discipline him

23 for any reason?

24    A      No.

25    Q      Have you ever received any

1    complaints that you needed to look into

2    regarding Officer Skidmore?

3         A      No.

4         Q      Did you ever receive any

5    complaints about Officer Skidmore?

6         A      No.

7                Can I clarify something, if

8    that's all right?

9         Q      Absolutely, of course.

10        A      You mentioned that I never --

11   if we can go back to the question where

12   you said about investigating, have I ever

13   investigated officers?

14        Q      Yes.

15        A      I've received complaints,

16   like, I've been the recipient of -- of or

17   talking to a complainant that wanted to

18   make a complaint against an officer where

19   I'll take that report and basically pass

20   it onto internal affairs, so if that is

21   considered part of the investigation

22   process, then I guess my answer would be

23   yes.

24        Q      Okay.

Is all you did was take the
complaint and forward it?

    A    Well, yeah.  Well, I would
interview the complainant, we would talk
about, you know, there's been instances
where I would talk to them about what
they're complaining about, and if they
wanted to proceed with a complaint about
an investigation, usually it is our
procedure where I would take the
complaint at the precinct, and usually
that would be -- then it would be my
responsibility to take that complaint and
go online, and it's called a Blue Team.
It's, like, the website that internal
affairs uses, it's how we would -- I
would enter the complaint in the Blue
Team, and it would be further
investigated by internal affairs.

    Q    In this process would you
interview the officer that was being
complained about as well?

    A    No, not necessarily.

    Q    Was there an occasion where

you did question an officer who received

a complaint from a complainant?

A     I don't recall doing that.

Q     These complaints that you

spoke of, were some of the complaints

about the treatment that they received

from police officers?

A     Yes.

Q     Did you receive any

complaints regarding Officer Skidmore?

A     No.

Q     Lieutenant, did you conduct,

and we're talking about in the year 2021,

any training of the officers that you

supervised?

A     Can you repeat it again,

please?  Conduct?

Q     Did you conduct any training

for the officers that you supervised?

A     Well, yes, it's one of my

responsibilities is to hold a monthly

inspection where usually I disseminate

information to the squad on various

directives that come out for the

department that they would need to know.

Q    In 2021, this was something
that was done on a monthly basis?

A    It is done on a monthly
basis.  The only thing we did for a while
with COVID regulations, we had stopped
doing them.  I don't really remember when
they started up again, but there was a
period where during COVID where we were
holding monthly inspections.

Q    You mentioned that in the
inspections you would disseminate
information, what type of information was
being provided to the officers?

A    The department comes out with
its directives every month, they deal
with, it can be anything from rules and
procedures to crime patterns or trends,
to anything from the impound yard being
closed.  It's a very wide variety on the
directives.

Q    So my initial question in
this regard was during this inspection is
there some type of training that is

provided to the officers?

    A      Well, it's considered
training by the department when -- when I
do that, when I have an inspection that
lasts for about 45 minutes or so, that's
considered training.

    Q      Did you ever review with the
officers conduct in traffic stops?

    A      I don't specifically recall
reviewing that with them, no.

    Q      Did you ever provide training
to the officers you supervised regarding
use of force?

    A      Again, I don't -- I don't
recall specifically going over use of
force with them.

    Q      Do the officers receive any
supplemental training on use of force
once they leave the academy?

    A      Yes.

    Q      How would they receive this
training?

    A      Once a year every squad
member is -- is mandated to requalify on

their firearm, and it's a full day of
training at the -- at the academy where
we go over use of force, deadly physical
force.

Q     Are you familiar with the
protocols for use of force?

A     Yes.

Q     When was the last time you
received any training on use of force?

A     I can't recall.  Oh, I went
in 2023, I can't recall right now what
month it was, but my last training with
my weapon was in 2023.

Q     In determining the proper
response in use of force, is that
something that is subjective, like up to
the individual officer, or is there a
protocol on how and what proper use of
force is or something else?

A     We are trained in the police
academy on use of force.

Q     Do officers have discretion
as to what the proper use of deadly force
is?

         A     I would say no.

         Q     Is there a specific training
or protocol or rule governing the amount
of force that officers should use when
engaged one on one with a suspect?

         A     Can you repeat that, please?

         Q     Is there a specific written
guideline governing the amount of force
that an officer should use when they're
engaged one on one with a suspect?

         A     I don't know.

         Q     Is it because my question was
not clear?

         A     We've received training on
the use of force, deadly physical force.
Your question -- if your question is a
specific guideline, it might be.  I would
have to refer to the rules and
procedures.  I'm sure it's in there, but
I haven't read it recently.

         Q     Are you familiar with
something called force continuum?

         A     Yes.

         Q     Can you explain what that is,

please?

    A     I -- I -- not adequately to -- to answer that question.

    Q     If an officer confronts a suspect that they believe is carrying a knife, what is the procedure that that officer should follow?

          MS. LEAHEY:  Objection. Hypothetical.

          The deponent may answer the question.

    A     Can you repeat the question?

    Q     Certainly.

          If an officer confronts a suspect that the officer believes has a knife on his person, what is the proper procedure that that officer should follow?

    A     Hypothetically, I would say stay sufficiently out of -- at -- have a sufficient distance between him, between him and the subject so he's not harmed with the -- with the knife.  Engage the subject verbally, find out what's going

on, what their intentions are, receive
more information on why he is there and
what's going on so he can evaluate the
situation.

        Q      Is there a specific guideline
as to what it means for an officer to be
in fear for his life?  By that question I
mean are there specific parameters that
say, Okay, once this happens, an officer
is in fear for his life?

        A      Not that I'm aware of.

        Q      So that would be something
that's up to the individual officer to
determine?

        A      Personally, I would think
that it would be, yes.

        Q      As far as you know, that's
not something that's specifically covered
in training or is it or you don't know or
something else?

        A      I don't understand the
question.

        Q      Fear for life, when an
officer should engage a suspect or

determine that they're in fear for their

life.

        A       Is it a personal decision?

        Q       Is it a personal decision, or

is there something, a guide, that is

provided by the police department?

        A       I'm not aware of a specific

guide.

        Q       If an officer is engaged in a

physical fight with a suspect as in this

case we're discussing, the officer is on

top of the suspect, and that officer

feels he is in fear for his life, is

there a protocol that dictates that that

officer should shoot the suspect once in

the head and once in the chest?

                MS. LEAHEY:  Objection.

        There's been no foundation that the

        witness has knowledge of the facts

        that you are positing, no

        foundation.

                The witness may answer the

        question.

        A       Can you repeat it, please?

 Q     Yes.

       Is there any type of
guideline that dictates that in a
physical altercation, if the officer is
on top of a suspect and he is in fear for
his life, that he should shoot the
suspect once in the head and once in the
chest?

 A     Not that I'm aware of.

       MR. MANUEL:  If it's okay
       with you guys, I have some eye
       issues and other things, can we
       take maybe a seven-minutes-or-so
       break?

       MS. LEAHEY:  Yes.

 A     That's fine with me.

       MR. MANUEL:  Okay, thank you.

       (Recess taken.)

 Q     Lieutenant, I just want to go
back to one question that I don't know
that either I didn't understand or I
didn't quite get the answer about the
determining of fear for life, whether or
not that is something that was covered in

any training that was received.

    A    We receive training on deadly physical force, if I understand your question correctly.

    Q    And was the training that deadly physical force may be applied when an officer is in fear for his life?

    A    Yes.

    Q    Was there anything in the training that described what it meant to be in fear for your life?

    A    Not that I know of.

    Q    Were there examples given to show when this occurs, this would be a position when an officer should feel that they are in fear for their life?

    A    I supposed there was, yes.

    Q    So there were examples given of when an officer would be in fear for their life?

    A    Yes.

    Q    Can you tell me what some of those examples were?

    A    If someone is using -- has a

weapon or is using force against you that

might result in your death or serious

physical injury.

Q     When you say "has a weapon"?

A     It's not only has a weapon,

that's an example.  I thought you were

you were asking for an example.

Q     Yes, I was.

A     So okay, do you want me to

give examples?

Q     When you say "has a weapon,"

is it enough to know that the person has

possession of a weapon for the officer to

feel that they are in fear for their

life --

A     No.

Q     -- and therefore use deadly

physical force?

A     Excuse me, I'm sorry.

Q     That's okay.

A     No.

Q     In this situation, May 2021

with Officer Skidmore and the death of

Jessie Bonsignore, you at some point

arrived at the scene; is that right?

          A      Yes.

          Q      How did you receive

information that you should arrive at

that scene?

          A      Officer Skidmore broadcast

over the radio that there were shots

fired at his call.

          Q      I see also that it is

referred to as a crime scene, why is it

referred to as a crime scene?

          A      It was a death.  The --

the -- because of the incident, or what I

know of it, it was a scene of the crime

scene.

          Q      What was the crime at that

scene?

          A      Potentially it could be

charges against the -- the decedent.

          Q      You said "Potentially"?

          A      Correct.

          Q      And potentially it could have

been charges against the officer, right?

          A      I wouldn't know.

Q      And you don't know whether it
would have been charges against the
decedent either, right?  You don't know
why it was called a crime scene; is that
right?

A      No, I wouldn't say that, no.

Q      So other than the potential
reasons why it could have been called a
crime scene, why was it called a crime
scene?

A      It was -- it involved an
on-duty shooting -- a police-involved
shooting that I know is going to get
investigated.

Q      Did you take any part in that
investigation?

A      The actual investigation, no.

Q      What were your duties when it
came to the crime scene on May 20, 2021?

A      Specific to the crime scene?

Q      Yes.

A      To assign personnel to secure
the crime scene.

Q      What does that mean, "secure

the crime scene"?

   A     I had officers block off the
road, I had officers set up crime scene
tape, any unauthorized personnel that was
in the crime scene, I would be trying --
I would be getting them out of the crime
scene so it was secure.  Basically
shutting everything down.

   Q     Did you have anything to do
with the physical evidence at the scene?

   A     Can you be more specific?  I
don't understand your question.

   Q     Did you secure any of the
physical evidence at the scene?

   A     No.

   Q     Did you do any inventory of
the physical evidence at the scene?

   A     I'm not entirely sure what
you mean of inventory.

   Q     Did you make any record of
the physical items that were at the
scene?

   A     I made mental notes of the
crime scene.

Q     And at any point did you
transform those notes from your thoughts
onto some type of physical existence,
whether it be paper, digital or something
else?

A     I included it in my
supplemental report.

Q     Were there any other reports
that you prepared, other than your
supplemental report?

A     No.

Q     Were there any other audio
recordings that were made regarding this
crime scene from May 20, 2021?

          MS. LEAHEY:  Objection.  The
          question is unclear as to whether
          the recordings were made by the
          officer or someone else, whether he
          has knowledge of them.

