UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

CARMELA BONSIGNORE, Individually, and
As Administrator of the Estate of
JESSE J. BONSIGNORE          Plaintiff,

        - against -

COUNTY OF SUFFOLK, SUFFOLK COUNTY
POLICE DEPARTMENT, Police Officer JAMES
SKIDMORE, Individually and in his official
capacity, JOHN DOES 1-5, Individually and in their
official capacity,
                Defendants.
-------------------------------------------------------------X

DOCKET NO.: CV-22-2925
(RER)(AYS)

# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

LAW OFFICES OF
FREDERICK K. BREWINGTON
Attorneys for Plaintiff
556 Peninsula Boulevard
Hempstead, New York 11550
(516) 489-6959

*OF COUNSEL: FREDERICK K. BREWINGTON*

      *A. SHAMEL MANUEL*

      *COBIA M. POWELL*

      *LORRAINE R. BISHOP*

**TABLE OF CONTENTS**

**PAGE. NO.**

**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

**PRELIMINARY STATEMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**LEGAL STANDARD**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**STATEMENT OF FACTS**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**POINT I**

    **DEFENDANTS USED UNREASONABLE DEADLY FORCE AGAINST PLAINTIFF** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**POINT II**

    **DEFENDANTS' LACKED PROBABLE CAUSE TO ARREST PLAINTIFF** . . . . 10

**POINT III**

    **FABRICATION OF EVIDENCE CLAIM SHOULD PROCEED** . . . . . . . . . . . . . . 17

**POINT IV**

    **THE *MONELL* CLAIM REGARDING EXCESSIVE AND/OR UNREASONABLE FORCE IS VIABLE AND MUST PROCEED TO A JURY** . . . . . . . . . . . . . . . . . . . 17

**POINT V**

    **OFFICER SKIDMORE IS NOT ENTITLED TO QUALIFIED IMMUNITY** . . . . 21

        **A. SKIDMORE IS NOT ENTITLED TO QUALIFIED IMMUNITY** . . . . . 23

        **B. SKIDMORE'S UNREASONABLE USE OF DEADLY FORCE PRECLUDES SUMMARY JUDGMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**POINT VI**

    **PLAINTIFF'S STATE LAW CLAIMS SHOULD BE HEARD BY THIS COURT AND SURVIVE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## TABLE OF AUTHORITIES

**CASE NAME**                                                                          **PAGE NO.**

*Amnesty Am. v. Town of W. Hartford*,
**361 F.3d 113 (2d Cir. 2004)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

*Anderson v. Creighton*,
**483 U.S. 635 (1987)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18, 22**

*Askins v. Doe No. 1*,
**727 F. 3d 248 (2d Cir. 2013)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

*Barnes v. Felix*,
**605 U.S. 73 (2025).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

*Bouche v Oliveri*,
**506 Fed Appx 29 (2d Cir 2012)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22, 24**

*Castro v. Cnty. of Los Angeles*,
**833 F. 3d 1060 (9th Cir. 2016)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

*Chew v. Gates*,
**27 F. 3d 1432 (9th Cir. 1994)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

*Curry v. City of Syracuse*,
**316 F.3d 324  (2d Cir. 2003)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**

*Davis v. City of New York*,
**902 F.Supp.2d 405  (S.D.N.Y. 2012)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**

*Devenpeck v. Alford*,
**543 U.S. 146 (2004)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**

*District of Columbia v. Wesby*,
**583 U.S. 48 (2018)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21, 22**

*Est. of Jackson by Jackson v. Cnty. of Suffolk*,
**No. 2:12-CV-1455, 2019 WL 3253063 (E.D.N.Y. July 19, 2019)** . . . . . . . . . . . . . . . . . **18, 20**

*Fields v. City of Philadelphia*,
**862 F. 3d 353 (3d Cir. 2017)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

*Flythe v. D.C.*,
**791 F.3d 13  (D.C. Cir. 2015)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

*Gibson v. County of Washoe*,
290 F. 3d 1175 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Gonzalez v County of Suffolk,*
09-CV-1023 (ST), 2022 WL 4648492 (EDNY Sept. 30, 2022) . . . . . . . . . . . . . . . . . . . . 17, 20

*Graham v. Connor*,
490 U.S. 386 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 24

*Gray v. City of Detroit*,
399 F. 3d 612 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Hargroves v. City of New York*,
411 F. App'x. 378 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Holeman v. City of New London*,
425 F.3d 184 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Hope v. Pelzer*,
536 U.S. 730 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Jocks v. Tavernier*,
316 F.3d 128 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Johnson v. New York State Police*,
659 F. Supp. 3d 237 (N.D.N.Y. 2023). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Kelly v. County of Suffolk,*
No.:CV-21-6685 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

*Kent v. Katz*,
312 F.3d 568 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Kingsley v. Hendrickson*,
576 U.S. 389 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*Kirby v. County of Suffolk*,
No.:CV-16-7161 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

*Knight v. United States Fire Insurance Co.*,
804 F.2d 9 (2d Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Krueger v. Phillips*,
154 F.4th 1164 (10th Cir. 2025). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Liscio v Warren*,
**901 F2d 274 (2d Cir 1990).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Matter of Anthony B.*,
**201 A.D.2d 725 (App. Div. 2nd Dept.1994)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*McCune v. Suffolk*
**NO.: CV-14-4431** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

*Miller v. Lovett*,
**879 F.2d 1066 (2d Cir. 1989)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Newcomb v. City of Troy*,
**719 F. Supp 1408 (E.D. Mich. 1989)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*O'Bert ex rel. Est. of O'Bert v. Vargo*,
**331 F.3d 29 (2d Cir. 2003)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 10

*Okin v. Vill. of Cornwall-on-Hudson Police Dep't*,
**577 F.3d 415 (2d Cir. 2009)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 24

*Owen v. City of Independence*,
**445 U.S. 622 (1980)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*People v. Alejandro*,
**70 NY 2d. 133 (1987)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*People v. Carneglia*,
**63 A.D.2d 734 (1978)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*People v. Harewood*,
**63 A.D.2d 876(1978)**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*People v. Jensen*,
**86 N.Y.2d 248 (1995)**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*People v. Lupinacci*,
**191 A.D.2d 589 (App. Div. 2nd Dept.1993)**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*People v. Peacock*,
**68 N.Y.2d 675, (1986)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*People v. Reese*,
**5 Misc.3d 1030(A), 799 N.Y.S.2d 163 (N.Y.Dist.Ct. Suf. Co.,2004)**,. . . . . . . . . . . . . . . . . . 14

*People v. Stevenson*,
31 NY2d. 108 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Plumhoff v. Rickard*,
572 U.S. 765 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Reynolds v. Giuliani*,
506 F.3d 183 (2d Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 20