          MR. MANUEL:  Yes, I'll
          rephrase.

Q     Lieutenant, did you make any
audio recordings regarding the scene that
you arrived at on May 20, 2021?

A       No.

Q       Did you make any video
recordings of that scene?

A       No.

Q       Did you take any photographs
of that scene?

A       No.

Q       Did you supervise anyone who
took photographs of the scene?

A       No.

Q       Did you interview anyone when
you arrived at the scene?

A       Yes.

Q       Who did you interview?

A       Officer Skidmore.

Q       Did you interview anyone,
other than Officer Skidmore?

A       No.

Q       Did you speak to any other
officers at the scene?

A       Yes.

Q       Who else did you speak to,
other than Officer Skidmore?

A       I spoke to Officer Dow.  I

spoke to Officer Jensen.  I spoke to
Sergeant Castelli.

    Q    What was the last name of the
sergeant?

    A    Paul Castelli.

    Q    What was the substance of
your conversation with Officer Dow?

    A    He assisted.  We worked
together to perform CPR on the decedent.

    Q    When you arrived, he didn't
have a pulse, right?

    A    I don't know if he had a
pulse when I arrived.

    Q    When you checked him, he
didn't have a pulse, did he?

    A    Correct.

    Q    And then did you immediately
perform CPR?

    A    Yes, by that time Officer Dow
was approaching and together we started
CPR on the subject.

    Q    Is there a protocol for how
you should handle people at a crime scene
that you determined were, I think your

words were, unconscious; is there a

procedure that you're supposed to follow?

     A     Not necessarily, no.

     Q     So you made a decision that

you and Officer Dow should perform CPR?

     A     Yes.

     Q     How long after you arrived at

the scene did you perform CPR?

     A     I would say timeframe, one

minute to two minutes after I initially

arrived to the initiation of CPR.

     Q     Did you ask Officer Skidmore

if he performed CPR on Mr. Bonsignore?

     MS. LEAHEY:  We couldn't hear

    that question.

     Q     Did you ask Officer Skidmore

if he performed CPR on Mr. Bonsignore?

     A     No, I did not.

     Q     Did you call an ambulance?

     A     Personally, no.

     Q     Was there an ambulance on

scene when you arrived?

     A     No.

     Q     Was there one there by the

1   time that you left?

2       A       Yes.

3       Q       How long after you arrived

4   did the ambulance come?

5       A       I'm not really sure on the

6   timeframe.  It wasn't -- it wasn't a very

7   long time between when I initiated CPR

8   and when Jensen showed up.  It was a

9   short period.

10      Q       What was the substance of

11  your conversation with Officer Jensen?

12      A       He, I believe, he approached

13  and said that he wanted to take Officer

14  Skidmore to the hospital.

15      Q       Why was Officer Jensen on the

16  scene?

17      A       He was an assisting officer.

18      Q       What does that mean?

19      A       He -- it was Officer

20  Skidmore's call, but Officer Jensen was

21  in an adjoining sector, so on many

22  occasions, the adjoining sector will show

23  up as light backup to assist the primary

24  officer.

Q    So Officer Jensen was there
based on the initial call that Officer
Skidmore was responding to or the call
that Officer Skidmore made regarding the
shots or something else?

A    I'm -- I'm not really sure,
you know.

Q    What was the substance of
your conversation with Sergeant Castelli?

A    I told Sergeant Castelli to
respond to the hospital where Officer
Skidmore was and to safeguard his firearm
and gun belt.

Q    Do you know why Sergeant
Castelli arrived at the scene?

A    Well, the way the call came
out as a police, you know, that it was a
police-involved shooting, there were a
lot of people coming to the scene, racing
to the scene.

Q    Okay.

So Sergeant Castelli came as
a result of the call regarding officer
shots?

A     I would believe so, yes.

Q     Okay.

Do you know whether it was that call or the initial call that caused Sergeant Castelli to come?

A     I don't know.

Q     Just so that I am clear and the record is clear, you were there to secure the scene, the crime scene, right?

A     That was one of my duties, yes.

Q     Who was responsible for securing the evidence?

A     That would also, it would fall under a lot of people, but one being me.

Q     Who else was responsible for securing the evidence?

A     I would think any investigator that showed up after me.

Q     Do you know who the investigator or investigators were who showed up after you?

A     I believe it was investigated

*Rich Moffett Court Reporting, Inc.*

by our homicide unit.

Q    And do you know who the person or persons were that conducted the investigation?

A    I don't remember specifically, no.

Q    Do you know Officer Rieppel?

A    Yes.

Q    And who is Officer Rieppel?

A    I believe he was, at the time of the incident he was a member of the crime scene unit.

Q    Is he an investigator?

A    I don't know exactly if their title is investigator.  It's their -- their job, as I understand it, it's to, you know, retrieve evidence, take pictures, take measurements, stuff like that.

Q    But you don't know whether part of their job duties is to interpret what the measurements and pictures may mean?

A    I can't testify to what their

specific duties are.

Q      You said that one of your duties was to secure the scene, what was another duty that you had regarding the crime scene?

A      My initial response was to get to the scene because there were shots fired, and I wanted to get there to assist the fellow officer.

Q      And you had to secure the scene, you had to secure the evidence, assist the officer, and what else were your duties regarding this crime scene?

A      Provide aid to -- to anyone that's injured.

Q      Anything else?

A      I made notifications that night.  I notified the duty officer through headquarters, because it was a police-involved shooting he had certain notifications he has to make.  I personally spoke to my inspector and my deputy inspector, and they responded to the scene.

Q      You said, I'm not sure, I
think I asked did you interview Officer
Skidmore, right, did you say you
interviewed Officer Skidmore?

A      I had a conversation with
him, yes.

Q      Did you make a record of that
conversation you had with Officer
Skidmore, other than a mental note?

A      I would have to review my --
my supplementary report.  I think I put
it in there.

Q      Anything other than your
supplementary report, did you make any
other notation regarding your
conversation with Officer Skidmore?

A      No.

Q      Before we go to your
supplemental report, do you recall what
your conversation with Officer Skidmore
was?

A      Yes.

Q      What was that conversation?

A      I asked him what happened.

Q     And what did he tell you?

A     He said that, "He went for my gun." Or something of, like, that substance, and, "He grabbed for my gun," or, "He went for my gun."

Q     Do you know what type of gun Officer Skidmore had on that date?

A     It was his service weapon. I'm not really sure we have the same service weapons, I don't know, because there was a time where we were -- we had the 9mm and then we went to the .40, and then we went back to the 9mm. I don't know, it was -- but it was -- it was his service weapon. I don't know if it was a .40 or a 9 at the time.

Q     Do you carry a service weapon?

A     Yes.

Q     Do you utilize a holster?

A     Yes.

Q     What type of holster did you have on May 20, 2021?

A     I -- I don't know the name of

it.  It's -- it's the one that is

provided by the County.

Q     How does it function, can you

describe the way that it functions?

A     Well, the -- the holster that

I wear during patrol on my gun belt,

it's, you have to press down with your

thumb and there's a latch, like, over the

top of your gun that you have to push

forward and then come up with the weapon.

So it's actually, like, a two-step

process to get the gun out.  It's

supposed to be greater security.

Q     Is that a standard holster,

or did officers have different types of

holsters?

A     No, I've never seen, to my

knowledge, all the officers have the same

holster.

MR. MANUEL:  Let's take a

look at the supplemental report.

Does it have a Bates stamp number?

We haven't had the greatest success

with Bates stamps and your office,

no reflection on you, of course,

but there are numbers in the middle

of the bottom of the page that we

can perhaps use for reference.

      MS. LEAHEY:  Yes.

      MR. MANUEL:  So it has a

1098, the next page is 1224, and

the third page has 1242.

      MS. LEAHEY:  The statement I

have is one page long, and it says,

"Attachment," I think, "16-1," at

the bottom.

      MR. MANUEL:  This is multiple

pages, but it looks to me to be a

duplicate, but I don't see the

16-1.

      MS. LEAHEY:  It's hard to

read.  It's a stamp that says ATT,

then a number sign, then in a

circle a pencilled-in number, I

think it's 16-1.

      Do you see this?

      THE WITNESS:  I do not see

that.

MR. MANUEL:  What I can do is
I can share my screen so we're
looking at the same document.

MS. LEAHEY:  And I think if
you share it once, then we'll
stipulate that it's the same
document.  You don't have to keep
it up on the screen if you don't
want to.

MR. MANUEL:  Yes, sure.

(Plaintiff's Exhibit 1,
Supplementary Report, deemed marked
for identification.)

Q    Do you see what is on the
screen, Lieutenant?

A    Yes.

Q    Do you recognize this
document?  I'll scroll down so you could
see the rest of it.

MS. LEAHEY:  It looks like it
has a Bates stamp on the bottom of
number 1242.  The copy I have
doesn't have it, but they're the
same document.  My guess is that is

2          your office's Bates stamp because

3          the county has a COS before theirs.

4               MR. MANUEL:  Yes, we usually

5          put the person's name, but there it

6          is.

7          Q      Lieutenant Gozaloff, do you

8     recognize this document?

9          A      Yes.

10         Q      What do you recognize this

11    document to be?

12         A      That is the supplementary

13    report that I made.

14         Q      Do you see the signature on

15    the bottom left?

16         A      Yes, this is my signature.

17         Q      Do you see the signature to

18    the right of your signature?

19         A      Yes.

20         Q      Do you know whose signature

21    that is?

22         A      I believe it's Sergeant Guyer

23    from the homicide unit.

24         Q      Do you know whether or not

25    that is Sergeant Guyer's signature?

1

2          A       No, I don't.

3          Q       You recognize this report as

4     being the supplemental report that you

5     prepared; is that right?

6          A       Yes.

7          Q       Where it says that, "I then

8     proceeded to check the male on the ground

9     who was unconscious," do you see that?

10         A       Yes.

11         Q       How did you know at that time

12    that he was unconscious?

13         A       He didn't appear to be

14    conscious.

15         Q       Can you describe what it

16    means to not appear to be conscious, what

17    was it that you observed to have you

18    reach the determination that he was not

19    conscious?

20         A       I mean, he was on the ground,

21    he wasn't moving, and he wasn't

22    responding to me.

23         Q       When you used the word

24    "unconscious," does it have any meaning

25    as towards whether the person is alive or

*Rich Moffett Court Reporting, Inc.*

not alive?

        A       No.

        Q       The next sentence says, "The
male did not respond to my verbal
commands, and I was unable to feel a
pulse on him."   What verbal commands did
you give?

        A       It was nothing more than me
saying, "Hey, can you hear me?"  Like --
like something along those lines.  I
don't remember specifically what I said,
but something along those lines like,
"Hey, Buddy, can you hear me?"