*Rodriguez v. City of New York*,
590 F. Supp. 3d 518 (E.D.N.Y.2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Rush v. City of Philadelphia*,
78 F.4th 610 (3d Cir. 2023). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Soto v. Gaudett*,
862 F.3d 148 (2d Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Tennessee v. Garner*
471 U.S. 1 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Terebesi v. Torreso*,
764 F.3d 217 (2d Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Tomka v. Seiler Corp*,
66 F.3d 1295 (2d Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*United Mine Workers v. Gibbs*,
383 U.S. 715 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Gomez,*
877 F.3d 76 (2d Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Valentine*,
539 F.3d 88  (2d Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Whren v. United States,*
517 U.S. 806 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*White v. Pauly*,
580 U.S. 73 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Zorn v. Linton,*
No. 25–297, 2026 WL 795469  (U.S. Mar. 23, 2026) . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**PRELIMINARY STATEMENT**

As this Court is aware, this office represents Plaintiff Carmela Bonsignore, Individually and as Administrator of the Estate of Jesse J. Bonsignore, in the above referenced matter. Plaintiff submits her Opposition to Defendants' Motion for Summary Judgment. Following a review of the facts of this matter and relevant the case law, Plaintiff withdraws her Fabrication of Evidence claims.

**LEGAL STANDARD**

"A motion for summary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 (2d. Cir. 1995). The role of the court" is not to resolve the disputed issues of fact, but to assess whether there are any factual issues to be tried." *Knight v. United States Fire Insurance Co.*, 804 F.2d 9, 11(2d Cir. 1986). Where excessive force and qualified immunity are tied to the use of deadly force and the witness most likely to contradict the living Police Officer's story is unable to testify because he is the decedent in this action, a court deciding whether summary judgment may be granted on the basis of qualified immunity premised on objective reasonableness may not simply accept the self-serving account of the police officer. Rather, courts must also consider circumstantial evidence that may discredit the police officer's story, and consider whether such evidence could convince a rational factfinder that the officer acted unreasonably. *O'Bert ex rel. Est. of O'Bert v. Vargo*, 331 F.3d 29 (2d Cir. 2003). Here, the facts as stated by the respective parties, give rise to disputed issues of material facts, for which a jury must decide.

**STATEMENT OF FACTS**

For a full statement of facts, please see Plaintiff's Disputed Facts and Counter-Statement of Facts dated October 24, 2025. On May 18, 2022, Officer Skidmore received a 911 alert via his

police radio and responded to the call regarding a parked car with someone sleeping inside. (Exhibit 1 - Skidmore Dep. 83:14-84:3). Skidmore arrived upon the car and did not see Bonsignore engaged in any illegal activity and did not know whether there were any signs prohibiting Bonsignore from parking in that location. (Exh. 1- Skidmore Dep. 88:8-24; 90:19-91:3). Bonsignore awoke startled by the officer knocking on Bonsignore's window. (*Id.* 107:16-108:6, 125:18-10). When Bonsignore stood up and got out of his car, Skidmore immediately turned Bonsignore around and instructed him to place his hands on his car and Bonsignore obeyed those directions without any resistance. (*Id* at 137). Although Skidmore stated that Bonsignore was free to leave, and thus was not in custody, this was in contradiction to Skidmore's actions as he took intentional steps to acquire Bonsignore's person and control his movement. (*Id* at 137-138:9).

In attempting to rationalize his continued escalation and mishandling of his interaction with Bonsignore, Skidmore testified that when he heard Bonsignore say that he knew his rights, he determined Bonsignore must be handcuffed. (Exh. 1 - 141:12-25). Bonsignore truthfully disclosed that he had a knife, again complying with Skidmore's authority. (*Id.* At 144:5-145:3). Skidmore then attempted to place Bonsignore in a bear hug and testified that although he could not explain how it occurred, while he was behind Bonsignore and on his back, Bonsignore placed Skidmore in a bear hug and threw him to the ground with Skidmore landing on top of Bonsignore. (Exh. 1 - 156:17-25; 166:12-24). Skidmore never saw Bonsignore grab for his own knife, nor did he see Bonsignore attempt to grab the Officer's gun. (Id. At 172:4-15, 184:25-185:6).

Skidmore's weapon was secured in a holster with a safety mechanism requiring special knowledge of the two-step process to unholster. (Exh. 1 - Skidmore Dep. 180:3-181:13; Exhibit 2 Longo, p. 8). Despite Skidmore's allegations that Bonsignore attempted to remove Skidmore's gun,

there is no physical evidence indicating that Bonsignore had any contact whatsoever with Skidmore's firearm, gun, holster, or gun belt. (Exh. 7, Biological Sciences Report pg.2).

Ultimately, Skidmore fatally shot Bonsignore by intentionally firing two (2) shots, based on his training, one to Bonsignore's chest and one to his head. (Exh. 1 - Skidmore 175:3-7). In a further act of disrespect to Bonsignore, Skidmore told Lt. Gozaloff to handcuff Bonsignore following the fatal shooting and did not seek medical attention for Bonsignore. (Exh. 1 - Skidmore Dep. 186:9-14).

Skidmore escalated his encounter with a man peacefully sleeping in the back seat of his car. Skidmore failed to de-escalate, failed to disengage, failed to await back-up, failed to implement less lethal options and deliberately presented a firearm in close quarters with a man in distress before consciously and deliberately shooting Bonsignore in the chest and in the head, needlessly and unreasonably ending the life of Mr. Jesse Bonsignore.(Exh. 2 - Longo Expert Report p. 10).

## POINT I
## DEFENDANTS USED UNREASONABLE DEADLY FORCE AGAINST PLAINTIFF

In order to establish his claim of excessive force under the Fourth Amendment, the Plaintiff must prove that Skidmore intended to commit acts that constitute a seizure as the Fourth Amendment is not implicated absent a governmental termination of freedom of movement through means intentionally applied. Excessive force is not determined by the Defendant Officer's intent to cause injury, but rather by the objectively unreasonable conduct of Skidmore from the moment he came upon Bonsignore asleep in his vehicle and continuing through Skidmore's admitted seizure and his intentional firing of two shots, killing Bonsignore. *Rodriguez v. City of New York*, 594 F. Supp. 3d 534 (E.D.N.Y. 2022). To evaluate excessive force, the totality of the circumstances involving Skidmore's interaction with Bonsignore must be evaluated. Neither defendants nor courts

may rely upon the so-called "moment of threat" rule where a law enforcement officer alleges the precise time he perceived a threat which induced him to undertake the use of deadly force, because that rule constricts the proper inquiry into whether the officer's use of force was objectively reasonable under the totality of the circumstances. *Barnes v. Felix*, 605 U.S. 73, 145 S. Ct. 1353, 221 L. Ed. 2d 751 (2025). The question facing this Court and ultimately the jury, regarding the assertion of excessive force in this case, is whether the deadly force deployed by Skidmore was justified from the perspective of a reasonable officer on the scene while taking account of both the individuals interests and the governmental interests at stake. *Id.* See also *Johnson v. New York State Police*, 659 F. Supp. 3d 237, 249 (N.D.N.Y. 2023). (This "objective reasonableness" inquiry is "necessarily case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake.")