        Q       The next part of the sentence
indicates that you were unable to feel a
pulse on him, what did you do to attempt
to find a pulse?

        A       I used my fingers to feel for
a pulse on his neck.

        Q       There was no pulse, right?

        A       I could not feel a pulse at
that time.

        Q       Was it after that that you
began applying CPR?

1

2          A      Yes, very soon after it.

3          Q      Then it says that while you

4    were performing CPR, "it was noted that

5    the male had a folded knife in his

6    possession and clipped to his belt."  Do

7    you see that?

8          A      Yes.

9          Q      Now, do you recall, as you

10   sit here today, where the knife was on

11   Mr. Bonsignore?

12         A      It would have been on his

13   front -- somewhere in the front, like, by

14   his belt buckle somewhere.

15         Q      Do you recall whether it was

16   on the left, right or in the middle or

17   somewhere else?

18         A      I don't recall.

19         Q      Do you recall what the knife

20   looked like?

21         A      It was in a holder so not

22   really, but I knew it was a knife, or I

23   suspected it to be a knife.

24         Q      That was my next question,

25   how did you know that it was a knife, and

how did you know that it was a folding

knife?

    A     Life experience, I've had

folding knives, I've seen folding knives,

I've had -- I've owned folding knives.

It appeared to me to be a folding knife

in a holder clipped to his belt.

    Q     How big was the knife?

    A     Well, it was folded so I

never opened it, so I don't really know

how long the knife was.

    Q     Can you describe for me the

holder that what you described as a

folding knife was in?

    A     I can't really recall a

description at this time.

    Q     Was it an open holder?

    A     I could see it was, like, a

holder with, like, maybe a flap that

connects to the front of the holder so

you could see a portion of the knife.

    Q     After you performed CPR, did

you leave the knife holder where it was?

    A     I don't recall.

Q    Did you take the knife for
evidence?

A    I don't recall if I -- I took
it off his person.

Q    Is there a procedure for what
you should do when you find a knife on a
suspect?

A    I don't know to be -- I don't
know how to answer that.

Q    Well, do you know if there is
a procedure --

A    No.

Q    -- or what to do if you find
a knife, or what you suspect to be a
knife, on an unconscious suspect?

A    No.

Q    It says in your supplemental
report that, "Police Officer Skidmore was
transported from the incident location by
PO Jensen to Peconic Bay Hospital for
medical treatment."  Why was Officer
Skidmore taken to Peconic Bay Hospital
for medical treatment?

A    I believe he had some scrapes

and abrasions.

    Q    Did you testify that you
spoke to Officer Jensen about taking
Officer Skidmore to the hospital?

    A    Yes.

    Q    Did you direct Officer Jensen
to take Officer Skidmore to the hospital?

    A    Yes.

    Q    Did Officer Skidmore tell you
that he was injured?

    A    No.

    Q    Why did you direct Officer
Jensen to take Officer Skidmore to the
hospital?

    A    I believe Officer Jensen said
he needed to get to the hospital because
he had scrapes and bruising and
abrasions.

    Q    Officer Jensen informed you
of Officer Skidmore's injuries?

    A    He said -- he said, "I'm
going to take Officer Skidmore."  In sum
and substance, he said that he was going
to take him to the hospital, and I said,

"Okay."

     Q     Did anyone from Suffolk
County Police Department ever interview
you regarding Officer Skidmore's shooting
of Mr. Bonsignore?

     A     Yes.

     Q     Who interviewed you?

     A     It would have been a member
of the homicide squad.  I'm not really
sure who I talked to.

     Q     Were there reports generated
regarding your interview?

     A     No.  Well, not on my end.  I
don't know.

     Q     When did this interview by
the homicide squad of you occur?

     A     When they arrived at the
scene, it's just common practice just to
when investigators show up at a crime
scene, whoever the investigators are, I
usually give them a quick synopsis of --
of what we have.

     Q     So this was the same day as
the incident, May 20, 2021?

A     Yes.

Q     And you don't know which
officer interviewed you?

A     No, there were numerous
detectives from the homicide bureau
there.

Q     Did more than one of them
speak with you?

A     I don't recall.

Q     Can you give me a description
of the person that interviewed you
regarding the crime scene that you were
securing?

A     No.

Q     Were you ever questioned by
internal affairs regarding this incident?

A     No.  Again, not formally.  I
wasn't interviewed formally.  I know when
internal affairs officers, investigators
from the internal affairs office showed
up, and you know, I make sure -- one of
my duties is to make sure anyone showing
up at the crime scene gets on the crime
scene log, and so I know, in general,

that investigators from internal affairs

were there.  I don't remember

specifically which ones, but I would have

given them probably the same synopsis of

what we had.

     Q     But do you recall speaking

with anyone from internal affairs about

this incident on May 20th that occurred

on May 20, 2021?

     A     A specific person?

     Q     Not their name, but do you

recall speaking with someone from

internal affairs about Officer Skidmore

shooting to death Jessie Bonsignore?

          MS. LEAHEY:  Just for

          clarification, this question with

          respect to the incident itself, the

          shooting incident as opposed to the

          crime-scene status?

          MR. MANUEL:  I'm using the

          word incident as the broad term to

          cover everything that happened,

          right.  I am asking if he spoke to

          anyone specifically from internal

affairs regarding that incident.

A     Yes.

Q     When did you speak to someone from internal affairs?

A     Whenever they arrived at the scene and went on the crime scene log.

Q     So it was on the day of the incident?

A     It either would have been on -- 'cause the incident occurred late on the 20th, it would have been -- and crime scene continued into the 21st, the morning of the 21st, so it could have been after midnight into the 21st.

Q     Yes.

You remained on the crime scene until it carried over from the 20th to the 21st?

A     Yes.

Q     Did you speak to more than one person from internal affairs --

A     I don't think so.

Q     -- on either of those days?

A     I don't recall.

1

2      Q      You said you didn't speak to

3  them formally, you spoke to them

4  informally?

5      A      Other than giving them a

6  synopsis of what I had, you know, as far

7  as the crime scene went, you know, there

8  was no -- nothing else other than that.

9      Q      So after that date, the 20th

10 and  21st, at the crime scene, did you

11 ever speak with anyone from internal

12 affairs regarding that incident?

13     A      No.

14     Q      Did Officer Skidmore remain

15 under your command after this incident?

16     A      Yes.

17     Q      Did his duties change at all?

18     A      No.

19     Q      He remained a patrol officer;

20 is that right?

21     A      He did, is that the question?

22     Q      Yes.

23     A      Yes.

24     Q      Did Officer Skidmore remain a

25 patrol officer?

A    Yes.

Q    Was he not assigned to desk
duty?

A    There might have been
instances where he worked the desk.

Q    Did Officer Skidmore receive
any type of disciplinary action as a
result of this incident that resulted in
Mr. Bonsignore's death?

A    Not to my knowledge.  I
wouldn't be privy to that information.

Q    You were not made aware of
officers in your charge if they receive
disciplinary actions?

A    Regarding this specific
incident, I -- I don't know -- I know it
was investigated by internal affairs, I
don't know the outcome, no.

Q    You don't know the outcome,
but I think you said you wouldn't be
privy to that?

A    I wasn't part of the
investigation.

Q    Right, but if there was

discipline, is that something that you
would know?

    A    Not necessarily, no.

    Q    Were you ever made aware of
any complaints made against Officer
Skidmore?

    A    Ever?

    Q    Yes.

    A    Yes.

    Q    What complaints were you made
aware of against Officer Skidmore?

    A    One of my duties is when an
internal affairs investigation comes to a
completion, the officer receives a
disposition letter, that goes through the
command staff, it comes down to me.  I
have -- I bring the officer in for an
interview, I hand him the sealed envelope
at that time, and my personal policy is
that I make them know that I'm aware or
I'm available if they want to discuss it
with me but they don't necessarily have
to.

    Q    What specific complaints were

made against Officer Skidmore?

    A    I don't know the specific complaints. I know I had to hand him a disposition letter in July of 2020.

    Q    Is that the only complaint you were made aware of?

    A    No, I also had to hand him a disposition letter in, I believe, in September of 2022.

    Q    And you are only aware of two complaints against Officer Skidmore?

    A    Those are the only two disposition letters that I -- that -- that I handed him, yes.

    Q    And in addition to handing him the disposition letters, are you aware of any other complaints made against Officer Skidmore?

    A    No.

    Q    Are you aware of any civilian complaints made against Officer Skidmore?

    A    No.

    MR. MANUEL: We're going to take another ten and see where we

1
2      are.
3              MS. LEAHEY:  Any idea how
4      long this might be?
5              MR. MANUEL:  I'm sorry?
6              MS. LEAHEY:  Any idea how
7      much longer you might need to go?
8              MR. MANUEL:  That's what
9      we're going to find out within this
10     ten minutes.
11             MS. LEAHEY:  Okay, great.
12     Thank you.
13             (Recess taken.)
14             MR. MANUEL:  I just want to
15     add, to the extent that it was not
16     already produced, we'd ask for
17     production of the crime scene log.
18             MS. LEAHEY:  We'll take it
19     under advisement.  Could you just
20     send us a list in writing on the
21     things you want, please?
22             MR. MANUEL:  Yes, it will
23     certainly be on the transcript, and
24     we'll get it to you before then as
25     well.

                    MS. LEAHEY:  Thank you.

          Q       Lieutenant, were you made
aware of the reason that Officer Skidmore
was initially called to the location?

          A       I already knew the reason,
yes.

          Q       How did you already know that
reason?

          A       I heard the call come over
the radio.

          Q       What was the reason that
Officer Skidmore was called to that
location?

          A       I believe he was dispatched
there for a 10-34, which is a suspicious
person.

          Q       Was there any violation
regarding where Mr. Bonsignore's vehicle
was situated when you arrived?

          A       Not that I know of.

          Q       Did you see any signs or
anything that indicated that the vehicle
should not have been where you saw it?

          A       I don't recall if there were

signs there, no.

Q    I know in your supplemental
report, and we can bring it back up if
you need it, and you may have it there,
you say that you observed Officer Jensen
handcuffing Mr. Bonsignore?

A    Yes.

Q    Where were you when you
observed Officer Jensen handcuffing
Mr. Bonsignore?

A    I was exiting my vehicle.

Q    How close to Mr. Bonsignore
and Officer Jensen were you?

A    Just an estimate, but I'll
say probably within 20 yards.

Q    And in what manner did he
handcuff Mr. Bonsignore?

A    He handcuffed him to -- he
handcuffed his hands in front of -- in
front of him.

Q    Could you see whether or not
Mr. Bonsignore was moving at that time?

A    I didn't see any movement.