There is a difficult problem in this case of opposing summary judgment regarding the use of deadly force, as the only witness in a position to directly contradict Skidmore's story is the person shot dead by Skidmore and therefore unable to testify. Therefore, the Court deciding the Defendants' motion for summary judgment on the basis of a qualified immunity defense premised on allegations of objective reasonableness may not simply accept the self serving account of the police officer who admitted committing the homicide. Rather, this Court must also consider circumstantial evidence, that if believed by a jury, would tend to discredit Skidmore's story. The Court must consider whether such evidence could convince a rational factfinder that Skidmore acted unreasonably." *O'Bert ex rel. Est. of O'Bert v. Vargo*, 331 F.3d 29 (2d Cir. 2003). When a rational factfinder could find that Skidmore's behavior was unreasonable, Defendants' motion for summary judgment must be denied.

Courts in the Second Circuit agree that under similar factual circumstances to this case, where the decedent was not suspected of any crime and posed no immediate threat, the use of deadly force would be unreasonable. *Johnson v. New York State Police*, 659 F. Supp. 3d 237, 250 (N.D.N.Y. 2023) (where Plaintiffs allege a Deputy used physical force in an ongoing attempt to restrain decedent, who was not suspected of any crime, did not pose any immediate threat to anyone's safety, and was not attempting to flee but was instead known by officers to be recovering from a serious medical episode). Under those facts the court found that it is impossible to conclude that the Deputy's alleged conduct was "objectively reasonable" as a matter of law. Indeed, the court found that it was hard to fathom how the use of any force was warranted under those circumstances.

Suffolk County Police Officers are trained to utilize what Defendants describe as a Use of Force Continuum. Suffolk County police officers have described the force continuum as beginning

> "with verbal commands. If the situation escalates you can use physical force to possibly restrain the individual. From there, if there is a physical threat of violence you can use your tools that you have on your belt, such as the tazer, the OC spray, the baton, which are nonlethal uses of force. From there, depending on if it escalates to possible serious physical injury to myself or other individuals or death you can escalate to lethal force." *See* Exhibit 3- Deposition of Casiano in case of *Emmanuel Johnson v. Suffolk County et al.,* CV-22-7741, at pp.30:12-31:3; 31:11-13.

This series of responsive force escalation is confirmed to be the Use of Force Continuum utilized by Suffolk County Police Officers. *Id* at p.31:11-18. See also Skidmore Dep. Pp.44:6-45:22; 50:4-11.

In this case, where Skidmore shot Bonsignore twice while Bonsignore possessed no weapon in his hands is objectively unreasonable, particularly when viewing the levels of force afforded Skidmore based upon his training regarding the use of force continuum which he was trained on by "[Suffolk County Police Department Staff] both as a Suffolk County Police Officer and as a cadet

5

or a candidate." (Exh. 1 - Skidmore Deposition 17:4-17; 51:11-52:17). The Use of Force Continuum is taught to all Suffolk County Police Officers and is not individualized nor does it allow for an individual assessment of the circumstances. This policy and procedure is described by Suffolk County Police Officer Casiano in the *Emmanuel Johnson* case and in Skidmore's deposition where he is asked whether the Use of Force Continuum is based upon his discretion. Skidmore replies "No" and the Use of Force Continuum does not afford him any discretion. (Ex. 1- Skidmore Dep. 46:22-49:5; 55:20-56:2). The amount of force proscribed by the Use of Force Continuum is based upon the actions of the person with whom the Officer is engaged. Skidmore confirmed in his deposition that the highest level of force would be the discharge of his gun and he would only use his gun in response to a high level of force being used against him. (Ex.1 - Skidmore Dep. 46:11-49:25; 61:12-17). In this case, there was not a high level of force used against Skidmore. Deadly force used by a Suffolk County Police Officer is to be used only to meet deadly force. (Ex. 1 - Skidmore Dep.: 46:11-21). Yet, despite this training regarding the limitations of deadly force, Skidmore insists that he is permitted to use whichever force he determines meets the situation. (Exh. 1 - Skidmore Dep.: 55:6-55:2). However, in this case, there is no evidence that Skidmore was in a position where deadly force may have been used against him. Therefore, there was no reason for Skidmore to resort to the use of deadly force. Skidmore exhibited this same disregard to the force policy and procedure when he shot Bonsignore twice while Bonsignore did not brandish a knife, nor did Bonsignore have possession of Skidmore's weapon. (*See* Exh.1 Skidmore Dep.: 172:10-15) Skidmore failed to consider his various options once he recognized that Bonsignore was in crisis. It is important to note that Bonsignore had committed no crime, and had not yet made any threats of violence against the officer when the officer first engaged. Even after allegedly making verbal threats, Bonsignore posed

6

no imminent threat to Skidmore that necessitated closing in and taking intentional steps to physically engage with someone who was clearly in crisis. (Exh.2 - Longo Expert Report p. 11). The shooting death of Bonsignore was the second documented instance where  Skidmore failed to follow procedures regarding the Use of Force and exhibited an excessive amount of force upon a person posing no threat. The circumstances leading to the death of Bonsignore eerily mimic the behavior for which Skidmore was disciplined previously. (Exh. 8 - Skidmore Personnel file, pg. 150 - 153 - "On or about 0105 hours on November 4, 2021, while Skidmore was handling a call of an aided case/injured person at or near the premises of 58 Railroad Avenue in Center Moriches, Skidmore, without justification, grabbed the shirt of a person and pulled such person towards Skidmore, and then Skidmore pushed such person, which resulted in such person falling to the ground. - Skidmore failed to submit a use of force report in connection with this incident and was charged under Policy 300.3 Use of Force and 300.5 Use of Force Reporting).

Moreover,  In addition to being trained on all uses of force and the legal principles underpinning such high risk and critical tasks, law enforcement officers in America have been trained in discerning when a person is in crisis and the steps that can be taken to slow down an encounter and mitigate an escalation that may result in the need to use force. (Exh. 2 - Longo Expert Report at 11) Officers who are properly trained in Crisis Intervention are taught to identify persons in crisis and use basic de-escalation skills to gain control of a situation, maintain a safe environment for the person in crisis and the involved officer(s), and decide as to the need for further mental health evaluation or the voluntary seeking of mental health services. (Exh. 2 - Longo Expert Report at 12).