MR. MANUEL:  I don't have any

1
2          further questions at this time.
3                 (Time noted:  12:23 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

A C K N O W L E D G M E N T

STATE OF NEW YORK   )
                    :ss
COUNTY OF           )

        I, LIEUTENANT THOMAS GOZALOFF,

   hereby certify that I have read the

   transcript of my testimony taken under

   oath in my deposition of

   August 23, 2024; that the transcript is

   a true, complete and correct record of

   my testimony, and that the answers on

   the record as given by me are true and

   correct.




                    _____

                    LIEUTENANT THOMAS GOZALOFF



Signed and subscribed to before
me, this            day
of                  , 2024.
_____
Notary Public, State of New York

```
 1                                              67
 2     ------------------I N D E X-------------------
 3     WITNESS              EXAMINATION BY      PAGE
 4     LT. THOMAS GOZALOFF  MR. MANUEL            4
 5
 6     ---------------DOCUMENT REQUEST----------------
 7     PAGE:  62   Crime scene log
 8
 9     ----------------EXHIBITS-------------------
10     PLAINTIFF'S                          DEEMED
11     1    Supplementary Report            46
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

*Rich Moffett Court Reporting, Inc.*

C E R T I F I C A T E

STATE OF NEW YORK  )
                   ) ss.:
COUNTY OF NASSAU   )

I, DIANA MITCHELL, a Notary Public within and for the State of New York, do hereby certify:

That LIEUTENANT THOMAS GOZALOFF, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 29th day of August, 2024.

_____
DIANA MITCHELL

# 1

**1** [2] - 46:12, 67:11
**1-5** [1] - 1:12
**10-34** [1] - 63:16
**100** [2] - 2:11, 2:19
**1098** [1] - 45:8
**10:31** [1] - 1:16
**11530** [1] - 2:12
**11550** [1] - 2:6
**11788** [1] - 2:20
**11980** [1] - 4:15
**1224** [1] - 45:8
**1242** [2] - 45:9, 46:23
**12:23** [1] - 65:3
**13** [1] - 11:8
**16-1** [3] - 45:12, 45:17, 45:22
**18** [2] - 11:21, 13:16
**1993** [1] - 9:5

# 2

**20** [9] - 1:15, 11:21, 31:20, 33:15, 33:25, 43:24, 54:25, 56:10, 64:16
**2005** [1] - 11:7
**2018** [1] - 8:23
**2019** [11] - 7:18, 7:20, 7:24, 8:22, 8:24, 9:7, 9:9, 9:14, 9:18, 11:7, 16:17
**2020** [1] - 61:5
**2021** [12] - 11:14, 16:5, 16:9, 19:14, 20:3, 29:23, 31:20, 33:15, 33:25, 43:24, 54:25, 56:10
**2022** [1] - 61:10
**2023** [2] - 22:12, 22:14
**2024** [4] - 1:15, 66:11, 66:23, 68:22
**20th** [4] - 56:9, 57:12, 57:18, 58:9
**21st** [5] - 57:13, 57:14, 57:15, 57:19, 58:10
**22-cv-02925** [1] - 1:8
**23** [1] - 66:11
**29th** [1] - 68:21

# 3

**3** [1] - 9:9
**30** [1] - 4:14
**3rd** [5] - 8:2, 8:5, 8:7, 8:10, 8:18

# 4

**4** [4] - 11:18, 11:22, 16:10, 67:4
**40** [2] - 43:13, 43:17
**45** [1] - 21:6
**46** [1] - 67:11

# 5

**556** [1] - 2:5

# 6

**62** [1] - 67:7

# 7

**7th** [11] - 7:13, 7:16, 7:17, 7:23, 8:11, 8:14, 8:16, 11:15, 16:11, 16:17, 16:19

# 9

**9** [1] - 43:17
**9mm** [2] - 43:13, 43:14

# A

**a.m** [1] - 1:16
**ability** [2] - 6:9, 6:15
**abrasions** [2] - 53:2, 53:19
**absolutely** [1] - 17:10
**academy** [5] - 8:21, 9:7, 21:20, 22:3, 22:22
**accurately** [1] - 5:11
**ACTING** [1] - 2:16
**action** [3] - 13:10, 59:8, 68:17
**actions** [1] - 59:15
**activity** [1] - 14:8
**actual** [2] - 5:18, 31:18
**add** [1] - 62:15
**addition** [1] - 61:16
**address** [2] - 4:13, 4:14
**adequately** [1] - 24:3
**adjoining** [2] - 37:22, 37:23
**administer** [1] - 3:17
**Administrator** [1] - 1:6
**advisement** [1] - 62:19
**affairs** [15] - 17:21, 18:17, 18:20, 55:17, 55:20, 55:21, 56:2, 56:8, 56:14, 57:2, 57:5, 57:22, 58:12, 59:18, 60:14
**AGREED** [3] - 3:3, 3:9, 3:14
**aid** [1] - 41:15
**Albany** [1] - 10:21
**alive** [2] - 48:25, 49:2
**altercation** [1] - 27:5
**ambulance** [3] - 36:20, 36:22, 37:5
**amount** [2] - 23:4, 23:9
**AND** [3] - 3:2, 3:8, 3:13
**ANNE** [1] - 2:21
**answer** [11] - 5:7, 5:16, 5:17, 6:10, 6:16, 17:23, 24:4, 24:11, 26:23, 27:23, 52:10
**answers** [3] - 4:25, 5:11, 66:13
**appear** [2] - 48:13, 48:16
**appeared** [1] - 51:7
**applied** [1] - 28:7
**applying** [1] - 49:25
**approached** [1] - 37:13
**approaching** [1] - 35:21
**arised** [1] - 12:25
**arrest** [2] - 13:17, 13:21
**arrests** [2] - 12:5, 15:7
**arrive** [1] - 30:5
**arrived** [15] - 7:17, 16:19, 30:2, 33:25, 34:13, 35:11, 35:14, 36:8, 36:12, 36:23, 37:4, 38:16, 54:18, 57:6, 63:20
**arriving** [1] - 7:23
**arts** [1] - 10:20
**assign** [1] - 31:23
**assigned** [8] - 7:12, 8:2, 8:20, 9:10, 10:16, 11:22, 16:10, 59:3
**assist** [3] - 37:24, 41:10, 41:13
**assisted** [1] - 35:9
**assisting** [1] - 37:18
**ATT** [1] - 45:19
**Attachment** [1] - 45:12
**attempt** [1] - 49:17
**Attorney** [3] - 2:4, 2:17, 4:22
**attorney** [1] - 4:20

**ATTORNEY** [1] - 2:16
**Attorneys** [1] - 2:10
**attorneys** [1] - 3:3
**audio** [2] - 33:13, 33:24
**August** [3] - 1:15, 66:11, 68:22
**authorized** [1] - 3:16
**available** [3] - 8:13, 12:2, 60:22
**Avenue** [1] - 4:15
**avoid** [1] - 5:8
**aware** [12] - 25:12, 26:8, 27:10, 59:13, 60:5, 60:12, 60:21, 61:7, 61:11, 61:18, 61:21, 63:4
**AYS** [1] - 1:9

# B

**bachelor** [1] - 10:20
**bachelor's** [1] - 10:22
**backup** [1] - 37:24
**based** [1] - 38:3
**basis** [2] - 20:4, 20:6
**Bates** [4] - 44:23, 44:25, 46:22, 47:2
**Bay** [3] - 8:3, 52:21, 52:23
**becoming** [1] - 11:2
**began** [1] - 49:25
**behavior** [3] - 13:6, 15:21
**believes** [1] - 24:16
**belt** [5] - 38:14, 44:7, 50:6, 50:14, 51:8
**between** [4] - 3:3, 24:22, 37:8
**big** [1] - 51:9
**block** [1] - 32:3
**blood** [1] - 68:17
**Blue** [2] - 18:15, 18:18
**BONSIGNORE** [2] - 1:5, 1:7
**Bonsignore** [12] - 4:20, 29:25, 36:14, 36:18, 50:11, 54:6, 56:15, 64:7, 64:11, 64:13, 64:18, 64:23
**Bonsignore's** [2] - 59:10, 63:19
**bottom** [4] - 45:4, 45:13, 46:22, 47:15
**Boulevard** [2] - 2:5, 2:11
**break** [3] - 6:3, 6:5, 27:15
**BREWINGTON** [1] - 2:3

**bring** [4] - 9:22, 13:3, 60:18, 64:4
**broad** [2] - 14:15, 56:22
**broadcast** [1] - 30:7
**bruising** [1] - 53:18
**buckle** [1] - 50:14
**Buddy** [1] - 49:14
**Building** [1] - 2:18
**bureau** [1] - 55:6
**business** [1] - 4:14
**BY** [5] - 2:7, 2:13, 2:21, 4:7, 67:3

# C

**capacity** [3] - 1:11, 1:12, 12:7
**CARMELA** [1] - 1:5
**carried** [1] - 57:18
**carry** [1] - 43:18
**carrying** [1] - 24:6
**case** [1] - 26:12
**Case** [1] - 1:8
**Castelli** [7] - 35:3, 35:6, 38:10, 38:11, 38:16, 38:23, 39:6
**caused** [1] - 39:5
**certain** [2] - 10:16, 41:21
**certainly** [2] - 24:14, 62:23
**certification** [1] - 3:6
**certify** [3] - 66:8, 68:8, 68:15
**change** [1] - 58:17
**charge** [3] - 11:17, 16:7, 59:14
**charges** [3] - 30:20, 30:24, 31:3
**check** [1] - 48:8
**checked** [1] - 35:15
**chest** [2] - 26:17, 27:9
**CHRISTOPHER** [1] - 2:15
**circle** [1] - 45:21
**City** [1] - 2:12
**civilian** [1] - 61:21
**clarification** [1] - 56:17
**clarify** [1] - 17:8
**classes** [4] - 9:22, 10:4, 