As a result of the foregoing, of a Fourth Amendment excessive force claim, Skidmore's prior training in the Use of Force Continuum and the training he received regarding interactions with

persons in crisis must be weighed under the totality of the circumstances analysis of whether or not he acted in an objectively reasonable manner when shooting Bonsignore. When considering the mandated Use of Force Continuum and training on everything a police officer needs which Skidmore contends he received and has failed to use more than once, combined with the actual use of force used against Bonsignore, the use of force was objectively unreasonable and clearly contrary to established policy and procedure. Therefore based upon these facts presented in the record, there is minimally material dispute as to the reasonableness of Skidmore's actions and Plaintiff can sustain her excessive force claim.

Should the Court not find that the failure to follow the Use of Force Continuum and officer training related to interaction and de-escalation with mentally disturbed civilians, which are clearly established policies of the Suffolk County Police Department, Plaintiff can still maintain her excessive force claim as Skidmore had no reason to escalate his use of force against Bonsignore based on a careful review of the facts in the record.

To begin, although Skidmore asserts that he was in fear for his life, Skidmore stated in sum and substance, "[Bonsignore] did not pull a knife on me" when asked about the circumstances which occurred while Skidmore was laying on top of Bonsignore. (Exh. 1- Skidmore Dep. 172:10-15). Even though Skidmore attributes some of his fear to Bonsignore allegedly touching his holster, during his deposition Skidmore stated he pulled his gun out using the motion of pressing down on the gun and pulling up on the gun in order to activate a lever. (Exh. 1- Skidmore Dep. 179:17-180:7). Skidmore's lieutenant, Thomas Gozaloff, provided deposition testimony that also described this two-step process which must be achieved in order to draw a weapon from an officer's holster, and to the best of his knowledge asserted that this level of retention provides additional safety for

the officer and absent some specialized knowledge on the part of someone who may be attempting to defeat these retention measures, the officer's weapon would remain secure. (Exh. 2 - Longo Expert Report p. 8). Moreover, there is no evidence in the record which supports Bonsignore knew of these measures.

Additionally, there is no evidence whatsoever that Bonsignore had committed or threatened to commit any acts of violence prior to or throughout his initial contact with Skidmore. (Exh. 2 - Longo Expert Report p. 12). It is clear from these facts and circumstances that Bonsignore was not a threat to Skidmore and in the absence of any threatening action taken by Bonsignore, it remains objectively unreasonable for Skidmore to escalate the situation on his own and then use deadly force to shoot Bonsignore twice. (Exh. 2 - Longo Expert Report p. 10).

Lastly, although Defendants contend that in the case of *Tennessee v. Garner* 471 U.S. 1 (1985) "deadly force may not be used unless it is necessary to prevent an escape *and* the officer has probable cause to believe that the subject possesses a significant threat of death or serious physical injury to the officer or others" and they claim this supports the position that "established precedent makes it clear that when the threat of serious bodily harm or death is perceived reasonably to be of an imminent nature—as is present in this matter—the law enforcement officer may immediately use deadly force to repel that threat", it does not. Further, the presence of the operative word *and* in the case makes the case completely inapplicable to the facts at hand as Bonsignore was not attempting to escape and there are no allegations which have arisen in the course of this action that would support he was. The law remains that, "It is not objectively reasonable for an officer to use deadly force to apprehend a suspect unless the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others. *See, e.g., Tennessee*

*v. Garner,* 471 U.S. 1, 3, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). Here, as Bonsignore posed no threat and by Skidmore's own admission did not attempt to pull the knife while he was on top of him, it was objectively unreasonable for Skidmore to believe a serious threat of death or physical injury existed thus making it objectively unreasonable to use deadly force on Bonsignore.

As a result of the foregoing, Plaintiff's claim for excessive force must survive.

## POINT II

## <u>DEFENDANTS' LACKED PROBABLE CAUSE TO ARREST PLAINTIFF</u>

The actions of Skidmore must be examined with the fine tooth comb of the evidence as this is a civil rights case where the victim of the violation is deceased due to the actions of the Defendants. In cases such as the case at bar, where the plaintiff's decedent is alleged to have died due to the defendants' malfeasance, the Court on a defendants' motion for summary must give still extra deference to the plaintiff. Where "the witness most likely to contradict" a defendant officer's testimony is dead and thus unavailable, "the court may not simply accept what may be a self-serving account by the [law enforcement] officer." *O'Bert ex rel. Est. of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) (internal quotations and citations omitted); *see also Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017) ("the court may not simply accept what may be a self-serving account by the [law enforcement] officer but must instead consider circumstantial evidence that, if believed, would tend to discredit the [ ] officer's version and must undertake a fairly critical assessment of, inter alia, the officer's original reports or statements to decide whether the officer's testimony could reasonably be rejected at a trial.") (cleaned up); *Flythe v. D.C.*, 791 F.3d 13, 18-22 (D.C. Cir. 2015). Bonsignore is not present to tell his truths. But the evidence in this case provides a frame work for the Court to see that the issue of probable cause at best is a question for the Jury and is not an

10

established fact.  The words of Bonsignore, however, are present in this case.  The video evidence (Exhibit 5) provides the support that the at a minimum raise questions that question probable cause. The fact that Skidmore can be heard on the video using an aggressive and elevated tone with Bonsignore whom has just been awaken from a sleep cannot be denied.  This fact must also been seen as creating  questions in light of about Bonsignore's clear statement of protest which states, **"that's fucked up!".** (Emphasis added).  This statement, found at 0:10 of the video (Exhibit 4) is both chilling and telling.  Defendants attempt to concoct a fiction that Bonsignore could have been arrested for allegedly violating "vehicle and traffic infractions including but not limited to parking in a no parking  zone" is unsupported by the evidence.  While the self-serving testimony of Skidmore is offered, it is not corroborated by any thing offered by the Defendants.  Not only do the Defendants fail to point to any indication that this road has been so designated as a "no parking zone", all the more, Defendants fail to tell the Court the local, state or other law or ordinance the so designates this area as a "no parking zone".  In fact, the evidence is that this area was devoid of any signs, devoid of any postings of any kind, and devoid of any other form of waning that would support the Defendants bald and conclusory assertions.  The Crime Scene video evidence(Exhibit 9) filmed by Det. Rieppel shows the area where Bonsignore was executed and illustrates that there is nothing designating this grassy area on the side of the road is a "no parking zone". (Def. MOL page 12). Further, the testimony of Lieutenant Thomas Gozaloff refutes any attempt by Skidmore to feather his own bed when it comes to probable cause and supports Plaintiffs' position that there was no vehicle and traffic infraction.  He testifies that:

Q. Was there any violation regarding where Bonsignore's vehicle was situated when you arrived?
A. Not that I know of.
Q. Did you see any signs or anything that indicated that the vehicle should not have been where you
    saw it?