10:9, 10:17
**CLAYTON** [1] - 2:15
**clear** [5] - 5:16, 5:22, 23:14, 39:8, 39:9
**clipped** [2] - 50:6, 51:8
**close** [1] - 64:13
**closed** [1] - 20:21

**co** [1] - 4:23
**co-counselor** [1] - 4:23
**coming** [1] - 38:20
**command** [3] - 7:11, 58:15, 60:17
**commands** [2] - 49:6, 49:7
**comment** [1] - 12:21
**common** [1] - 54:19
**complainant** [3] - 17:18, 18:5, 19:3
**complained** [1] - 18:23
**complaining** [1] - 18:8
**complaint** [8] - 17:19, 18:3, 18:9, 18:12, 18:14, 18:18, 19:3, 61:6
**complaints** [13] - 17:2, 17:6, 17:16, 19:5, 19:6, 19:11, 60:6, 60:11, 60:25, 61:4, 61:12, 61:18, 61:22
**complete** [2] - 5:15, 66:12
**completion** [1] - 60:15
**comprised** [1] - 9:19
**computer** [1] - 10:6
**conduct** [4] - 19:13, 19:18, 19:19, 21:9
**conducted** [4] - 9:16, 13:25, 14:5, 40:4
**conducting** [1] - 9:12
**confronts** [2] - 24:5, 24:15
**connects** [1] - 51:21
**conscious** [3] - 48:14, 48:16, 48:19
**considered** [3] - 17:22, 21:3, 21:7
**continued** [1] - 57:13
**continuum** [1] - 23:23
**conversation** [8] - 35:8, 37:12, 38:10, 42:6, 42:9, 42:17, 42:21, 42:24
**copy** [1] - 46:23
**correct** [8] - 7:10, 12:19, 13:5, 13:6, 30:22, 35:17, 66:12, 66:15
**correctly** [2] - 12:6, 28:5
**COS** [1] - 47:3
**counselor** [1] - 4:23
**COUNTY** [6] - 1:10, 1:20, 2:16, 66:5, 68:4
**county** [1] - 47:3

**County** [5] - 7:7, 9:2, 11:5, 44:3, 54:4
**couple** [1] - 5:5
**course** [2] - 17:10, 45:2
**Court** [1] - 3:19
**COURT** [1] - 1:2
**court** [1] - 5:10
**cover** [1] - 56:23
**covered** [2] - 25:19, 27:25
**COVID** [2] - 20:7, 20:10
**CPR** [12] - 35:10, 35:19, 35:22, 36:6, 36:9, 36:12, 36:14, 36:18, 37:8, 49:25, 50:4, 51:23
**Crime** [1] - 67:7
**crime** [33] - 20:19, 30:11, 30:12, 30:15, 30:17, 31:5, 31:10, 31:20, 31:21, 31:24, 32:2, 32:4, 32:6, 32:7, 32:25, 33:15, 35:24, 39:10, 40:13, 41:6, 41:14, 54:20, 55:13, 55:24, 56:20, 57:7, 57:13, 57:17, 58:7, 58:10, 62:17
**crime-scene** [1] - 56:20
**criminal** [1] - 10:24

## D

**date** [2] - 43:8, 58:9
**days** [1] - 57:24
**deadly** [6] - 22:4, 22:24, 23:16, 28:3, 28:7, 29:18
**deal** [2] - 13:3, 20:17
**death** [6] - 15:16, 29:3, 29:24, 30:13, 56:15, 59:10
**decedent** [3] - 30:20, 31:4, 35:10
**decision** [2] - 26:4, 26:5, 36:5
**DEEMED** [1] - 67:10
**deemed** [1] - 46:13
**Defendant** [1] - 1:19
**Defendants** [2] - 1:13, 2:17
**degree** [1] - 10:21
**demographics** [1] - 15:3
**Dennison** [1] - 2:18
**Department** [2] - 7:7, 9:3, 54:4

**DEPARTMENT** [2] - 1:11, 1:20
**department** [5] - 9:5, 20:2, 20:16, 21:4, 26:7
**deponent** [1] - 24:11
**deposed** [1] - 5:2
**deposition** [7] - 3:7, 3:14, 6:19, 6:22, 66:10, 68:10, 68:12
**Deposition** [2] - 1:14, 1:19
**deputy** [1] - 41:24
**describe** [3] - 44:5, 48:15, 51:13
**described** [2] - 28:11, 51:14
**description** [2] - 51:17, 55:11
**desk** [2] - 59:3, 59:6
**detectives** [1] - 55:6
**determination** [1] - 48:18
**determine** [3] - 13:9, 25:15, 26:2
**determined** [1] - 35:25
**determining** [2] - 22:15, 27:24
**development** [1] - 10:5
**Diana** [1] - 1:22
**DIANA** [2] - 68:6, 68:24
**dictates** [2] - 26:15, 27:4
**different** [1] - 44:16
**digital** [1] - 33:5
**direct** [2] - 53:7, 53:13
**directives** [3] - 19:25, 20:17, 20:22
**disciplinary** [4] - 13:2, 13:10, 59:8, 59:15
**discipline** [2] - 16:22, 60:2
**discretion** [1] - 22:23
**discuss** [1] - 60:22
**discussing** [1] - 26:12
**dispatched** [1] - 63:15
**disposition** [5] - 60:16, 61:5, 61:9, 61:14, 61:17
**disseminate** [1] - 19:23, 20:13
**distance** [1] - 24:22
**DISTRICT** [2] - 1:2, 1:3
**document** [6] - 46:4, 46:8, 46:19, 46:25, 47:8, 47:11
**DOCUMENT** [1] - 67:6
**documents** [2] - 6:18,

6:21
**DOES** [1] - 1:12
**done** [2] - 20:4, 20:5
**Dow** [4] - 34:25, 35:8, 35:20, 36:6
**down** [5] - 5:10, 32:9, 44:8, 46:19, 60:17
**duly** [2] - 4:3, 68:11
**duplicate** [1] - 45:16
**during** [3] - 20:10, 20:24, 44:7
**duties** [10] - 11:16, 31:19, 39:11, 40:22, 41:2, 41:4, 41:14, 55:23, 58:17, 60:13
**duty** [5] - 13:9, 31:13, 41:5, 41:19, 59:4

## E

**EASTERN** [1] - 1:3
**education** [1] - 10:19
**effect** [1] - 3:18
**effective** [1] - 12:16
**effectiveness** [1] - 12:22
**either** [5] - 13:4, 27:22, 31:4, 57:10, 57:24
**employed** [2] - 7:5, 7:6
**end** [1] - 54:14
**engage** [2] - 24:24, 25:25
**engaged** [3] - 23:6, 23:11, 26:10
**enter** [1] - 18:18
**entirely** [1] - 32:19
**ENV** [1] - 1:9
**ENV-AYS** [1] - 1:9
**envelope** [1] - 60:19
**ESQ** [4] - 2:7, 2:13, 2:15, 2:21
**Estate** [1] - 1:6
**estimate** [1] - 64:15
**evaluate** [1] - 25:4
**evaluation** [1] - 13:20
**evaluations** [1] - 12:8
**evidence** [8] - 32:11, 32:15, 32:18, 39:14, 39:19, 40:18, 41:12, 52:3
**exact** [1] - 11:21
**exactly** [1] - 40:15
**exam** [1] - 11:12
**EXAMINATION** [2] - 4:7, 67:3
**examined** [1] - 4:4
**example** [2] - 29:7, 29:8

**examples** [4] - 28:14, 28:19, 28:24, 29:11
**except** [1] - 3:9
**excuse** [1] - 29:20
**Exhibit** [1] - 46:12
**EXHIBITS** [1] - 67:9
**existence** [1] - 33:4
**exiting** [1] - 64:12
**experience** [1] - 51:4
**explain** [1] - 23:25
**extent** [1] - 62:15
**eye** [2] - 14:25, 27:12

## F

**facts** [1] - 26:20
**failed** [1] - 6:13
**fall** [1] - 39:16
**familiar** [2] - 22:6, 23:22
**family** [1] - 4:20
**far** [3] - 14:12, 25:18, 58:6
**fear** [8] - 25:8, 25:11, 25:24, 26:2, 26:14, 27:6, 27:24, 28:8, 28:12, 28:17, 28:20, 29:15
**fellow** [1] - 41:10
**fight** [1] - 26:11
**filing** [1] - 3:5
**filled** [1] - 12:6
**fine** [1] - 27:17
**fingers** [1] - 49:19
**firearm** [2] - 22:2, 38:13
**fired** [2] - 30:9, 41:9
**five** [3] - 8:9, 8:21, 9:13
**flap** [1] - 51:20
**Floyd** [1] - 7:14
**folded** [2] - 50:5, 51:10
**folding** [1] - 51:2, 51:5, 51:6, 51:7, 51:15
**follow** [3] - 24:8, 24:19, 36:3
**follows** [1] - 4:5
**force** [21] - 3:18, 21:14, 21:17, 21:19, 22:4, 22:5, 22:7, 22:10, 22:16, 22:20, 22:22, 22:24, 23:5, 23:9, 23:16, 23:23, 28:4, 28:7, 29:2, 29:19
**form** [1] - 3:10
**formally** [3] - 55:18, 55:19, 58:3

forth [1] - 68:11
forward [2] - 18:3, 44:11
foundation [2] - 26:19, 26:22
FREDERICK [1] - 2:3
front [5] - 50:13, 51:21, 64:20, 64:21
full [2] - 4:9, 22:2
function [1] - 44:4
functions [1] - 44:5
FURTHER [2] - 3:8, 3:13

## G

GABRIELE [1] - 2:9
Garden [1] - 2:12
general [1] - 55:25
generated [1] - 54:12
given [5] - 28:14, 28:19, 56:5, 66:14, 68:13
governing [2] - 23:4, 23:9
Gozaloff [3] - 4:12, 4:17, 47:7
GOZALOFF [1] - 1:21, 66:7, 66:19, 67:4, 68:9
grabbed [1] - 43:5
grade [2] - 12:10, 12:14
great [1] - 62:11
greater [1] - 44:14
greatest [1] - 44:24
ground [2] - 48:8, 48:20
guess [2] - 17:23, 46:25
guide [2] - 26:6, 26:9
guideline [4] - 23:9, 23:18, 25:6, 27:4
gun [8] - 38:14, 43:4, 43:5, 43:6, 43:7, 44:7, 44:10, 44:13
Guyer [1] - 47:22
Guyer's [1] - 47:25
guys [1] - 27:12

## H

hand [4] - 60:19, 61:4, 61:8, 68:21
handcuff [1] - 64:18
handcuffed [2] - 64:19, 64:20
handcuffing [2] - 64:7, 64:10
handed [1] - 61:15

handing [1] - 61:16
handle [1] - 35:24