11

A. I don't recall if there were signs there, no. (Exhibit 5 - Gozaloff Deposition pp 63:18-64:2).

The issue of there being probable cause to arrest for "no registration and no front license plate" once again is unsupported by any actual law or section of the Vehicle and Traffic law to which the  Defendants point the Court and Plaintiff's Counsel.  The evidence in this case is that by the time Skidmore had physical contact with Bonsignore there was no issue about Bonsignore's identity,  nor was there any issue about any Vehicle and Traffic Law violation.  Thus, there was no probable cause that he was in violation of any infraction as to his registration or the validity of his license plates.  The testimony of Skidmore provides that he did not believe, nor was there a basis to believe that Bonsignore was violating any law.  His testimony continues to raise questions of fact. (See Exhibit 1 Skidmore Dep. pp. 91:4- 94:19).

This testimony demonstrates that there was no valid basis or probable cause to arrest Bonsignore about being unregistered nor was there any question about the validity of his license plate.  The fact is that Skidmore says, in his own words, "I'm 100 percent not sure of  exactly what they said because I could tell you this much, dispatch did not give me any reason to be alarmed based on what I had, which is kind of what we are looking for when we run a plate. Stolen vehicle, wanted subject, things of that nature."  The fact that the plate and registration was "valid" and that there was not "any reason to be alarmed..." negates any claim of probable cause for lack of registration, identity or authenticity of the plate for that car.  If there was no basis which would support probable cause based on unspecified vehicle and traffic law violations begs that question as to the other hypothetical crimes Defendants try to fashion, as they attempt to avoid liability and the consequences of their actions.

Resisting arrest, the claim of the charges of Menacing and Obstructing Governmental

Administration must fall. The evidence is clear that Bonsignore did not know he was being arrested or even handcuffed, was never told do and was never told to put his hands behind his back. (Exhibit 1-Deposition of Skidmore pp. 141:15-144:4, 144:19-145:3). There was no valid arrest as there was no arrest. There was unauthorized and excessive force initiated and carried out by Skidmore. According to Skidmore that cuffing was for safety not for the commission of any crime or infraction. But now the Defendants claim there was an arrest. If there was never probable cause to support the initial engagement of Bonsignore for parking, or non-registration, then any thing that follows cannot give rise to probable cause and same cannot be manufactured by Defendants.

The charge of Obstruction of Governmental Administration requires a showing that the defendant prevented a public servant from performing an official function (Penal Law § 195.05). Further, the official function must be authorized. *People v. Lupinacci*, 191 A.D.2d 589, 595 N.Y.S.2d 76 (App. Div. 2nd Dept.1993); *Matter of Anthony B.*, 201 A.D.2d 725, 608 N.Y.S.2d 302 (App. Div. 2nd Dept.1994). The allegations in the instant case fail to show that the Bonsignore, interfered with a lawful arrest, as there are no facts which establish this element of the Defendants to shield themselves with this charge (see CPL § 100.15(3)). At the outset, the bald claim that Defendants could find probable cause in arresting Bonsignore with obstruction of governmental administration fails to state the most basic elements of the charge and fails to be supported by the facts. If the official act is the grabbing, handcuffing, throwing to the ground and shooting of Mr. Skidmore, the Defendants have not articulated facts which support their position. Just listing alleged theories of the what Defendants can now try to fashion as something, anything to try give them safe passage to probable cause cannot be done as Defendants have attempted. They do no examination of the crimes/violations they claim to be supportive of their quest for probable cause and thereby

qualified immunity.

Penal Law § 205.30 states that "A person is guilty of resisting arrest when he intentionally prevents or attempts to prevent a police officer or peace officer from effecting an authorized arrest of himself or another person." CPL § 205.30. "The Statute requires that the arrest be authorized." *People v. Alejandro*, 70 NY 2d. 133, 135 (1987). "The crime of resisting arrest does not occur if the arrest is illegal or unlawful." *People v. Stevenson*, 31 NY2d. 108 (1972).  Here, the Defendants have failed to demonstrate by any specific and particular facts, which, along with any logical deductions, would justify the arrest of the Bonsignore for "obstruction of governmental administration." *People v. Reese*, 5 Misc.3d 1030(A), 799 N.Y.S.2d 163 (N.Y.Dist.Ct. Suf. Co.,2004). "Further, under the Penal Law, an essential element of the offense of Resisting Arrest (PL § 205.30) is the requirement that there be an 'authorized' arrest." *Infra*. Thus, the any claim to have the basis to arrest must have been made in accordance with the law, including a finding that the arrest was premised on probable cause." *People v. Reese, supra; citing, People v. Jensen*, 86 N.Y.2d 248 (1995); *People v. Peacock*, 68 N.Y.2d 675, 505 N.Y.S.2d 594 (1986).  Here, the evidence and allegations do not give reasonable cause to believe that Bonsignore's arrest would be authorized. "It is an essential element of the crime of resisting arrest that the arrest be authorized and, absent proof that the arresting officer had a warrant or probable cause to arrest [Bonsignore] for commission of some offense, a conviction cannot stand" *Alejandro*., citing, *People v. Peacock*, 68 N.Y.2d 675, 505 N.Y.S.2d 594; *People v. Carneglia*, 63 A.D.2d 734, 405 N.Y.S.2d 298; *People v. Harewood*, 63 A.D.2d 876, 406 N.Y.S.2d 44. The defendants cannot create probable cause and attempt to use that which they manufacture to justify their ends.

Further, the conflicting testimony of Skidmore with that of his Lieutenant,  at best leave questions as to what they knew from and about what was transpiring with 911 operators.  At worst, the

14

facts demonstrate that any claims or belief of criminal wrong doing had been wiped clean before Skidmore placed hands on Bonsignore and the any suggestion that the seizure was justified or could be justified is debunked (Ex.1- Skidmore Deposition p 88:8-24,) (Ex. 5- Gozaloff Deposition pp 63:10-21)

There was no probable cause to arrest, charge or prosecute Bonsignore. The probable cause analysis presents triable disputes of fact. In the Second Circuit, the warrantless arrest of an individual is presumptively unlawful. *Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003). Defendants bear the burden of "raising and proving the affirmative defense of probable cause." *Id.* Whether probable cause or reasonable suspicion exists is an objective inquiry. *Holeman v. City of New London*, 425 F.3d 184, 190 (2d Cir. 2005) (citing *Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). "[T]he existence of probable cause is to be determined on the basis of the totality of the circumstances…through an inquiry into whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause or arguable probable cause to arrest." *Hargroves v. City of New York*, 411 F. App'x. 378, 383 (2d Cir. 2011) (citing *Kent v. Katz,* 312 F.3d 568, 576 (2d Cir. 2002) and *Devenpeck v. Alford,* 543 U.S. 146, 153, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004)).