hands [1] - 64:20
hard [1] - 45:18
harmed [1] - 24:23
Hauppauge [1] - 2:20
head [3] - 5:9, 26:17, 27:8
headquarters [1] - 41:20
hear [3] - 36:15, 49:10, 49:14
heard [1] - 63:10
Hempstead [1] - 2:6
HEREBY [1] - 3:2
hereby [2] - 66:8, 68:8
herein [1] - 3:4
hereinbefore [1] - 68:11
hereunto [1] - 68:21
highest [1] - 10:18
Highway [1] - 2:19
hired [2] - 9:2, 9:4
hold [1] - 19:22
holder [7] - 50:21, 51:8, 51:14, 51:18, 51:20, 51:21, 51:24
holding [1] - 20:11
holster [5] - 43:21, 43:23, 44:6, 44:15, 44:20
holsters [1] - 44:17
homicide [5] - 40:2, 47:23, 54:10, 54:17, 55:6
Hospital [2] - 52:21, 52:23
hospital [7] - 37:15, 38:12, 53:5, 53:8, 53:15, 53:17, 53:25
hypothetical [1] - 24:10
hypothetically [2] - 12:24, 24:20

## I

idea [2] - 62:3, 62:6
identification [1] - 46:14
immediately [4] - 7:22, 7:25, 8:17, 35:18
impair [2] - 6:9, 6:15
impound [1] - 20:20
IN [1] - 68:20
in-service [6] - 9:11, 9:13, 9:16, 9:18, 9:20, 10:7
incident [18] - 15:13,

15:18, 30:14, 40:12, 52:20, 54:25, 55:17, 56:9, 56:18, 56:19, 56:22, 57:2, 57:9, 57:11, 58:12, 58:15, 59:9, 59:17
included [1] - 33:7
indicated [1] - 63:23
indicates [1] - 49:16
individual [2] - 22:18, 25:14
Individually [3] - 1:5, 1:11, 1:12
individuals [1] - 15:3
informally [1] - 58:4
information [6] - 19:24, 20:14, 25:3, 30:5, 59:12
informed [1] - 53:20
initial [4] - 20:23, 38:3, 39:5, 41:7
initiated [1] - 37:8
initiation [1] - 36:12
injured [2] - 41:16, 53:11
injuries [1] - 53:21
injury [1] - 29:4
input [1] - 12:16
inspection [2] - 19:23, 20:24, 21:5
inspections [2] - 20:11, 20:13
inspector [2] - 41:23, 41:24
instances [2] - 18:6, 59:6
instructor [1] - 10:5
instructors [1] - 10:16
intentions [1] - 25:2
interested [1] - 68:18
internal [15] - 17:21, 18:16, 18:20, 55:17, 55:20, 55:21, 56:2, 56:8, 56:14, 56:25, 57:5, 57:22, 58:11, 59:18, 60:14
interpret [1] - 40:22
interview [10] - 18:5, 18:22, 34:12, 34:15, 34:17, 42:3, 54:4, 54:13, 54:16, 60:19
interviewed [5] - 42:5, 54:8, 55:4, 55:12, 55:19
inventory [2] - 32:17, 32:20
investigated [7] - 15:20, 15:25, 17:14, 18:20, 31:15, 39:25, 59:18

investigating [1] - 17:13
investigation [7] - 17:22, 18:10, 31:17, 31:18, 40:5, 59:24, 60:14
investigator [4] - 39:21, 39:23, 40:14, 40:16
investigators [5] - 39:23, 54:20, 54:21, 55:20, 56:2
involved [6] - 15:9, 15:16, 31:12, 31:13, 38:19, 41:21
IS [3] - 3:2, 3:8, 3:13
issues [1] - 27:13
IT [3] - 3:2, 3:8, 3:13
items [1] - 32:22
itself [1] - 56:18

## J

JAMES [1] - 1:11
Jensen [15] - 35:2, 37:9, 37:12, 37:16, 37:21, 38:2, 52:21, 53:4, 53:7, 53:14, 53:16, 53:20, 64:6, 64:10, 64:14
JESSE [1] - 1:6
Jessie [2] - 29:25, 56:15
job [2] - 40:17, 40:22
jobs [1] - 12:4
JOHN [1] - 1:12
jointly [1] - 13:13
July [1] - 61:5
justice [1] - 10:24

## K

keep [2] - 14:25, 46:8
knife [20] - 24:7, 24:17, 24:24, 50:5, 50:10, 50:19, 50:22, 50:23, 50:25, 51:3, 51:7, 51:9, 51:12, 51:15, 51:22, 51:24, 52:2, 52:7, 52:15, 52:16
knives [3] - 51:5, 51:6
knowledge [5] - 15:22, 26:20, 33:20, 44:19, 59:11

## L

last [3] - 22:9, 22:13, 35:4

lasts [1] - 21:6
latch [1] - 44:9
late [1] - 57:11
LAW [1] - 2:3
LEAHEY [17] - 2:21, 24:9, 26:18, 27:16, 33:16, 36:15, 45:6, 45:10, 45:18, 46:5, 46:21, 56:16, 62:3, 62:6, 62:11, 62:18, 63:2
learn [1] - 13:5
learning [1] - 10:6
leave [2] - 21:20, 51:24
Lee [1] - 2:18
left [3] - 37:2, 47:15, 50:16
letter [3] - 60:16, 61:5, 61:9
letters [2] - 61:14, 61:17
level [1] - 10:18
Lieutenant [7] - 4:11, 4:16, 5:3, 6:7, 7:5, 10:19, 46:16
lieutenant [16] - 7:8, 7:21, 8:3, 8:6, 9:8, 11:2, 11:10, 11:15, 13:23, 14:10, 16:12, 19:13, 27:20, 33:23, 47:7, 63:3
LIEUTENANT [4] - 1:21, 66:7, 66:19, 68:9
life [13] - 25:8, 25:11, 25:24, 26:3, 26:14, 27:7, 27:24, 28:8, 28:12, 28:17, 28:21, 29:16, 51:4
light [1] - 37:24
lines [2] - 49:11, 49:13
list [1] - 62:20
LLP [1] - 2:9
located [1] - 7:13
location [3] - 52:20, 63:5, 63:14
log [4] - 55:25, 57:7, 62:17, 67:7
look [2] - 17:2, 44:22
looked [1] - 50:20
looking [1] - 46:4
looks [2] - 45:15, 46:21
Lori [1] - 4:22
LORI [1] - 2:13
LT [1] - 67:4

## M

**majored** [1] - 10:23
**male** [3] - 48:8, 49:5, 50:5
**mandated** [1] - 21:25
**manner** [3] - 11:23, 12:20, 64:17
**MANUEL** [19] - 2:7, 4:8, 27:11, 27:18, 33:21, 44:21, 45:7, 45:14, 46:2, 46:11, 47:4, 56:21, 61:24, 62:5, 62:8, 62:14, 62:22, 64:25, 67:4
**Manuel** [1] - 4:19
**MARANO** [2] - 2:9, 2:13
**Marano** [1] - 4:22
**March** [3] - 9:5, 9:9, 11:7
**marked** [1] - 46:13
**marriage** [1] - 68:17
**matter** [2] - 4:21, 68:19
**mean** [8] - 10:13, 12:14, 25:9, 31:25, 32:20, 37:19, 40:24, 48:20
**meaning** [1] - 48:24
**means** [2] - 25:7, 48:16
**meant** [1] - 28:11
**measurements** [2] - 40:19, 40:23
**medical** [2] - 52:22, 52:24
**medication** [2] - 6:8, 6:14
**member** [4] - 9:10, 21:25, 40:12, 54:9
**Memorial** [1] - 2:19
**mental** [2] - 32:24, 42:10
**mentioned** [2] - 17:11, 20:12
**middle** [2] - 45:3, 50:16
**midnight** [4] - 8:13, 8:15, 11:18, 57:15
**might** [7] - 6:9, 6:14, 23:18, 29:3, 59:5, 62:4, 62:7
**mind** [1] - 5:6
**mine** [1] - 13:13
**minor** [1] - 10:24
**minute** [1] - 36:11
**minutes** [4] - 21:6, 27:14, 36:11, 62:10
**Mitchell** [1] - 1:23

**MITCHELL** [2] - 68:6, 68:24
**monitor** [9] - 13:17, 13:24, 14:4, 14:11, 14:15, 14:18, 14:21, 15:2, 15:6
**monitored** [1] - 14:9
**month** [2] - 20:17, 22:13
**monthly** [4] - 19:22, 20:4, 20:5, 20:11
**months** [1] - 8:9
**morning** [3] - 4:16, 4:18, 57:14
**mostly** [2] - 8:12, 10:4
**movement** [1] - 64:24
**moving** [2] - 48:21, 64:23
**MR** [18] - 4:8, 27:11, 27:18, 33:21, 44:21, 45:7, 45:14, 46:2, 46:11, 47:4, 56:21, 61:24, 62:5, 62:8, 62:14, 62:22, 64:25, 67:4
**MS** [16] - 24:9, 26:18, 27:16, 33:16, 36:15, 45:6, 45:10, 45:18, 46:5, 46:21, 56:16, 62:3, 62:6, 62:11, 62:18, 63:2
**multiple** [1] - 45:14

## N

**name** [7] - 4:9, 4:11, 4:19, 35:4, 43:25, 47:5, 56:12
**NASSAU** [1] - 68:4
**necessarily** [4] - 18:24, 36:4, 60:4, 60:23
**necessary** [1] - 13:7
**neck** [1] - 49:20
**need** [5] - 6:2, 6:5, 20:2, 62:7, 64:5
**needed** [3] - 5:24, 17:2, 53:17
**never** [4] - 15:24, 17:11, 44:18, 51:11
**new** [1] - 10:6
**NEW** [3] - 1:3, 66:4, 68:3
**New** [8] - 1:24, 2:6, 2:12, 2:20, 4:15, 8:3, 66:24, 68:7
**next** [4] - 45:8, 49:4, 49:15, 50:24
**night** [1] - 41:19
**Notary** [4] - 1:23, 4:4,

66:24, 68:6