"[U]nder some circumstances, a police officer's awareness of the facts supporting a defense can eliminate probable cause." *Jocks v. Tavernier*, 316 F.3d 128, 135 (2d Cir. 2003). The conclusion and documenting that the registration was "valid", and Skidmore's being advised being advised of this fact clearly supports that there was an determination by the Defendants that there was no probable cause to arrest. The fact that they now seek to manufacture and re-engineer what is in the record does not change the lack of probable cause. "[N]o probable cause exists to arrest where a suspect's actions are too ambiguous to raise more than a generalized suspicion of involvement in criminal activity." *Davis v. City of New York*, 902 F.Supp.2d 405, 445 (S.D.N.Y. 2012) (quoting *United States v. Valentine*, 539 F.3d

15

88, 94 (2d Cir. 2008)).

Here, as described above and in Plaintiff's Local Civil Rule 56.1 Counterstatement, *generally*, Plaintiff has raised disputes of fact which preclude summary judgment. A jury that reviews the video evidence and compares same to the false testimony of the Defendants would easily credit an account of innocence, which finds abundant support in the record. In doing this evaluation the jury could easily conclude that probable cause to arrest Plaintiff was lacking.

The entirety of defendants' argument on probable cause is that the Court should adopt defendants' version of the events, without even considering, let alone crediting, the compelling evidence of Plaintiff's innocence and the contradictions in Defendants' records and testimony that support Plaintiff's opposition to a finding of probable cause. To adopt same would be error. Plaintiff is entitled to have a jury decide the factual questions presented in this case. This is especially true given that sibling Circuits agree with the Second Circuit in cases such as this that it would be error at summary judgment to "uncritically adopt" the movant's "version of events during a crucial portion of the encounter not captured on video." *Krueger v. Phillips*, 154 F.4th 1164, 1178 (10th Cir. 2025). "Where the victim . . . is unable to testify, courts should be cautious to ensure that the [defendant] is not taking advantage of the fact that the witness most likely to contradict his story . . . is unable to testify." *Rush v. City of Philadelphia*, 78 F.4th 610, 617 n.9 (3d Cir. 2023) (cleaned up; internal citations omitted). Instead, courts should "avoid[] simply accepting what may be a self-serving account by [the defendant] and look[] to circumstantial evidence that, if believed, would tend to discredit the [defendant's] story, and consider whether this evidence could convince a rational fact finder." *Ibid*.

Accordingly, defendants are not entitled to summary judgment on plaintiff's false arrest claims under federal or state law.

16

## POINT III
## FABRICATION OF EVIDENCE

Plaintiff voluntarily withdraws the this claim.

## POINT IV
## THE *MONELL* CLAIM REGARDING EXCESSIVE AND/OR UNREASONABLE FORCE IS VIABLE AND MUST PROCEED TO A JURY

Municipal liability under § 1983 does not lie only where the official policy or ordinance in question is itself unconstitutional; where a city's official policy is constitutional, but the city causes its employees to apply it unconstitutionally, such that the unconstitutional application might itself be considered municipal policy, the city may be held liable for its employees' unconstitutional acts. *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113 (2d Cir. 2004).

"Where plaintiffs allege that their rights were deprived not as a result of the enforcement of an unconstitutional official policy or ordinance, but by the unconstitutional application of a valid policy, or by a city employee's single tortious decision or course of action, the inquiry into municipal liability under § 1983 focuses on whether the actions of the employee in question may be said to represent the conscious choices of the municipality itself." *Id.*

Monell's policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions. *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007). Such a pattern, if sufficiently persistent or widespread as to acquire the force of law, may constitute a policy or custom within the meaning of Monell. *Id*. The use of force in this case is not so different from that in *Gonzalez (Estate of Kenny Lazo) v. Suffolk County* No.: CV-09-01023 EDNY 2009; *McCune v. Suffolk* NO.: CV-14-4431; *Est. of Jackson by Jackson v. Cnty. of Suffolk*, No. 2:12-CV-1455, 2019 WL 3253063 (E.D.N.Y. July 19, 2019); *Kelly v. County of Suffolk*, No.:CV-21-

17

6685; *Kirby v. County of Suffolk,* No.:CV-16-7161 . These are just examples of the scores of cases in which excessive force by Suffolk County Police have occurred. In each of those cases, force resulting in injury took place at the hands of SCPD and nothing was done to address the force that led to the serious injuries or death. This pattern and practice, especially and specifically by Skidmore, necessitates accountability. Such a pattern by Suffolk County and SCPD, is sufficiently persistent and/or widespread as to acquire the force of law and thus constitutes a policy or custom within the meaning of Monell. *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007).

A Municipality's consistent failure to discipline police officers [as we see with Suffolk County] gives rise to the finding of an implicit policy. Therefore, if senior personnel have knowledge of a pattern of constitutionally offensive acts by subordinates and senior personnel fail to take remedial steps, a municipality may be held liable under civil rights statutes for subsequent violations, but Plaintiff must link the behavior in question to the policy of failure to discipline. *Anderson v. City of New York*, 657 F. Supp. 1571 (S.D.N.Y. 1987). In Plaintiff's expert report, he concluded: "***In this case, the administrative review may never have fully developed as is evidenced by the fact that neither Officer Skidmore nor Lieutenant Gozaloff was never interviewed by the police department's Internal Affairs element. In my opinion, the absence of such a review is contrary to generally accepted law enforcement practices***."(Exhibit 2- Longo Expert Report at pg 15).

Here, although in conclusory fashion Defendants contend that Plaintiff has not established the constitutional violation of excessive force, such is incorrect. (*See* Point I). To reiterate, based on the facts, it is disputed by Defendants whether Skidmore used excessive force when he killed Bonsignore by shooting him twice. That claim should proceed to a jury. As to the *Monell* claim, Defendants contend: (1) there is no evidence to establish a violation of Plaintiff's constitutional right nor a County

18

custom, policy or practice; (2) Plaintiff has shown no evidence of a County policy, custom or practice that led to or was the proximate cause of a constitutional violation; and (3) the *Monell* claim is conclusory with little or no evidence to support. All three points are essentially the same and all three are incorrect.