**notation** [1] - 42:16
**note** [1] - 42:10
**noted** [2] - 50:4, 65:3
**notes** [2] - 32:24, 33:3
**nothing** [1] - 49:9, 58:8
**Notice** [1] - 1:22
**notifications** [2] - 41:18, 41:22
**notified** [1] - 41:19
**November** [1] - 11:7
**number** [8] - 11:21, 14:12, 14:19, 14:24, 44:23, 45:20, 45:21, 46:23
**numbers** [1] - 45:3
**numerous** [1] - 55:5

## O

**oath** [2] - 3:17, 66:10
**objection** [3] - 24:9, 26:18, 33:16
**objections** [1] - 3:9
**observed** [3] - 48:17, 64:6, 64:10
**occasion** [1] - 18:25
**occasions** [1] - 37:23
**occur** [1] - 54:17
**occurred** [2] - 56:9, 57:11
**occurs** [1] - 28:15
**OF** [7] - 1:3, 1:10, 2:3, 66:4, 66:5, 68:3, 68:4
**office** [2] - 44:25, 55:21
**office's** [1] - 47:2
**officer** [42] - 3:16, 11:17, 13:5, 13:11, 16:7, 16:18, 17:19, 18:22, 19:2, 22:18, 23:10, 24:5, 24:8, 24:15, 24:16, 24:18, 25:7, 25:10, 25:14, 25:25, 26:10, 26:12, 26:13, 26:16, 27:5, 28:8, 28:16, 28:20, 29:14, 30:24, 33:19, 37:18, 37:25, 38:24, 41:10, 41:13, 41:19, 55:4, 58:19, 58:25, 60:15, 60:18
**Officer** [65] - 16:3, 16:4, 16:15, 16:22, 17:3, 17:6, 19:11, 29:24, 30:7, 34:16, 34:18, 34:24, 34:25, 35:2, 35:8, 35:20,

36:6, 36:13, 36:17, 37:12, 37:14, 37:16, 37:20, 37:21, 38:2, 38:3, 38:5, 38:12, 40:8, 40:10, 42:3, 42:5, 42:9, 42:17, 42:21, 43:8, 52:19, 52:22, 53:4, 53:5, 53:7, 53:8, 53:10, 53:13, 53:14, 53:16, 53:20, 53:21, 53:23, 54:5, 56:14, 58:14, 58:24, 59:7, 60:6, 60:12, 61:2, 61:12, 61:19, 61:22, 63:4, 63:13, 64:6, 64:10, 64:14
**OFFICER** [1] - 1:11
**officers** [30] - 11:22, 12:8, 12:17, 12:23, 13:14, 13:16, 13:24, 14:4, 15:10, 15:15, 15:19, 15:25, 17:14, 19:8, 19:15, 19:20, 20:15, 21:2, 21:9, 21:13, 21:18, 22:23, 23:5, 32:3, 32:4, 34:21, 44:16, 44:19, 55:20, 59:14
**officers'** [1] - 13:20
**OFFICES** [1] - 2:3
**official** [2] - 1:11, 1:12
**on-duty** [1] - 31:13
**once** [8] - 21:20, 21:24, 25:10, 26:16, 26:17, 27:8, 46:6
**one** [18] - 13:2, 19:21, 23:6, 23:11, 27:21, 36:10, 36:25, 39:11, 39:16, 41:3, 44:2, 45:11, 55:8, 55:22, 57:22, 60:13
**ones** [1] - 56:4
**online** [1] - 18:15
**oOo** [1] - 3:21
**open** [1] - 51:18
**opened** [1] - 51:11
**opposed** [1] - 56:19
**originally** [1] - 9:4
**outcome** [3] - 59:19, 59:20, 68:18
**owned** [1] - 51:6

## P

**p.m** [1] - 65:3
**page** [4] - 45:4, 45:8, 45:9, 45:11
**PAGE** [2] - 67:3, 67:7
**pages** [1] - 45:15

**paper** [1] - 33:5
**paperwork** [1] - 12:5
**parameters** [1] - 25:9
**Parkway** [1] - 7:14
**part** [5] - 17:22, 31:16, 40:22, 49:15, 59:23
**parties** [2] - 3:4, 68:16
**pass** [1] - 17:20
**patrol** [3] - 44:7, 58:19, 58:25
**patterns** [1] - 20:19
**Paul** [1] - 35:6
**Peconic** [2] - 52:21, 52:23
**pencilled** [1] - 45:21
**pencilled-in** [1] - 45:21
**Peninsula** [1] - 2:5
**people** [7] - 9:15, 9:22, 11:24, 12:11, 35:24, 38:20, 39:16
**perform** [4] - 35:10, 35:19, 36:6, 36:9
**performed** [3] - 36:14, 36:18, 51:23
**performing** [2] - 12:17, 50:4
**perhaps** [1] - 45:5
**period** [2] - 20:10, 37:10
**person** [9] - 24:17, 29:13, 40:4, 48:25, 52:5, 55:12, 56:11, 57:22, 63:17
**person's** [1] - 47:5
**personal** [4] - 8:12, 26:4, 26:5, 60:20
**personally** [5] - 12:9, 15:8, 25:16, 36:21, 41:23
**personnel** [2] - 31:23, 32:5
**persons** [1] - 40:4
**photographs** [2] - 34:6, 34:10
**physical** [13] - 22:4, 23:16, 26:11, 27:5, 28:4, 28:7, 29:4, 29:19, 32:11, 32:15, 32:18, 32:22, 33:4
**pictures** [2] - 40:19, 40:23
**place** [1] - 14:8
**Plaintiff** [3] - 1:8, 2:4, 2:10
**Plaintiff's** [1] - 46:12
**PLAINTIFF'S** [1] - 67:10
**plus** [1] - 11:8
**PO** [1] - 52:21

point [2] - 29:25, 33:2
POLICE [3] - 1:10, 1:11, 1:20
Police [4] - 7:7, 9:2, 52:19, 54:4
police [14] - 8:20, 9:5, 9:7, 11:21, 12:17, 12:23, 13:25, 19:8, 22:21, 26:7, 31:13, 38:18, 38:19, 41:21
police-involved [3] - 31:13, 38:19, 41:21
policy [1] - 60:20
portion [1] - 51:22
positing [1] - 26:21
position [2] - 9:6, 28:16
possession [2] - 29:14, 50:6
potential [1] - 31:8
potentially [2] - 30:19, 30:23
Potentially [1] - 30:21
practice [1] - 54:19
precinct [1] - 18:12
Precinct [16] - 7:13, 7:16, 7:17, 7:24, 8:2, 8:5, 8:8, 8:11, 8:14, 8:16, 8:19, 11:15, 16:11, 16:17, 16:19
preparation [1] - 6:19
prepared [2] - 33:10, 48:5
preparing [1] - 6:22
press [1] - 44:8
primary [1] - 37:24
privy [2] - 59:12, 59:22
problem [1] - 13:2
procedure [6] - 18:11, 24:7, 24:18, 36:3, 52:6, 52:12
procedures [2] - 20:19, 23:20
proceed [1] - 18:9
proceeded [1] - 48:8
process [3] - 17:23, 18:21, 44:13
produced [1] - 62:16
production [1] - 62:17
programs [1] - 10:6
promoted [3] - 9:8, 11:6, 11:13
promotion [2] - 11:12, 15:11
proper [4] - 22:15, 22:19, 22:24, 24:17
protocol [4] - 22:19, 23:4, 26:15, 35:23
protocols [1] - 22:7
provide [4] - 4:25,

5:17, 21:12, 41:15
provided [4] - 20:15, 21:2, 26:7, 44:3
psychology [1] - 10:23
Public [4] - 1:23, 4:4, 66:24, 68:7
pulse [9] - 35:12, 35:14, 35:16, 49:7, 49:17, 49:18, 49:20, 49:21, 49:22
pursuant [1] - 1:22
push [1] - 44:10
put [2] - 42:12, 47:5

Q

Quentin [1] - 2:11
questioned [1] - 55:16
questions [4] - 4:24, 5:8, 12:2, 65:2
quick [2] - 5:6, 54:22
quite [1] - 27:23

R

racing [1] - 38:20
radio [2] - 30:8, 63:11
rank [4] - 7:8, 7:19, 8:4, 10:25
reach [1] - 48:18
read [4] - 6:18, 23:21, 45:19, 66:8
really [10] - 10:8, 12:13, 20:8, 37:6, 38:7, 43:10, 50:22, 51:11, 51:16, 54:10
reason [8] - 5:21, 6:2, 14:23, 16:23, 63:4, 63:6, 63:9, 63:12
reasons [3] - 8:12, 14:22, 31:9
reassigned [1] - 8:16
receive [9] - 17:5, 19:10, 21:18, 21:22, 25:2, 28:3, 30:4, 59:7, 59:14
received [6] - 10:20, 16:25, 17:16, 19:2, 19:7, 22:10, 23:15, 28:2
receives [1] - 60:15
recently [1] - 23:21
recess [1] - 27:19
Recess [1] - 62:13
recipient [1] - 17:17
recognize [4] - 46:18, 47:8, 47:10, 48:3
recommendation [1] - 12:21

recommending [1] - 15:10
record [8] - 4:10, 5:16, 32:21, 39:9, 42:8, 66:12, 66:14, 68:13
recordings [4] - 33:14, 33:18, 33:24, 34:4
records [2] - 13:17, 13:21
refer [1] - 23:19
reference [1] - 45:5
referred [2] - 30:11, 30:12
reflection [1] - 45:2
regard [1] - 20:24
regarding [20] - 12:22, 13:20, 17:3, 19:11, 21:13, 33:14, 33:24, 38:5, 38:24, 41:5, 41:14, 42:16, 54:5, 54:13, 55:13, 55:17, 57:2, 58:12, 59:16, 63:19
regulations [1] - 20:7
related [1] - 68:16
remain [2] - 58:14, 58:24
remained [1] - 57:17, 58:19
remember [4] - 20:8, 40:6, 49:12, 56:3
repeat [6] - 5:23, 14:3, 19:17, 23:7, 24:13, 26:25
rephrase [1] - 5:23, 33:22
report [8] - 6:24, 17:20, 33:8, 33:11, 42:12, 42:15, 42:20, 44:22, 47:13, 48:3, 48:4, 52:19, 64:4
Report [2] - 46:13, 67:11
reporter [1] - 5:10
reports [2] - 33:9, 54:12
requalify [1] - 21:25
REQUEST [1] - 67:6
reserved [1] - 3:11
respect [1] - 56:18
respective [1] - 3:4
respond [2] - 38:12, 49:5
responded [1] - 41:24
responding [2] - 38:4, 48:22
response [2] - 22:16, 41:7
responsibilities [1] -

19:22
responsibility [1] - 18:14
responsible [2] - 39:13, 39:18
rest [1] - 46:20
result [2] - 29:3, 38:24, 59:9
resulted [1] - 59:9
retrieve [1] - 40:18
review [3] - 6:21, 21:8, 42:11
reviewed [2] - 6:23, 7:2
reviewing [2] - 11:25, 21:11
Rieppel [2] - 40:8, 40:10
road [1] - 32:4
Roosevelt [1] - 2:11
rule [1] - 23:4
rules [3] - 5:6, 20:18, 23:19

S

safeguard [1] - 38:13
saw [1] - 63:24
scene [59] - 30:2, 30:6, 30:11, 30:12, 30:15, 30:16, 30:18, 31:5, 31:10, 31:11, 31:20, 31:21, 31:24, 32:2, 32:4, 32:6, 32:8, 32:11, 32:15, 32:18, 32:23, 32:25, 33:15, 33:24, 34:4, 34:7, 34:10, 34:13, 34:21, 35:24, 36:9, 36:23, 37:17, 38:16, 38:20, 38:21, 39:10, 40:13, 41:4, 41:6, 41:8, 41:12, 41:14, 41:25, 54:19, 54:21, 55:13, 55:24, 55:25, 56:20, 57:7, 57:13, 57:18, 58:7, 58:10, 62:17, 67:7
schedule [2] - 10:3, 10:12
scrapes [2] - 52:25, 53:18
screen [4] - 4:21, 46:3, 46:9, 46:16
scroll [1] - 46:19
sealed [1] - 60:19