Defendants intentionally ignore Plaintiff's Police Practice expert who opined on SCPD's unacceptable police practices and Skidmore's use of excessive force when he shot and killed Mr. Bosignore (Exhibit 2 - Longo Expert Report). Defendants not only failed to hire a rebuttal expert, they failed to address Mr. Longo's report at all. Mr. Longo not only concluded "***I believe that Officer Skidmore's use of deadly force was premature, unnecessary, unreasonable, and contrary to generally accepted law enforcement practice***", but additionally, concluded: "***I believe that it is irresponsible to rely solely upon a criminal investigation report, such as that which was prepared by the AG's office, given its narrow scope. The subsequent administrative investigation takes a deeper dive into the event and examines the officer's tactics, decision making, as well as any departure from policy and training. If what occurred in this case is consistent with the manner in which deadly force actions are reviewed by the department, I am of the opinion that this practice is contrary to generally accepted policing practice***." (Exhibit 2 at pgs 10 and 18). Although Defendants seek to ignore Plaintiff's expert's detailed report, it is clear that the constitutionally violative actions of Skidmore were addressed and Suffolk County was on notice regarding their lack of training, their lack of de-escalation tactics, and the failure to properly investigate excessive force claims/complaints or not investigating them at all, were also addressed regarding Plaintiff's *Monell* claim.

Time and time again, Suffolk County lacks accountability for their officers utilizing excessive and deadly force, as in this matter. Skidmore was not placed on any administrative leave nor interviewed

by Internal Affairs. The only times Suffolk County Police Officers have to even answer for their actions are through civil litigation. (*See Gonzalez v. Suffolk County* No.: CV-09-01023 EDNY 2009; *McCune v. Suffolk* NO.: CV-14-4431; *Est. of Jackson by Jackson v. Cnty. of Suffolk*, No. 2:12-CV-1455, 2019 WL 3253063 (E.D.N.Y. July 19, 2019); *Kelly v. County of Suffolk*, No.:CV-21-6685; *Kirby v. County of Suffolk,* No.:CV-16-7161). Otherwise, the custom, policy, and practices of Suffolk County Police Department never changes and the officers involved in the constitutional violation rarely get disciplined and suffer no monetary punishment. With a pattern of misconduct that is so pervasive, and the County choosing to do nothing, the County has acquiesced or tacitly authorized their subordinates' wrongful actions. *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007). Plaintiff argues that Suffolk County encourages such wrongful actions as there is never any recourse or accountability. Therefore, based on the entire record including but not limited to Mr. Longo's report, there is ample evidence of a custom, policy, and practice of officers utilizing excessive force and the County turning their head and eyes away from the issues.

As argued below, qualified immunity does not apply in any fashion to any aspect of this case. Even if Skidmore were entitled to qualified immunity, which he is not, a finding of qualified immunity for individual defendants does not bar a *Monell* claim. *Fields v. City of Philadelphia*, 862 F.3d 353 (3d Cir. 2017); *Askins v. Doe No. 1*, 727 F.3d 248, 252–54 (2d Cir. 2013) (fact individual officer prevailed on qualified immunity defense does not preclude imposition of municipal liability); *Gray v. City of Detroit*, 399 F.3d 612, 617 (6th Cir. 2005) ("When an officer violates a plaintiff's rights that are not 'clearly established,' but a city's policy was the 'moving force' behind the constitutional violation, the municipality may be liable even though the individual officer is immune."); *Gibson v. County of Washoe*, 290 F.3d 1175, 1186 n.7 (9th Cir. 2002), overruled on other grounds by *Castro v. Cnty. of Los*

20

*Angeles*, 833 F.3d 1060, 1069 (9th Cir. 2016) ("[A] municipality may be liable if an individual officer is exonerated on the basis of the defense of qualified immunity, because even if an officer is entitled to immunity a constitutional violation might still have occurred."); *Chew v. Gates*, 27 F.3d 1432, 1438–39 (9th Cir.1994); *Newcomb v. City of Troy*, 719 F. Supp. 1408, 1416–17 (E.D. Mich. 1989); see *Owen v. City of Independence*, 445 U.S. 622, 650-52, 100 S. Ct. 1398, 1415-16 (1980) (holding municipalities should not benefit from qualified immunity enjoyed by individual defendants since "many victims of municipal malfeasance would be left remediless" under such a holding).

Hence, the *Monell* claim should proceed to trial.

## POINT V
## OFFICER SKIDMORE IS NOT ENTITLED TO QUALIFIED IMMUNITY

Defendants contend that even if the Court finds evidence to overcome Skidmore's motion on the grounds described above, he is nonetheless protected from §1983 liability by the principle of qualified immunity. This argument fails because disputes of fact preclude granting qualified immunity to Skidmore on Plaintiff's claims.

### *Doctrine of Qualified Immunity*

Officers are not entitled to qualified immunity if "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.' See *District of Columbia v. Wesby*, 583 U.S. 48, 62–63, 138 S.Ct. 577, 199 L.Ed.2d 453 (2018), and *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014). In determining the existence of such a right, courts in this circuit "look to Supreme Court and Second Circuit precedent existing at the time of the alleged violation to determine whether the conduct violated a clearly established right." *Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 433 (2d Cir. 2009). The Supreme Court has "repeatedly told courts...not to define clearly established law at a high level of generality, since doing

21

do avoids the crucial question [of] whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014).

In a recent decision, the Supreme Court the second prong of the qualified immunity analysis asks whether the "unlawfulness of [the official's] conduct was 'clearly established at the time' ". *Zorn v. Linton*, No. 25–297, 2026 WL 795469, at *5 (U.S. Mar. 23, 2026), *Wesby*, 583 U.S., at 63, 138 S.Ct. 577. This analysis requires assessing whether the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right," *Id.*5, *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "[E]arlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established," *Id. Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002), ***but there need not be a*** " ' ***"case directly on point,"*** ' *Id. White v. Pauly*, 580 U.S. 73, 79, 137 S.Ct. 548, 196 L.Ed.2d 463 (2017) (emphasis added ) Summary judgment must be denied where there are genuine disputes of material fact regarding whether a defendant officer acted reasonably in using deadly force. *See  Bouche v Oliveri*, 506  Fed Appx 29, 30 (2d Cir 2012).

In excessive force cases, these steps often converge into a single question: whether a reasonable officer in those specific circumstances would have believed the force used was lawful. *Id.* at 822. Determining whether a given use of force is excessive requires a "careful balancing of ' "the nature and quality of the intrusion on the individual's Fourth Amendment interests" ' against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

It is clearly established that a traffic stop violates the Fourth Amendment unless the officer making the stop has "probable cause or reasonable suspicion that the person stopped has committed a

traffic violation or is otherwise engaged in or about to be engaged in criminal activity." *United States v. Gomez,* 877 F.3d 76, 86 (2d Cir. 2017) (citation omitted). This inquiry depends on the " 'totality of the circumstances,' " "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, ... whether [s]he is actively resisting arrest or attempting to evade arrest by flight," ibid., the "relationship between the need for the use of force and the amount of force used[, and] the extent of [her] injury," *Kingsley v. Hendrickson*, 576 U.S. 389, 397, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015).