sealing [1] - 3:5
sector [2] - 37:22, 37:23
secure [8] - 31:23,

31:25, 32:8, 32:14, 39:10, 41:4, 41:11, 41:12
securing [3] - 39:14, 39:19, 55:14
security [1] - 44:14
see [17] - 4:22, 30:10, 45:16, 45:23, 45:24, 46:15, 46:20, 47:14, 47:17, 48:9, 50:7, 51:19, 51:22, 61:25, 63:22, 64:22, 64:24
send [1] - 62:20
sentence [2] - 49:4, 49:15
September [4] - 7:18, 7:20, 16:17, 61:10
sergeant [6] - 10:15, 11:3, 11:4, 11:6, 11:10, 35:5
Sergeant [8] - 35:3, 38:10, 38:11, 38:15, 38:23, 39:6, 47:22, 47:25
sergeant's [1] - 13:8
sergeants [3] - 11:19, 13:2, 13:15
serious [1] - 29:3
service [10] - 9:11, 9:13, 9:16, 9:18, 9:20, 10:7, 43:9, 43:11, 43:16, 43:18
set [2] - 32:4, 68:11, 68:21
seven [1] - 27:14
seven-minutes-or-so [1] - 27:14
shaking [1] - 5:8
shall [1] - 3:11
Shamel [1] - 4:19
SHAMEL [1] - 2:7
share [2] - 46:3, 46:6
Shirley [1] - 7:14
shoot [2] - 26:16, 27:7
shooting [7] - 31:13, 31:14, 38:19, 41:21, 54:5, 56:15, 56:19
Shore [1] - 8:3
short [1] - 37:10
shots [4] - 30:8, 38:6, 38:25, 41:8
show [3] - 28:15, 37:23, 54:20
showed [4] - 37:9, 39:21, 39:24, 55:21
showing [1] - 55:23
shutting [1] - 32:9
sic [1] - 12:25
sign [1] - 45:20
signature [6] - 47:14,

47:16, 47:17, 47:18, 47:20, 47:25
**Signed** [1] - 66:22
**signed** [2] - 3:15, 3:18
**signs** [2] - 63:22, 64:2
**sit** [1] - 50:10
**situated** [1] - 63:20
**situation** [3] - 12:24, 25:5, 29:23
**SKIDMORE** [1] - 1:11
**Skidmore** [43] - 16:3, 16:4, 16:15, 16:22, 17:3, 17:6, 19:11, 29:24, 30:7, 34:16, 34:18, 34:24, 36:13, 36:17, 37:15, 38:4, 38:5, 38:13, 42:4, 42:5, 42:10, 42:17, 42:21, 43:8, 52:19, 52:23, 53:5, 53:8, 53:10, 53:14, 53:23, 56:14, 58:14, 58:24, 59:7, 60:7, 60:12, 61:2, 61:12, 61:19, 61:22, 63:4, 63:13
**Skidmore's** [3] - 37:21, 53:21, 54:5
**someone** [4] - 28:25, 33:19, 56:13, 57:4
**somewhere** [3] - 50:13, 50:14, 50:17
**soon** [1] - 50:2
**sorry** [2] - 29:20, 62:5
**speaking** [2] - 56:7, 56:13
**specialized** [1] - 11:11
**specific** [14] - 10:9, 23:3, 23:8, 23:18, 25:6, 25:9, 26:8, 31:21, 32:12, 41:2, 56:11, 59:16, 60:25, 61:3
**specifically** [7] - 21:10, 21:16, 25:19, 40:7, 49:12, 56:4, 56:25
**spot** [1] - 8:13
**squad** [10] - 11:18, 11:22, 16:8, 16:9, 16:10, 19:24, 21:24, 54:10, 54:17
**ss** [2] - 66:4, 68:4
**staff** [2] - 10:14, 60:17
**stamp** [4] - 44:23, 45:19, 46:22, 47:2
**stamps** [1] - 44:25
**standard** [1] - 44:15
**start** [2] - 14:14, 14:18
**started** [2] - 20:9, 35:21

**State** [3] - 1:24, 66:24, 68:7
**STATE** [2] - 66:4, 68:3
**state** [1] - 4:9
**statement** [1] - 45:10
**STATES** [1] - 1:2
**stationed** [1] - 8:18
**status** [1] - 56:20
**stay** [1] - 24:21
**step** [1] - 44:12
**stipulate** [1] - 46:7
**STIPULATED** [3] - 3:2, 3:8, 3:13
**stopped** [2] - 15:4, 20:7
**stops** [10] - 13:25, 14:2, 14:6, 14:11, 14:13, 14:16, 14:22, 15:7, 21:9
**stuff** [1] - 40:19
**subject** [3] - 24:23, 24:25, 35:22
**subjective** [1] - 22:17
**subscribed** [1] - 66:22
**substance** [7] - 6:9, 6:14, 35:7, 37:11, 38:9, 43:5, 53:24
**success** [1] - 44:24
**sufficient** [1] - 44:22
**sufficiently** [1] - 24:21
**Suffolk** [4] - 7:7, 9:2, 11:5, 54:3
**SUFFOLK** [1] - 1:10, 1:20, 2:16
**suggested** [1] - 14:19
**sum** [1] - 53:23
**SUNY** [1] - 10:21
**supervise** [4] - 11:20, 11:24, 12:4, 34:9
**supervised** [8] - 9:17, 12:12, 13:15, 15:15, 15:20, 19:16, 19:20, 21:13
**supervising** [7] - 9:15, 9:25, 10:2, 10:3, 10:12, 10:14, 13:23
**supervisor** [1] - 16:6
**supervisory** [1] - 12:7
**supplemental** [9] - 6:23, 21:19, 33:8, 33:11, 42:20, 44:22, 48:4, 52:18, 64:3
**Supplementary** [2] - 46:13, 67:11
**supplementary** [3] - 42:12, 42:15, 47:12
**supposed** [3] - 28:18, 36:3, 44:14
**suspect** [15] - 15:16, 15:21, 23:6, 23:11,

24:6, 24:16, 25:25, 26:11, 26:13, 26:16, 27:6, 27:8, 52:8, 52:15, 52:16
**suspected** [1] - 50:23
**suspicious** [1] - 63:16
**sworn** [4] - 3:15, 3:19, 4:4, 68:11
**synopsis** [3] - 54:22, 56:5, 58:6
**system** [1] - 14:7

## T

**tape** [1] - 32:5
**Team** [2] - 18:15, 18:19
**ten** [2] - 61:25, 62:10
**term** [1] - 56:22
**testified** [1] - 4:5
**testify** [2] - 40:25, 53:3
**testimony** [3] - 66:9, 66:13, 68:13
**THE** [1] - 45:24
**theirs** [1] - 47:3
**therefore** [1] - 29:18
**third** [1] - 45:9
**THOMAS** [5] - 1:21, 66:7, 66:19, 67:4, 68:9
**Thomas** [1] - 4:11
**thoughts** [1] - 33:3
**three** [2] - 11:19, 13:15
**thumb** [1] - 44:9
**tickets** [1] - 14:24
**timeframe** [2] - 36:10, 37:7
**title** [1] - 40:16
**today** [4] - 4:24, 15:14, 50:10
**today's** [2] - 6:19, 6:22
**together** [2] - 35:10, 35:21
**took** [3] - 11:12, 34:10, 52:4
**top** [3] - 26:13, 27:6, 44:10
**tours** [1] - 8:15
**towards** [1] - 48:25
**traffic** [6] - 14:2, 14:6, 14:11, 14:12, 14:16, 21:9
**trained** [1] - 22:21
**training** [29] - 9:11, 9:13, 9:16, 9:18, 9:19, 9:20, 9:23, 9:24, 10:3, 10:7, 11:11, 19:15, 19:19, 20:25, 21:4, 21:7,

21:12, 21:19, 21:23, 22:3, 22:10, 22:13, 23:3, 23:15, 25:20, 28:2, 28:3, 28:6, 28:11
**transcript** [3] - 62:23, 66:9, 66:11
**transfer** [1] - 8:10
**transform** [1] - 33:3
**transition** [1] - 11:9
**transitioned** [1] - 15:7
**transported** [1] - 52:20
**treatment** [3] - 19:7, 52:22, 52:24
**trends** [1] - 20:19
**trial** [1] - 3:12
**true** [3] - 66:12, 66:14, 68:13
**truthfully** [2] - 6:11, 6:16
**trying** [1] - 32:6
**two** [4] - 36:11, 44:12, 61:11, 61:13
**two-step** [1] - 44:12
**type** [11] - 9:24, 11:11, 12:21, 13:19, 20:14, 20:25, 27:3, 33:4, 43:7, 43:23, 59:8
**types** [1] - 44:16

## U

**Un-un** [1] - 5:9
**unable** [2] - 49:6, 49:16
**unanswered** [1] - 6:4
**unauthorized** [1] - 32:5
**unclear** [1] - 33:17
**unconscious** [5] - 36:2, 48:9, 48:12, 48:24, 52:16
**under** [4] - 39:16, 58:15, 62:19, 66:9
**undergo** [1] - 11:10
**unit** [3] - 40:2, 40:13, 47:23
**UNITED** [1] - 1:2
**up** [14] - 20:9, 22:17, 25:14, 32:4, 37:9, 37:24, 39:21, 39:24, 44:11, 46:9, 54:20, 55:22, 55:24, 64:4
**uses** [1] - 18:17
**utilize** [1] - 43:21

## V

**varies** [1] - 11:25

**variety** [1] - 20:21
**various** [3] - 9:21, 10:4, 19:24
**vehicle** [6] - 13:25, 14:5, 14:16, 63:19, 63:23, 64:12
**verbal** [2] - 49:5, 49:7
**verbally** [2] - 5:8, 24:25
**Veterans** [1] - 2:19
**video** [1] - 34:3
**violation** [1] - 63:18

## W

**wait** [1] - 5:14
**waived** [1] - 3:7
**weapon** [10] - 22:14, 29:2, 29:5, 29:6, 29:12, 29:14, 43:9, 43:16, 43:19, 44:11
**weapons** [1] - 43:11
**wear** [1] - 44:7
**website** [1] - 18:16
**weeks** [2] - 8:21, 9:13
**WHEREOF** [1] - 68:20
**wide** [1] - 20:21
**William** [1] - 7:13
**WITNESS** [1] - 45:24, 67:3, 68:20
**witness** [5] - 4:3, 26:20, 26:23, 68:10, 68:14
**word** [2] - 48:23, 56:22
**words** [1] - 36:2
**writing** [1] - 62:20
**written** [2] - 14:24, 23:8

## Y

**Yaphank** [2] - 4:15
**yard** [1] - 20:20
**yards** [1] - 64:16
**year** [2] - 19:14, 21:24
**years** [1] - 11:8
**YORK** [3] - 1:3, 66:4, 68:3
**York** [8] - 1:24, 2:6, 2:12, 2:20, 4:15, 8:3, 66:24, 68:8
**yourself** [3] - 14:11, 15:6, 15:24

## Z

**Zoom** [1] - 1:14