A. Skidmore Is Not Entitled to Qualified Immunity

Skidmore is not entitled to qualified immunity because his conduct violated Bonsignore's' clearly established Fourth Amendment rights.  The conduct of Skidmore fails both prongs of *Wesby* and *Torreso*  qualified immunity analysis. First, Skidmore violated Mr. Bonsignore's constitutional right by initialing a seizure resulting without "probable cause or reasonable suspicion" that Plaintiff had committed any criminal activity. *United  States v. Gomez,* 877 F.3d at 86. There was no sign indicating no parking as stated by Skidmore. At the time Skidmore arrived on the scene, he did not see Bonsignore engage in any criminal activity and he did not see whether there was a sign posted which prohibited Bonsignore from parking there. (Plaintiff's Statement of Disputed Facts ¶ 6, Plaintiff's Counter-statement of Facts ¶ 3,  Exh. 1 - Skidmore Dep.  88:8-24,  90:19-91:3). Because there was a total "lack of observed criminal activity," any subsequent use of force was "objectively unreasonable" under the "totality of the circumstances." *Graham v. Connor*, 490 U.S. at 396. Specifically, there was no "immediate threat to the safety of the officers or others" based on the subjective Skidmore's  own testimony stating Bonsignore did not pull a knife on him.  (Plaintiff's Counter-statement of Facts ¶23, 28 , Exh 1 - Skidmore Dep.  172:6-15).

23

Further, Skidmore continuing to apply force after any alleged "threat ha[d] subsided," when has shot Bonsignore twice, and Skidmore ignored the "relationship between the need for the use of force and the amount of force used." *Kingsley v. Hendrickson,* 576 U.S. at 397. Skidmore consciously and deliberately drew his firearm in a close quarter situation having not been presented with a circumstance that necessitated deadly force and thus exposed the weapon to a person in crisis which escalated a situation that could have otherwise been avoided. (Plaintiff's Statement of Disputed Facts ¶ 34, Exh. 2 - Longo Expert Report p. 9) The use of deadly force against Bonsignore was premature, unnecessary, unreasonable, and contrary to generally accepted law enforcement practice. (Plaintiff's Final 56.1 With Counter statement of Facts ¶47, Exh. 2- Longo Expert Report p. 10). Based on the facts described above, no reasonable officer could have believed that such a "nature and quality of the intrusion" conducted by Skidmore resulting in the death of Bonsignore was lawful under these "particular circumstances." *Okin*, 577 F.3d at 433; *Graham,* 490 U.S. at 396.

B.  Skidmore's Unreasonable Use of Deadly Force Precludes Summary Judgment

Defendants' motion for summary judgment must be denied because there are "genuine disputes of material fact regarding whether Skidmore acted reasonably in using deadly force against Mr. Bonsignore. *Bouche v. Oliveri*, 506 Fed. Appx. 29, 30 (2d Cir 2012). Here, the facts as disputed by Plaintiff suggest Skidmore continued to shoot at Bonsignore after it was no longer reasonable to believe that he posed a threat of death or serious physical harm. Despite the officer's assertion, there is no physical, photographic, or forensic evidence that confirms that Bonsignore had any contact whatsoever with Skidmore's firearm while it was holstered. Moreover, because there is no independent evidence that confirms Bonsignore's attempts to disarm the officer or otherwise engage with his firearm once it was consciously and deliberately un-holstered by Skidmore, the determination as to the credibility of

24

that account remains within the province of the court. (Plaintiff's Statement of Disputed Facts ¶ 32, Exh. 2 Longo Expert Report p. 9).    This is clearly a matter of credibility as if this statement is true, Bonsignore could have been grabbing Skidmore's write to prevent Skidmore from shooting him. *Id.* The reasonableness of Skidmore's conduct is a question that must be reserved for a jury and summary judgment raised on this issue must be denied at this phase.

Therefore, it is clear that Skidmore is not entitled to qualified immunity as the use of force on Plaintiff was not objectively reasonable and a material issue of fact exist as to the circumstances leading up to the officer's violations of Plaintiff's Fourth amendment rights that apply to the qualified immunity analysis.

**POINT VI**

**PLAINTIFFS' STATE LAW CLAIMS SHOULD**
**BE HEARD BY THIS COURT AND SURVIVE**

All of Plaintiffs' State Law claims should be heard by this jury and this Court. In order for a Federal court to exercise pendent jurisdiction over State claims, the Federal claims must be substantial and the Federal and State claims "must derive from a common nucleus of operative fact" and be such that plaintiff would be expected to try them all in one judicial proceeding. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966).  "Nor would the state claims 'predominate,' so long as the federal claim remains in the case. In addition, the risk of jury confusion can be reduced by 'judicious use of special verdicts and carefully drawn instructions.'"*Liscio v Warren*, 901 F2d 274, 277 (2d Cir 1990); *quoting  Miller v. Lovett*, 879 F.2d 1066, 1073 (2d Cir. 1989) (requiring district court to  exercise pendent jurisdiction over state claims for negligence and assault and battery in suit under § 1983 against police officers for use of excessive force).

The State claims of assault and battery, contrary to Defendants argument are not duplicative and

25

should be determined in the instant matter. Defendant focus on the Intentional Infliction of Emotional Distress and Negligent Infliction of Emotional Distress. Plaintiff voluntarily withdraws the Intentional Infliction of Emotional Distress and Negligent Infliction of Emotional Distress claims to avoid and jury confusion and to streamline the presentation of evidence in this matter.

**CONCLUSION**

There are numerous disputed material issues fact in this matter. As such, other than false arrest, all claims by Plaintiff should survive the Court should deny Defendants' motion for summary judgment as to each claim alleged by Plaintiff.

Dated: Hempstead, New York
April 2, 2026

Respectfully submitted,

LAW OFFICES OF
FREDERICK K. BREWINGTON

By: */S/ Frederick K. Brewington*
FREDERICK K. BREWINGTON
*Attorneys for Plaintiff*
556 Peninsula Boulevard
Hempstead, New York 11550
(516) 489-6959

26

## **CERTIFICATION**

**PLEASE TAKE NOTICE**, that pursuant to Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Cobia M. Powell, an attorney duly admitted to practice law before the courts of New York State and the Eastern District of New York, hereby certifies that Plaintiff's memorandum of law in Opposition to Defendants' Summary Judgment sets eight thousand three hundred seventy-five (8,375) words, and that the affirmant further certifies that the word count complies with the limit of eight thousand seven hundred and fifty (8,750) words, not including the caption, any index, table of contents, table of authorities, signature blocks, or any required certificates, pursuant to Local Rule 7.1(c). I relied on the word count of the word processing system used to prepare the document, which was the "Word Count" feature of Microsoft Word.

Dated: Hempstead, New York
        April 2, 2026

/s/ Cobia M. Powell
COBIA M. POWELL